## TERMS and CONDITIONS

Therefore, the parties hereby have agreed to the terms and conditions stipulated hereinafter to develop, improve, and build the subject property -lot 1 through 5- for profit.

1. Due to the facts that all of the approval and subdivision agreement have been executed by and between DIMAS, LLC. and City of Milpitas, CA. and Preliminary Public Subdivision Report from D.R.E. has been issued and Final Public Subdivision Report is pending to be issued. It is very difficult to change the title from DIMAS, LLC. to the Joint Venture Parties without affecting the approval process and further delay of the project. Therefore the parties have agreed to let DIMAS, LLC. maintain the title of the subject property as the owner of the record and DIMAS, LLC. will permit a deed of trust in the amount of **One Million Two Hundred Thousand Dollars ($1,200,000.00)** to be recorded in favor of **the company** upon close of escrow.

2. The Company will invest **One Million Two Hundred Thousand Dollars ($1,200,000.00)** to the Joint Venture as needed working capital for the project.

3. The Company will keep existing mortgage from Investment Grade Loans, Inc.

4. The Owner will invest the net equity of the subject property, which is determined by the following terms agreed upon between the Owner and the Company; (a) The subject property will be valued at **Five Million Dollars ($5,000,000.00)** less encumbrances against the property, which is **Two Million Seven Hundred Ten Thousand Dollars ($2,710,000.00)** stated in the Preliminary Title Report issued by Stewart Title Insurance Co. dated August 24, 2000.

5. The profit sharing from **the Joint Venture** (income generated from Lot 1 through Lot 5) shall be as follows:

    5.1  Return the Company's original One Million Two Hundred Thousand Dollars ($1,200,000.00) Investment.

2

5.2 Then the Company will receive additional One Million Two Hundred Thousand Dollars ($1,200,000.00) as return of the investment.

5.3 Then return the land Owner's equity adjusted according the final balance of the capital account of the land owner's in the joint venture.

5.4 Then the final distribution to (a) DIMAS, LLC. – 50.00%; (b) the Company – 50.00%.

6. The return of **DIMAS, LLC.**'s equity will be stated as follows: (a) Lot No. 6 in the pre-determine value of $1,000,000.00; (b) the balance of the net equity in the form of cash which will be adjusted according to the Capital Account of **DIMAS, LLC.** reflected in the accounting of the Joint Venture. And the distribution according the above paragraph 5.0

7. The Joint Venture will employ John Ho (**Ridge View Investment Ltd., LLC.**) as its sole project manager to conduct daily business affair of The Joint Venture. The compensation for the project management fee will be at **5%** of total project cost indicated at project cost and profit analysis statement (see attached in Exhibit "E"). The duty and responsibility of the project manager will be stated in the contract agreement between The Joint Venture and **John Ho (Ridge View Investment, Ltd., LLC.)** The project management fee will be paid on the progress payment basis for the duration of the entire project (see attached project cash flow analysis as Exhibit "F").

8. Upon execution of this Joint Venture Agreement, The Company will pay DIMAS, LLC. Five Hundred Fifty Thousand Dollars ~~Two~~ ($250,000.00) from its general funds which will deduct from **DIMAS, LLC**'s equity in the Joint Venture as the Rakitin family's living expenditure for the fiscal year of 2001 and 2002 and reimbursement for the direct project related cost.

9. The Company will open a Bank Account with Bank of America located at Fremont, CA. - Beacon Branch - for the purpose of receiving and disbursing all the funds ~~related to the Joint Venture business.~~ Milpitas Countryside Estate Development, Inc. will be the party in charge of the disbursement of the funds for improvement and construction of the project development.

3

10. This Agreement shall not be modified or changed without the all parties approval and consent.
11. The Laws of the state of California shall be the governing laws in the events of dispute
12. Each of the persons signing this Agreement covenant that he or she has the authority to enter the Agreement and to bind the signing party.

IN THE WITNESS WHEREOF, the parties have executed this Joint Venture Agreement

Milpitas Countryside Estates Development, Inc.
a California Corporation
BY: _____ 6/22/01
    Tony Hu
Its: _____President_____
DATE: _____

DIMAS, LLC.
BY: _Adrienne L. Rakitin, Principal_
    Adrienne Rakitin, Principal
DATE: __6/25/01__

4

D1111

EXHIBIT G



Entered on Docket
July 24, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**NOT INTENDED FOR PUBLICATION**

