The April 19, 2001 agreement provided that MCED would "keep existing mortgage from Investment Grade Loans" and pay $200,000 as an interest reserve for the IGL mortgage. It also provided that from March 1, 2001, the joint venture would make the mortgage payments to IGL. The terms of profit sharing were adjusted such that Dimas would receive 40% of the profits while the investors received 60%. The provisions for priority of profit distributions remained the same.

On April 21, 2001, Dimas and Ridge View Investment, Inc., a company controlled by Ho, entered into a Standard Form of Agreement Between Owner and Construction Manager. This agreement provided that the construction manager would receive compensation of one percent of the total project cost, or $100,000, for the preconstruction phase of the project and four percent of the total project cost, or $450,000, payable in monthly installments of $20,000, for the construction phase.

### *May 15, 2001 Joint Venture Agreement*

Dimas executed another joint venture agreement with MCED on May 15, 2001. MCED still had not been incorporated at this time. Rakitin testified that Ho advised her the new agreement was necessary to increase the investment capital to $1.35 million and to change the profit sharing formula to increase the investors' interest to 70%. The May 15, 2001 agreement was otherwise substantially the same as the April 19, 2001 agreement, including the provisions regarding payment of the mortgage.

### *June 20, 2001 Joint Venture Agreement*

On June 20, 2001, Dimas and MCED executed yet another joint venture agreement. Rakitin testified that Ho represented that this new agreement was necessary once again to restructure the profit sharing formula. The June 20, 2001 agreement was otherwise substantially the same as the April 19, 2001 agreement and the May 15, 2001 agreement.

Relying on paragraph 3, Rakitin contends that the investors were obligated to make the mortgage payments. She testified that it was necessary that the investors pay the mortgage on the property because she had no income other than Social Security benefits. She also testified that Ho represented that the investors understood that they would be paying the mortgage. Rakitin asserts that the word "current" was missing from the end of the following clause in paragraph 3: "[t]he Company will keep existing mortgage from Investment Grade Loans. . . ." However, she noted that she apparently overlooked its absence at the time the agreements were executed. She also believed that profit

MEMO. DECISION & ORDER AFTER TRIAL

distributions would be made from the sale of the improved lots and shared proportionately as each lot was sold. She believed the provision allowing priority return of investors' capital entitled the investors to priority, but that the mortgage would be paid before the investors received their profit distribution.

Although it appeared that Michael Jeng executed the April 19, 2001, the May 15, 2001, and the June 20, 2001 agreements on behalf of MCED as its president, Rakitin later learned that he, in fact, had not executed them. Jeng testified that the signatures on the agreements were not his. Apparently, Ho signed the agreements on Jeng's behalf so that Ho would have an executed joint venture agreement to present as part a loan package for a construction loan. Rakitin testified that at the time, however, she had no reason to question Ho concerning MCED's performance under the agreements since she had already received close to $100,000 in investment capital.

*June 22, 2001 Joint Venture Agreement*

In May 2001, Ho met with Tony Hu, a San Jose businessman from Taiwan, concerning the development of the property. Hu has been living in the United States since 1991 operating two successful businesses and testified through an interpreter. He was introduced to Ho through a mutual acquaintance, Robert Liu, an employee of Ho's who acted as an intermediary through the course of the relationship. Hu understood that Ho was seeking investors on behalf of the owner of the property. On May 24, 2001, Ho made a written investment proposal to Hu, which contemplated a joint venture between Hu's investment group and Ho, a transfer of title to the property to the joint venture, MCED, a profit sharing formula of 60%-40%, a capital investment of $2 million, a 100% return on investment entitled to priority distribution, plus an equal division of net profits, and projected net profits of $2 million. Dimas would have no interest in MCED.

Hu declined the terms proposed and testified that he considered the profit projection in the proposal to be "mere rubbish" and overstated. Rather, he understood that profits anticipated from a real estate development was largely determined by market conditions. He had previously invested in real estate development projects in Taiwan, but this was his first real estate project in the United States. He testified that Ho showed him the April 10, 2001 letter granting Ho authority to negotiate on behalf of Dimas and the April 21, 2001 construction management agreement. Hu did not inquire about the terms of the secured loans from IGL, and Ho did not disclose the terms or that they were then in default. Ho

7

MEMO. DECISION & ORDER AFTER TRIAL

testified that he did not want to discourage investors from participation. Rakitin testified she was unaware of the terms of this proposal and denies that she authorized Ho to withhold information from investors.

On June 22, 2001, Hu executed on MCED's behalf a joint venture agreement with Dimas. MCED still had not been incorporated as of June 22, 2001. This agreement provided for advances of $1.2 million in working capital, secured by a deed of trust. Hu testified that he executed the joint venture agreement only after he had actually seen the executed deed of trust. The June 22 agreement also provided that upon execution MCED would pay Dimas $250,000, which would be deducted from Dimas' equity in the joint venture to pay for the Rakitin family's living expenses and for reimbursement of direct project related costs. The agreement further provided a priority return of capital investment, plus 100% return, before profit sharing according to the formula in the agreement.

