1  $42,230.84, which he would use to obtain additional funds from investors. She testified that she did not
2  receive any funds in exchange for the notes. Hu testified that although Liu told him about the notes and
3  requested funds from MCED for Dimas to pay IGL, Hu declined to advance funds for that purpose or
4  on account of the notes.

5  Rakitin became increasingly concerned that the investors' funds were not forthcoming in a
6  timely basis, and she was unable to make the IGL mortgage payments. At the time, she had not met any
7  of the investors and communicated strictly through Ho. Based on her understanding of paragraph 3 of
8  the joint venture agreement, she believed that MCED was obligated to keep the existing mortgages
9  current. Rakitin wrote to Ho on September 18, 2001 expressing her concerns and asserting that MCED
10 was in breach of its financial obligations under the June 20, 2001 joint venture agreement.

11 Ho responded to Rakitin by letter dated September 23, 2001. He signed the letter as president
12 of Ridge View and the "authorized representative" of MCED. In the letter, Ho stated that MCED was
13 withdrawing from the joint venture with Dimas and treating the amounts advanced as a loan, secured
14 by the existing deed of trust, that would become due and payable on December 31, 2001. No provision
15 in the June 22, 2001 joint venture agreement authorized MCED to convert the advances to a loan. Ho
16 testified that his relationship with Rakitin had deteriorated, and he felt that she failed to understand the
17 complexities of the development project. Hu was concerned about the viability of the project and
18 refused to make any further advances so long as they were used for the payment of the high interest IGL
19 loans. However, Ho acknowledged at trial that Hu never refused to fund advances for project
20 development costs. Ho felt he could no longer be effective in representing the investors' interests and
21 the owner's interests in the joint venture, and he did not have the ability to bridge the impasse between
22 Rakitin's and Hu's respective positions. He wanted to withdraw from the development project and to
23 propel the parties to protect their interests. At trial, he admitted that he was not the authorized
24 representative of MCED and inaccurately represented MCED's intentions with respect to the joint
25 venture. In fact, Hu was unaware of this letter and had not authorized Ho to send it on behalf of MCED.

26 Rakitin testified that she was extremely upset upon receipt of Ho's September 23 letter and
27 considered the joint venture terminated at that point. However, she intended to preserve her rights to
28 assert a breach of the agreement. She personally met Hu for the first time in late September or early

October 2001. IGL declared the loans in default on October 10, 2001. With the IGL loans in default, Rakitin sought Ho's assistance to try to revive the joint venture with MCED. Until November 2001, she negotiated directly with Hu, who testified that he would have been willing to continue with the development of the property on the condition that title to the property be transferred to MCED so he would have control and the ability to refinance the debt. In fact, Hu had obtained approval of a loan on very favorable terms.

### *January 9, 2002 Joint Venture Agreement*

Rakitin also pursued alternate investors. Ho prepared some written projections of development costs and profits for potential investors, but Hu testified that the projections were not provided to him. Rakitin testified that Ho informed her around December 2001 that there was a new investor but that a new agreement was needed. By that time, the predevelopment phase was completed except for recordation of the final map and obtaining the construction permit. On January 9, 2002, Dimas executed a new joint venture agreement with Countryside Estates, LLC. Ho executed the agreement on behalf of Countryside Estates. Although she did not see any written evidence, Rakitin believed that MCED had been restructured as a limited liability company because Ho informed her that the investors were the same ones as before, including Hu. Ho testified that, in fact, Countryside Estates was unrelated to MCED. He prepared the January 9, 2002 agreement at the request of Dan Snyder, who had previously entered a joint venture agreement with Dimas and Rakitin in July 2000 before Rakitin commenced discussions with Ho to develop the property.

The January 9, 2002 agreement increased the investment capital to $1.6 million because the mortgage was in arrears, and additional working capital was needed. This agreement also explicitly placed the responsibility for making the mortgage payments on Dimas through the end of 2001. Rakitin testified that she was desperate at the time because IGL would record a notice of sale imminently. She accepted the term as a reduction in Dimas' net equity in the joint venture.

Rakitin imposed as a condition to the January 9, 2002 agreement that Countryside Estates furnish $40,000 to Dimas no later than January 10, 2002. Rakitin testified that she received the requested funds, which she believed were advanced pursuant to the January 9 agreement. Although Hu was unaware of the January 9, 2002 agreement, he caused MCED to advance the funds at Robert Liu's urging. Although

he did not consider it to be MCED's obligation to make the mortgage payments, Hu testified that he gave Liu the funds with the knowledge that they would be forwarded to Dimas to pay IGL. Hu testified that although he wanted the property's title transferred to MCED, he still believed it was worthwhile to try to salvage the project. Rakitin intended to use the funds to reinstate and bring the IGL loans current; however, IGL would grant only an extension of the recordation of the notice of sale. She testified that she was unaware of Dimas' right to specify the application of the funds.

On February 7, 2002, Ho requested that Dimas agree to an addendum to the January 9, 2002 agreement that provided that Dimas would transfer title to the property to Countryside Estates upon recordation of the final subdivision map. Ho advised her that the investors were pursuing a refinance and had obtained a loan commitment; however, a title transfer was necessary. The refinance never materialized. Rakitin testified that she acceded to the investors' demands because IGL's final postponement expired the following day on February 8, 2002. The same day the addendum was executed, February 7, 2002, Dimas received from MCED an advance in the amount of $10,000, which it used to obtain another extension from IGL of the recordation of the notice of sale. Once again, the funds were provided by MCED at Liu's request, which Hu understood to be on behalf of Dimas. Rakitin believed the $10,000 advance was made pursuant to the January 9 agreement.

