entitled to the balance. MCED's former counsel, Paul Reza, testified that at the time the stipulation was entered into on July 11, 2002, the parties understood that MCED would be paid $250,000 from escrow upon refinancing. Circumstances changed, and it became apparent that there would be insufficient funds to pay MCED from escrow. Notwithstanding, he understood from discussions with Long that Dimas would pay MCED $250,000, even if payment was from a source other than the refinance, and Dimas would not dispute that portion of MCED's claim. Reza also testified that the reconveyance by MCED was not conditioned on payment of $250,000.

After MCED reconveyed the deed of trust, Dimas voluntarily dismissed the complaint against John Ho and MCED and the clerk's office closed the file. In October 2002, Dimas obtained an amended order of dismissal to reflect that only MCED, and not Ho, was dismissed from the adversary proceeding.

### *Trustee's Sale by Investment Grade Loans*

IGL filed a motion for relief from the automatic stay on May 22, 2002 to proceed with a foreclosure sale. However, it failed to serve notice of the motion on creditors of Dimas. At a hearing on the motion held on August 8, 2002, Dimas and IGL entered into a stipulation on the record. Under the terms of the stipulation, IGL agreed to a rescission of the notices of default on the first and second deeds of trust and to full reconveyances of the deeds of trust if Dimas deposited $3.285 million into an escrow by September 3, 2002 and released funds for the undisputed portion of IGL's claim no later than September 4, 2002. If Dimas failed to comply with the stipulation, IGL could proceed with a foreclosure sale under the third deed of trust. On September 3, 2002, MCED served upon debtor's counsel an objection to the stipulation for relief from stay.

Dimas failed to timely make the $3.285 million escrow deposit in accordance with the terms of the stipulation with IGL. IGL submitted to the court a proposed order granting relief from the automatic stay accompanied by the declaration of counsel for IGL attesting that MCED and Dan Snyder, the only creditors scheduled on the List of Creditors Holding 20 Largest Unsecured Claims, had waived notice of and objection to the motion for relief from stay. On September 9, 2002, the court issued an order granting relief from the stay to allow IGL to proceed with a foreclosure sale.

On September 10, 2002, IGL conducted a foreclosure sale of the property under the third deed of trust. In addition to Dimas' representative, IGL's principal, Andy Lewis, Michael Stone, who is IGL

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  and Lewis' attorney, Ho, Hu, and Dan Snyder were in attendance. Rakitin, on behalf of Dimas, tendered
2  to the trustee's agent $150,000, an amount she estimated was sufficient to exercise the equity of
3  redemption under the third deed of trust. The trustee's agent rejected the tender and indicated that the
4  payoff demand was over $3 million. The agent advised Rakitin that the beneficiary had cured the
5  defaults on the senior deeds of trust and added those amounts to the third deed of trust. IGL acquired
6  the property by credit bid. There were no other bids.

7  Rakitin testified that Hu and Ho met with counsel for IGL after the bidding. Hu testified that
8  he did not negotiate directly to acquire the property because of his limited English. He further indicated
9  that while IGL offered him the opportunity to purchase the property, and he expressed his interest, they
10 did not reach terms such as a purchase price. However, MCED filed a complaint against IGL in Santa
11 Clara Country Superior Court on October 17, 2002 for breach of an option agreement to acquire the
12 property. Hu acknowledged that he authorized the filing of the complaint.

### *Setting Aside of Foreclosure Sale*

14 On November 18, 2002, Dimas commenced this adversary proceeding against IGL, Lewis,
15 MCED, Ho, and others to set aside the foreclosure sale. After conducting discovery, Dimas learned that
16 Lewis, who was the beneficiary under the third deed of trust, had not actually advanced any funds to
17 cure the defaults on the senior deeds of trust and that the second deed of trust had been assigned to a
18 third party. Dimas filed a motion for summary adjudication in February 2004. The court found that
19 Dimas' tender on the date of the foreclosure sale was sufficient and that the trustee's refusal of the
20 tender was wrongful and denied Dimas the right to exercise the equity of redemption. It further found
21 that the trust deeds could not be merged because they were not consecutive since the second deed of
22 trust was held by a third party. The court granted partial summary adjudication in Dimas' favor, set
23 aside the foreclosure sale, and restored title to Dimas. However, it reserved and set the damages issue
24 as well as the remaining issues for trial in January 2005.

25 Thereafter, IGL and Lewis renewed the motion for relief from stay. The court consolidated the
26 stay proceeding with this adversary proceeding for purposes of trial. In January 2005, Dimas and IGL
27 entered into a settlement following a judicially supervised settlement conference. The parties
28 contemplated the formation of a new limited liability company to procure financing to pay off the IGL

loans and to develop the property. Dimas and IGL would then share the proceeds from the sale of the developed lots. This first settlement was never consummated.

After extensive negotiations, the parties entered into a second settlement, which provided that Lewis would relinquish the security interest in the property upon receipt of $3.1 million from the proceeds of a refinance. If Dimas failed to make the payment by a due date, Lewis would receive title to the property upon payment of $1.8 million to Dimas. Notwithstanding several extensions and a reduction in the payoff amount, Dimas failed to obtain a loan to timely make the payment under the second settlement. When Dimas failed to timely perform, Lewis paid $1.8 million to Dimas in accordance with the terms of the second settlement. Dimas conveyed title to the property to Lewis in October 2005.

In July 2006, the court authorized MCED to file a late claim in the case. MCED filed a proof claim in the amount of $467,000, and Dimas objected to MCED's claim in October 2006. On November 13, 2006, Dimas confirmed a chapter 11 plan that provides for the distribution of the proceeds of the second settlement. It appears that the estate will have surplus funds available for distribution to the members of Dimas after creditors are paid in full.

