1 Mutual consent is one of the essential elements of contract formation. Leo F. Piazza Paving Co. v. Bebek and Brkich, et al., 141 Cal. App. 2d 226, 232 (Cal. Ct. App. (1st Dist.) 1956); Cal. Civ. Code §§ 1550, 1565. Consent is not mutual unless the parties all agree upon the same thing in the same sense. Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 208 (Cal. Ct. App. (6th Dist.) 2006); Cal. Civ. Code § 1580. California law is clear that there is no contract until there has been a meeting of the minds on *all* material points. Banner Entertainment, Inc. v. The Superior Court of Los Angeles Co., 62 Cal. App. 4th 348, 357-58 (Cal. Ct. App. (2nd Dist.) 1998)(emphasis in original). This determination is made based on an objective standard. Bustamante, 141 Cal. App. 4th at 208.

Mutual consent as to the broad goals of an agreement is insufficient for contract formation. Terry v. Conlan, 131 Cal. App. 4th 1445, 1458 (Cal Ct. App. (6th Dist.) 2005). The parties must reach agreement on all material and essential terms, which must be sufficiently definite and certain so that a court can determine the scope of the parties' obligations, judge whether a breach of those obligations has occurred, and have a rational basis for the assessment of appropriate damages. Bustamante, 141 Cal. App. 4th at 209. Accord Lawrence Block Co., Inc. v. Palston, 123 Cal. App. 2d 300, 307-08 (Cal. Ct. App. (2nd Dist.) 1954), *disapproved on other grounds*, Mattei v. Hopper, 51 Cal. 2d 119 (1958). The failure to arrive at a meeting of the minds as to all material terms precludes the formation of a contract notwithstanding that the parties may have agreed to *some* of the terms or have taken steps to perform under the contract. Bustamante, 141 Cal. App. 4th at 215; Banner Entertainment, 62 Cal. App. 4th at 359.

Terry v Conlan, 131 Cal. App. 4th 1445, involved the enforceability of a settlement agreement between litigants. The underlying dispute between a widow and her adult stepchildren arose from conflicting provisions in two testamentary trusts set up by the widow's deceased husband. At the conclusion of a multiple-week trial, the parties reached a judicially-supervised settlement. The terms of the settlement encompassed the division of real properties, including a ranch in Castroville, payments by the widow to the children in excess of $2.5 million over a two-year period, and the payment of trust expenses. The parties agreed that the ranch in Castroville would be operated by an independent trustee or manager for seven years while an adult stepdaughter served as trustee, that the widow would receive the income from the ranch while the children received the remainder, and that the transaction would be structured to receive the most favorable tax treatment. However, they immediately disagreed about the

specific terms of the settlement. Upon the children's motion, the trial court entered a judgment enforcing the settlement.

On appeal to the Sixth District Court of Appeals, the appellate court reversed the judgment, holding the settlement did not result in an enforceable agreement because ambiguities remained with respect to material terms. Id. at 1460-61. It noted that while the parties reached mutual consent as to the goals of the settlement, they did not agree to the means of achieving those goals. In particular, there was no meeting of the minds as to the management of the Castroville ranch, such as whether the manager would report to the trustee, and whether the trustee had the unilateral power to terminate the manager's employment. There also was no meeting of the minds as to the designation of the trust as a QTIP trust for tax purposes. Absent the designation, the widow was subjected to substantially greater tax liability for the income from the ranch. The appellate court found that the parties had not reached an agreement as to the means of achieving the goals, which means were material to the settlement because they had a significant financial impact on the parties. Id. at 1458-59.

Like this case, Bustamante v. Intuit, 141 Cal. App. 4th 199, dealt with the formation of a joint venture. Bustamante solicited Intuit's participation in establishing a joint venture to market Intuit software, including Quicken and Quickbooks, in Mexico. The parties contemplated an equity interest for Bustamante, no more than a twenty percent interest by Intuit, no monetary investment by Intuit but funding by outside venture capitalists, and a multi-phase approach to an assessment of the opportunity. Over several months, the parties conducted due diligence, defined objectives, and continued to negotiate terms. After Bustamante's attempts to secure outside funding failed, Intuit withdrew from further efforts to move into the market in Mexico. Bustamante filed a complaint against Intuit for breach of contract in connection with the joint venture in Mexico. The trial court granted summary judgment in favor of Intuit, and the Sixth District Court of Appeal affirmed, finding that there was no mutual consent to form an association without investor financing. The court of appeal observed that Intuit and Bustamante did not reach a meeting of the minds as to the essential structure and operation of the joint venture. They had not agreed to specific and definite terms on material issues, namely Bustamante's interest or compensation, his management role, the amount of Intuit's royalty, the identity of the management team, outside investors, and the liquidation terms. Absent certain agreement on material terms, there