The following constitutes
the order of the court. Signed July 23, 2007

*Marilyn Morgan*
**Marilyn Morgan
U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>DIMAS, LLC,<br>　　　　Debtor. | Case No. 02-51420-MM<br>Chapter 11 |
| DIMAS, LLC,<br>　　　　Plaintiff,<br>vs.<br>INVESTMENT GRADE LOANS, ANDY LEWIS, MILPITAS COUNTRYSIDE ESTATES DEVELOPMENT, INC., THE FORECLOSURE COMPANY, JOHN HO, AND DOES 1 through 40,<br>　　　　Defendants. | Adversary No. 02-5453<br><br>**MEMORANDUM DECISION AND ORDER AFTER TRIAL ON COMPLAINT AND DEBTOR'S OBJECTION TO CLAIM OF MILPITAS COUNTRYSIDE ESTATES DEVELOPMENT, INC.** |

## INTRODUCTION

Before the court is the consolidated trial of: (1) the objection by the debtor, Dimas, LLC, to the claim of Milpitas Countryside Estates Development, Inc., (MCED) and (2) the ninth claim for relief in the complaint by the debtor against MCED and John Ho for conspiracy to wrongfully foreclose.

1

MEMO. DECISION & ORDER AFTER TRIAL

## CONTENTIONS OF THE PARTIES

Dimas contends that its relationship with MCED was that of joint venturers rather than lender and borrower and that funds that MCED advanced were an investment rather than a loan. It asserts that is has no obligation to repay MCED other than from profits derived from the sale of improved lots, of which there were none. Dimas further contends that it is entitled to offset any liability to MCED by damages suffered by Dimas as a result of MCED's breach of the joint venture agreement between them by failing to fund the joint venture, causing Dimas to default on its secured obligations and dooming the development of its real property. Dimas also asserts that MCED and John Ho conspired with Dimas' secured lender to wrongfully foreclose on Dimas' property so that MCED could acquire the property after foreclosure. Finally, Dimas disputes MCED's contention that Dimas subsequently agreed to pay $250,000 to MCED.

MCED asserts that there was no meeting of the minds between Dimas and MCED to support an agreement for the formation of a joint venture. It asserts in the alternative that John Ho, acting as Dimas' agent, fraudulently induced MCED to enter a joint venture agreement with Dimas by failing to disclose the egregious terms of the obligations secured by the property or that the obligations were then in default. Under either theory, MCED contends that it is entitled to restitution of the amounts it advanced to Dimas. MCED further asserts that if the court concludes that the parties entered into an enforceable joint venture agreement, it should also enforce the contract provision that entitles MCED to a priority return of investment capital from the joint venture before Dimas receives any distribution. MCED and Ho dispute Dimas' contention that they participated in a conspiracy with Dimas' secured lender. Finally, MCED contends that Dimas and its representatives subsequently characterized the advances as a loan and agreed to repay MCED $250,000 in exchange for a reconveyance of a deed of trust in favor of MCED.

## FACTUAL BACKGROUND

### *Acquisition and Financing of Property*

The convoluted history of the quest to develop the real property commonly known as 1499 Country Club Drive, Milpitas, California, reflects the tenacity and persistence of the principal of Dimas,

1  LLC, which owned the property. Adrienne Rakitin and her late husband, Demitri Rakitin, acquired the
2  24-acre undeveloped hillside parcel in 1985. In July 1994, they obtained from the City of Milpitas
3  approval of a six-lot final subdivision map, which had to be recorded no later than November 17, 2002,
4  or the subdivision rights would expire. The Rakitins intended to retain one of the lots as their residence
5  and to develop the other five lots. Before they could record the final map, however, they needed
6  construction financing for improvements to the property. In the meantime, they defaulted on the
7  obligations secured by the property.

8        The Rakitins filed an individual bankruptcy petition in 1994 to stop a foreclosure sale of the
9  property. A trust deed holder obtained relief from the automatic stay in the bankruptcy case and
10 completed a foreclosure sale in 1997. The Rakitins filed a lawsuit in Santa Clara County Superior Court
11 for wrongful foreclosure and to set aside the foreclosure sale. After Dimitri Rakitin passed away in
12 1998, Adrienne Rakitin settled the wrongful foreclosure action in March 2000, providing for a
13 reconveyance of title and a reduction in the secured debt. To facilitate the settlement, Rakitin formed
14 Dimas, a family-owned limited liability company, to hold title to and develop the property. She has
15 served as the managing member since Dimas' formation, while her sons, Peter Rakitin and Paul Rakitin,
16 are members.