However, there are significant differences between the June 22, 2001 agreement and the June 20, 2001 agreement. Significantly, the amount of the capital investment, the equity contribution, and the profit sharing formula are different from the earlier agreement. Paragraph 3 of the June 22, 2001 agreement provided simply: "The Company will keep existing mortgage from Investment Grade Loans, Inc.," which Hu understood to mean that the owner would retain the existing mortgage on the property without refinancing. Paragraph 10 from earlier agreement, which provided that the obligation of the mortgage payment to IGL would be the responsibility of the joint venture, was omitted from the June 22 agreement. Hu testified that he believed that the owner would make the mortgage payments on the property to protect its interests, noting that the agreement is silent as to the obligation to pay the mortgage. He understood the term "working capital" to constitute the project development costs, including bond fees, city fees, and onsite improvements but did not believe it included the debt service on the property. The June 22 agreement is otherwise substantially the same as the April 19, May 15, and June 20 joint venture agreements. While Rakitin's signature appears on the June 22, 2001 agreement, Rakitin testified that she did not sign it, and Dimas asserts that the signature is forged, pointing out that her name is misspelled. Ho acknowledged that he executed the agreement on Rakitin's behalf but testified that she later ratified it.

8

MEMO. DECISION & ORDER AFTER TRIAL

### MCED Advances to Dimas

To ensure his investment group was the beneficiary under the deed of trust that Dimas had executed, Hu incorporated MCED on June 25, 2001. Hu was an officer, and Robert Liu was appointed as secretary. Ho was not an officer of MCED. On, June 27, 2001, Hu issued a check in the amount $67,859 on behalf of the newly incorporated MCED to Dimas for payment of a subdivision improvement bond. Ho had informed him that there was an urgent need to pay the bond and subsequently showed Hu a July 2, 2001 letter from the City of Milpitas confirming receipt of the bond deposit. The City of Milpitas, in fact, did not receive the bond or issue a confirming letter. Ho admitted that he had falsified the letter so Hu would believe that the funds had been used as represented. Rakitin testified that she never authorized Ho to prepare the forged letter. She did, however, acknowledge that Dimas received $22,500 in disbursements between June 28 and July 11, 2001.

Hu issued on behalf of MCED another check to Dimas in the amount of $250,000 on July 11, 2001 in accordance with the terms of the June 22, 2001 joint venture agreement. Ho negotiated both the $67,859 check and the $250,000 check from MCED at the Bank of America branch in Fremont. Ho had opened an account in Dimas' name at Bank of America using a copy of Dimas' Operating Agreement, which Rakitin had provided to him, and a copy of the April 10, 2001 letter granting Ho authority to negotiate on behalf of Dimas. While Rakitin testified that she never authorized Ho to open or operate a bank account on behalf of Dimas, Ho testified that his actions were authorized, and he opened the account because he had a banking relationship with Bank of America and was concerned that Dimas' or Rakitin's financial institution would place a hold on deposited checks. A payment to IGL was due within forty-eight hours of his receipt of the $250,000 check from MCED to stop a foreclosure, so Ho promptly negotiated the check. Bank of America immediately issued a cashier's check in the amount of $238,684.20 payable to IGL. Rakitin personally delivered the cashier's check to IGL to cure the defaults on the mortgages. She was aware at the time that the source of the funds was a new investor. However, Hu was unaware at the time that the advance had been used to pay the IGL loans. He believed that the funds were intended for Rakitins' living expenses and reimbursement of project related expenses.

MCED issued a check in the amount of $14,970 to Ridge View, the project construction

manager, on July 23, 2001. Hu believed the funds were for city fees. Ho testified that the funds were used to reimburse Ridge View for payment of the first and second installments of property taxes for 2001. MCED issued another check for $60,000 to Ridge View on August 13, 2001. Hu also believed that these funds were for city fees. MCED issued a $25,000 check to Ridge View on August 17, 2001. Hu believed that these funds were for the payment of taxes. Ho testified that the August 13, 2001 and August 17, 2001 advances from MCED were used to pay Ridge View's operational costs. From the end of July through mid-September 2001, Dimas acknowledges that it received an additional $65,271 in disbursements from MCED to pay project related expenses. This amount includes a $38,391 advance made on August 22, 2001 for the July 2001 mortgage payment to IGL.

### *Termination of Joint Venture*

Ho attempted unsuccessfully through September 2001 to locate additional investment capital for the development project. Meanwhile, the IGL mortgage payments came due every month. Hu first learned from Robert Liu in September 2001 that the senior mortgages on the property were for unconventional, high interest loans and that the funds advanced by MCED had been used to make the mortgage payments. He was infuriated when he learned of the circumstances and the nondisclosure. While Hu was willing for MCED to continue making advances to finance the improvements on the property, he was unwilling to pay the high interest IGL mortgage. It did not make economic sense to him. Moreover, he believed that the July 22, 2001 joint venture agreement did not obligate MCED to make the mortgage payments on the property. Hu testified that Dimas' failure to make the mortgage payments and Ho's deception caused him to lose confidence in Dimas and Ho. Thereafter, Hu became concerned over the viability of the project, and wanted to exercise greater control.

At Ho's urging to provide greater protection of the investors' capital, Rakitin executed an addendum to the June 20, 2001 joint venture agreement on September 11, 2001 that provided the parties would consider a limited partnership form of organization for the joint venture. MCED never executed the addendum.

Rakitin requested that Ho make disbursements from the investors for the September and October 2001 mortgage payments to IGL and for additional working capital. Ho urged her to execute two promissory notes on September 17, 2001, one in the amount of $75,000 and one in the amount of