Although MCED introduced a letter dated February 18, 2002 from Ho to Rakitin concerning the transfer of title and project control to Hu, Rakitin testified that neither she nor the other members of Dimas received the letter. Rakitin became aware of the Dimas account with Bank of America in February 2002. Although she requested an accounting of the bank account numerous times, Ho refused to provide one.

### Chapter 11 Filing

The IGL loans matured by their terms on March 1, 2002. When Dimas failed to cure the defaults under the notes, IGL recorded a notice of trustee's sale on March 14, 2002 pursuant to the third deed of trust. Dimas filed a chapter 11 petition on March 13, 2002 to stop the foreclosure sale.

Dimas negotiated with Hu in June 2002 for MCED to provide further financing for the development of the property. One meeting between Rakitin and Hu took place at Hu's offices on June 17, 2002. Liu and Al Reuter, the accountant for Dimas, and C.M. Pang, Hu's assistant, were also in

attendance at that meeting. Hu testified that Rakitin acknowledged in the meeting Dimas' receipt of $367,000 that MCED had previously advanced and characterized those funds as a loan from MCED. Hu, on the other hand, asserted that MCED had advanced $447,000 in connection with the development project. Because of the language barrier, the parties wrote the numbers on a whiteboard in the conference room and printed an image of their analysis. Rakitin also furnished a letter of intent containing some discussion points. However, no agreement was reached as a result of these discussions.

### *Stipulation to Set Aside MCED Deed of Trust*

Dimas commenced an adversary proceeding on May 31, 2002 against John Ho, MCED, and others to void the fourth deed of trust on the property so Dimas could obtain a refinance. It also asserted claims for misrepresentation, negligence, and interference with prospective economic advantage. Dimas obtained a loan commitment from Amex Mortgage and Investments, Inc. and filed a motion on July 8, 2002 for authority to refinance the secured debt on the property. MCED objected to the motion to refinance. At an initial, expedited hearing held July 10, 2002 on the refinance motion, the court set an evidentiary hearing for July 12, 2002 to determine the extent, validity and priority of MCED's fourth deed of trust on the property. To facilitate the refinance, on July 11, 2002, Dimas and MCED entered into a stipulation to remove the deed of trust, which provided that MCED may submit a demand in escrow for $250,000 and litigate the balance of its claim in the chapter 11 case. Pursuant to the stipulation, the parties reserved all other claims. The recitals in the stipulation also characterized the MCED claim as a "loan." The stipulation provides in pertinent part:

> 14. To the extent that either Dimas or Milpitas claims that any joint venture agreement identified in paragraphs 9-12 are binding and enforceable, each party hereby agrees that each such agreement is terminated as of the date of the Bankruptcy filing which was March 13, 2002.
>
> 15. Dimas agrees to allow Milpitas to submit to the Escrow a demand in the amount of $250,000 (the "Demand") to be applied towards the claim of Milpitas, as identified in paragraph 13 of the Recitals.
>
> 16. The payment of the Demand is conditioned upon the following:
>    a. The passage of at least eleven days following entry of the order approving the Funding Motion;
>    b. Dimas obtaining a loan in the amount of not less than $4.3 million from AMEX of any other lender, subject to Bankruptcy Court approval;
>    c. Submission to the Escrow of a Deed of Reconveyance by Milpitas conditioned upon the approval of this Stipulation.

17. The parties agree that Milpitas shall have all rights allowed under the Bankruptcy Code to pursue its alleged remaining claim identified in paragraph 13 as an unsecured creditor subject to all objections and defenses which may be available to Dimas.

18. The parties agree that nothing contained in this Stipulation constitutes a release or waiver of any claims any party may have against the other, except as specifically stated herein.

Based in part on the stipulation, the court entered an order on July 12, 2002 approving the debtor's motion to refinance. However, MCED did not immediately reconvey the deed of trust.

It became apparent in August 2002 that there would be insufficient funds from the refinance to pay the $250,000 to MCED contemplated under the stipulation. Dimas then sought relief from the stipulation and to expunge the MCED deed of trust on an expedited basis. The court set an evidentiary hearing for September 3, 2002 on the extent, validity, and priority of the MCED deed of trust. Counsel for Dimas and counsel for MCED agreed, and confirmed by letter on August 28, 2002, that MCED would reconvey the deed of trust without receiving any payment, that Dimas would pay MCED $250,000 in accordance with the July 11, 2002 stipulation, and the parties would litigate the balance of MCED's claim in the bankruptcy court. Hu executed a request for reconveyance on behalf of MCED on September 3, 2002, which was furnished to Dimas without accompanying escrow instructions. MCED now asserts that Dimas stipulated that MCED has an undisputed secured claim against the estate in the amount of $250,000.

Christine Long, former special counsel to Dimas, testified that in negotiating the July 11, 2002 stipulation, she intended that Dimas would pay MCED $250,000 for the removal of the deed of trust even if the refinance did not occur. This testimony is consistent with her August 28, 2002 letter. She then stated that the payment of $250,000 to MCED was conditioned on the refinancing. In her view, the reconveyance by MCED was not contingent on the refinancing or the payment of $250,000 but was entirely independent. She conceded, however, that all the terms of the stipulation were not conditioned on the refinance. She also asserted that the MCED deed of trust was invalid because MCED had not advanced $1.2 million to Dimas.

Hu, on the other hand, testified that he understood that MCED would be paid $250,000 in exchange for the reconveyance and that the court would determine at a later time whether MCED was

15

MEMO. DECISION & ORDER AFTER TRIAL