## LEGAL DISCUSSION

### I. MCED Bears the Burden of Proof on its Claim While Dimas Bears the Burden on the Conspiracy Claim

A threshold inquiry is which party bears the burden of proof on the various claims asserted. With respect to Dimas' objection to the MCED claim, a properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). The debtor then bears the burden of presenting sufficient evidence to rebut this prima facie validity. In re Mulvania, 214 B.R. 1, 6 (B.A.P. 9th Cir. 1997). Once rebutted, the burden shifts back to the creditor to prove its claim. Id. The claimant bears the ultimate burden of persuasion on its claim. In re Holm, 931 F.2d 620, 623 (9th Cir. 1991). Consequently, MCED bears the burden of persuasion in establishing the validity and amount of its claim.

As to the civil conspiracy claim, the plaintiff, Dimas, must prove the elements of a civil

1  conspiracy, Choate v. County of Orange, 86 Cal. App. 4th 312, 333 (Cal. Ct. App. (4th Dist.) 2001), and
2  the elements must be proven by a preponderance of the evidence. Sprague v. Equifax, 166 Cal. App.
3  3d 1012, 1045-46 (1985).

5  II.   ***The Transaction May be Characterized as a Joint Venture That is Not Enforceable Against***
6  ***MCED.***
7  **A. The surrounding facts and circumstances indicate the transaction was intended to be**
8  **a joint venture.**
9  The crux of the dispute between the parties is the characterization of the transaction between
10 Dimas and MCED. To determine the character of a transaction, courts must look beyond the form of
11 a transaction to its substance. Ghirardo v. Antonioli, 8 Cal.4th 791, 802 (1994); Boerner v. Colwell Co.,
12 21 Cal.3d 37, 44 (1978). The terminology used by the parties to refer to the transaction is not
13 determinative. Boerner, 21 Cal. 3d at 48; Burr v. Capital Reserve Corp., 71 Cal.2d 983, 989 (1969).
14 The true character of a transaction is determined from all the surrounding facts and circumstances,
15 including the conduct of the parties before and after. Sherman v. Panno, 129 Cal. App. 2d 375, 388 (Cal
16 Ct. App. (2nd Dist.) 1954)(whether deed absolute in form is in fact a mortgage).
17     A loan, for example, is "the delivery of a sum of money to another under a contract to return at
18 some future time an equivalent amount with or without an additional sum agreed upon for its use; and
19 if such be the intent of the parties the transaction will be deemed a loan regardless of its form. . . ."
20 Milana v. Credit. Discount Co., 27 Cal.2d 335, 339 (1945). Clearly, a loan transaction contemplates
21 a debtor-creditor relationship with an obligation to repay the amount advanced. Ghirardo v. Antonioli,
22 8 Cal.4th at 802. With a loan, the lender does not share in the profits of the enterprise, does not run the
23 risk of loss of capital other than upon the insolvency of the borrower, has no discretion or role in the
24 management of the enterprise, and incurs no tort or contractual liability in connection with the
25 enterprise. Martin v. Ajax Constr. Co., 124 Cal. App. 2d 425, 433 (Cal Ct. App. (2nd Dist.) 1954).
26     A joint venture, on the other hand, is an undertaking by two or more persons jointly to carry out
27 a single business enterprise for profit. 580 Folsom Assoc. v. Prometheus Dev. Co., 223 Cal. App. 3d
28 1, 15 (Cal. Ct. App. (1st Dist.) 1990). The elements of a joint venture are: 1) the members must have

joint control over the venture, even if they may delegate it; 2) they must share the profits of the undertaking; and 3) the members must each have an ownership interest in the enterprise. Scottsdale Ins. Co. v. Essex Ins. Co., 98 Cal. App. 4th 86, 91 (Cal. Ct. App. (4th Dist.) 2002). A joint venturer has no assurance of a return on the capital advanced, shares in the earnings but risks a total loss upon the failure of the enterprise, and normally cannot assert a claim against the joint venturers for any capital loss. The presence or absence of one or more of these characteristics is not conclusive as to the nature of the transaction. Martin v. Ajax Constr. Co., 124 Cal. App. 2d at 433.

        Viewed in context, the transaction does not bear the indicia of a loan. It was not simply the delivery of an amount of money to Dimas with the agreement for its return in the future with an additional amount assessed for its use. There was no maturity date or repayment schedule. Rather, it was contemplated that both Dimas and MCED would contribute either assets or capital to the venture. Other characteristics of a joint venture were common to both the June 20, 2001 agreement and the June 22, 2001 agreement. The stated objective was to develop and improve the property for profit. Significantly, the parties agreed to distribute profits in accordance with the formula set forth in the respective agreements, sharing profits after the recovery of the initial capital. The parties agreed that the venture would employ and compensate Ho to conduct its daily business affairs. MCED was required to establish a bank account to make disbursements of project costs. The parties denominated the arrangement a joint venture in the documents purporting to create the relationship. Dimas' periodic characterization of the transaction as a loan is not determinative. The discussion between the parties in the whiteboard meeting of June 17, 2002 constituted mere negotiations. No agreement was reached at the time. Similarly, Long's characterization in the recitals of the stipulation to set aside the deed of trust and in her firm's first interim fee application is not binding. All the surrounding facts and circumstances indicate that the parties intended the transaction to be a joint venture to develop the property for profit.

### B. The June 22, 2001 Joint Venture Agreement is Not Enforceable Against MCED.

1.     **There was no mutual consent between the parties.**

The next inquiry is whether the parties entered into an enforceable joint venture agreement.