22

MEMO. DECISION & ORDER AFTER TRIAL

1  was no enforceable agreement, and they had at best an agreement to agree. Bustamante, 141 Cal. App.
2  4th at at 211-215.
3      The objective facts demonstrate that the principals of the two contracting parties, Dimas and
4  MCED, did not reach a meeting of the minds as to the material terms of the joint venture. Each of the
5  parties believed that the operative agreement was a different one. The testimony reflects that the
6  principal of Dimas, Rakitin, believed that the terms of the joint venture were those set forth in the June
7  20, 2001 joint venture agreement. The principal of MCED, Hu, believed the terms were delineated in
8  the June 22, 2001 joint venture agreement. There are significant differences between the two
9  agreements. Dimas contemplated that investors would contribute $1.35 million in working capital to
10 the development of the property pursuant to the June 20 agreement, while MCED agreed to make a $1.2
11 million investment pursuant to the June 22 agreement. Rakitin intended that Dimas would make a $2.04
12 million equity contribution to the joint venture based on a property valuation of $4.75 million. Hu, on
13 behalf of MCED, understood that Dimas' equity contribution would be $2.29 million based on a
14 property valuation of $5 million. Rakitin anticipated a profit distribution formula under the June 20
15 agreement of 65% to the investors while Dimas received 35%. She also testified that she believed that
16 the profit distribution would be made pro rata from the sale of the improved lots and only after the
17 mortgages had been paid. Hu believed that, pursuant to the June 22 agreement, MCED would receive
18 a priority distribution of its initial capital plus a 100% return on investment, Dimas would recover its
19 initial capital, then profits would be shared equally thereafter. Rakitin believed that MCED was
20 obligated to make the mortgage payments. Hu, on the other hand, expected that Dimas would retain the
21 existing mortgages. Because the June 22 agreement was silent as to payment of the mortgages, Hu
22 believed that MCED was not required to make the payments. He understood that all the advances from
23 MCED would be used to pay or to reimburse project development costs.
24     The evidence shows that the parties had agreed to different terms. There was no mutual consent
25 between the parties with respect to the amount of capital to be invested, the equity contribution by the
26 property owner, the valuation of the property, the profit distribution, the obligation to make the
27 mortgage payments, and retention of the existing mortgages. These terms are material because they
28 have a significant financial impact on the parties. Because there was no meeting of the minds with

23

MEMO. DECISION & ORDER AFTER TRIAL

1  respect to numerous material terms of the joint venture, no agreement was formed. The June 22, 2001
2  joint venture agreement is not enforceable.

### 2. Ho Did Not Have Authority as Dimas' Agent to Enter into the June 22, 2001 Agreement.

While MCED and Dimas did not reach mutual consent as to the material terms of a joint venture agreement, a question arises whether Ho, as Dimas' agent, had the authority to bind Dimas to the June 22, 2001 joint venture agreement. Indicia of an agency relationship are the agent's power to alter legal relations between the principal and others, a fiduciary relationship, and the principal's right to control the agent's conduct. Vallely Investments, L.P. v. Bancamerica Commercial Corp., 88 Cal. App. 4th 816, 826 (Cal. Ct. App. (4th Dist.) 2001). The essential element of an agency relationship is the right of the principal to control the agent's conduct. Flores v. Brown, 39 Cal.2d 622, 628-29 (1952); Edwards v. Freeman, 34 Cal.2d 589, 592 (1949). An agent has whatever authority that the principal, either actually or ostensibly, confers upon the agent. Van't Rood v. County of Santa Clara, 113 Cal. App. 4th 549, 572 (Cal. Ct. App. (6th Dist.) 2003); Cal. Civ. Code § 2315. Actual authority is that which a principal confers upon an agent or, as a result of the principal's intentional or negligent conduct, the agent believes that he has. Cal. Civ. Code § 2316. Ostensible authority is that which a principal, through his intentional or negligent conduct, causes or allows a third person to believe that the agent has. Cal. Civ. Code § 2317.

A principal cannot be held accountable for the conduct of an agent who acts beyond the scope of his actual or ostensible authority. Van't Rood, 113 Cal. App. 4th at 573. Authority in a particular case is interpreted in accordance with the usual rules for interpretation of contracts. Id. The existence of an agency relationship is a question of fact for the trial court. Burr v. Capital Reserve Corp., 71 Cal.2d at 995.

The evidence indicates that there was an actual agency relationship pursuant to which Dimas appointed Ho to secure the investment capital to develop the property. The scope of Ho's authority, however, was limited to that which Dimas actually or ostensibly conferred to him. There is no indication that Dimas authorized Ho to enter into agreements on Dimas' behalf. On the contrary, Rakitin testified that Ho did not have such authority. Her testimony is consistent with the April 10, 2001 letter, which indicates that Ho has the authority to negotiate with potential investors on behalf of