17       In August 2000, Rakitin obtained financing arranged by Investment Grade Loans ("IGL"), a
18 hard money lender, to pay off the existing trust deeds. Because Rakitin had no income other than Social
19 Security benefits, the loan amount included a 5-month interest reserve, points, and closing costs. It
20 accrued interest at the annual rate of 17% and became due and payable in eighteen months on March
21 1, 2002. Dimas took title to the property concurrent with the close of escrow. On August 7, 2000,
22 Dimas executed three promissory notes in the amounts of $2,350,000, $251,600, and $108,400,
23 respectively, which were secured by deeds of trust. The first deed of trust was held in fractionalized
24 shares among the IGL investors that advanced the loan amount. The second deed of trust secured the
25 broker's commission of Andy Lewis, the principal of IGL, who thereafter assigned it to Bank of Los
26 Altos as security. The third deed of trust secured a finder's fee in favor of Lee Roebke and Mick
27 Cheshack. The three deeds of trust were recorded in Santa Clara County on August 10, 2000.
28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

3

MEMO. DECISION & ORDER AFTER TRIAL

*September 11, 2000 Agreement to Develop Property*

Hoping to form a joint venture with investors to develop the property, Rakitin met with John Ho on August 16, 2000 to discuss the terms of such an arrangement. Ho had previously participated in some development projects but had transitioned from the construction industry to his own computer consulting business when he met Rakitin in 1997. Although Rakitin believed that he was a licensed contractor, in fact, his license was inactive at the time they met and has remained inactive ever since. Ho memorialized their discussion in a commitment letter dated September 1, 2000. Rakitin and Ho originally contemplated the formation of a limited liability company, Milpitas Countryside Estates Development, LLC, of which Dimas and certain investors would be members. Dimas would contribute $2.5 million in equity in the property for a 75% interest in the LLC, and the investors would contribute working capital of $850,000 for a 25% interest. Ho would serve as the project manager, receiving 15% of the profits, and search for potential investors for Dimas. The balance of the profits would be divided evenly between Dimas and the investors, who would receive a priority return on investment capital before Dimas received a distribution.

Dimas and a group identified as "Investors Group" entered into an agreement on September 11, 2000 to form Milpitas Countryside Estates Development, LLC to build improvements to the property. The investors were identified in the agreement as Michael Jeng, Jerry Wong, Jack Lu, Angie Hsu, Josephine Chang, and C.Y. Lin Ho. The agreement provided that Ho was Dimas' sole agent and project manager to secure the investment group and financial lending institution and had authority to enter into the agreement on behalf of the investors, on whose behalf he executed the agreement. It further provided that the investors would furnish working capital of $850,000, Dimas would transfer title to the property, and the LLC would obtain a construction loan of $3,300,000 to $3,500,000 from Valley Financial to pay off the IGL loans and to construct improvements on lots one through five. Dimas would grant to the investors a second deed of trust that was subordinated to the construction loan to secure their investment capital. The agreement provided that after the investors and Dimas recovered their investment in full, with the investors receiving priority, profits would be divided in accordance with the formula in the agreement. Attached to the agreement was a Preliminary Project Cost and Profit Analysis prepared by Ho, who periodically prepared such analyses for the project.

4

MEMO. DECISION & ORDER AFTER TRIAL

By March 2001, the interest reserve was exhausted and interest payments became due on the IGL loans. However, Dimas still had insufficient investment capital for the development project. Ho prepared and had Rakitin execute a letter dated April 10, 2001 stating that Dimas had employed Ho as project manager and business consultant for the development of the property and that he had "total authority on behalf of Dimas, LLC and the Rakitins to negotiate with any third party, who is interested as an investor of the Milpitas Countryside Estates Development project. . . . The final decision regarding how to structure the join (sic) venture relationship with any third party or parties will be made jointly by Dimas, LLC, the Rakitins and Mr. Ho." Rakitin testified that this letter was prepared for the purpose of raising additional investment funds because the project had insufficient working capital, the interest reserve from the IGL loans was exhausted, and interest payments should have commenced in March 2001. However, she testified that she did not grant Ho broad, general authority on behalf of Dimas. Ho also testified that the April 10 letter was necessary to solicit new investors and to show that he had the authority to negotiate on behalf of Dimas. He, on the other hand, believed that Rakitin gave him wide latitude and authority on Dimas' behalf.

### *April 19, 2001 Joint Venture Agreement*

Over the course of the next nine months, at Ho's urging, Dimas executed several other joint venture agreements, each purporting to supercede the prior one and modifying its terms slightly. Dimas executed a new joint venture agreement for the development of the property on April 19, 2001 with Milpitas Countryside Estates Development, Inc. ("MCED"), defined in the agreement as "the Company." This was the first of four joint venture agreements between Dimas and MCED. Rakitin believed that the investors decided to incorporate rather than form an LLC, but she was unaware at the time that MCED had not yet been formed. The April 19, 2001 agreement restructured the terms of the joint venture so Dimas would retain title to the property. Retitling the property in the LLC would have resulted in adverse tax consequences for Dimas and delay the development because new map approvals would have to be obtained. Because it would retain title, Dimas agreed to grant a $1.2 million deed of trust to MCED to secure the investors' capital, which would be increased from $850,000. The deed of trust included a partial release clause so the lien could be released as lots were sold. It was recorded on July 16, 2001.

5

MEMO. DECISION & ORDER AFTER TRIAL