UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN MORGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 02-51420-MM |
| | ) Chapter 11 |
| DIMAS, LLC, | ) |
| | ) CONTINUED HEARING on |
| Debtor. | ) OBJECTION to CLAIM re |
| | ) MILPITAS COUNTRYSIDE |
| | ) ESTATES & DEVELOPMENT, INC. |
| | ) |
| DIMAS, LLC, | ) Adv. 02-5453 |
| | ) |
| Plaintiff, | ) CONTINUED HEARING on ORDER |
| | ) to SHOW CAUSE re DISMISSAL |
| v. | ) re LACK of PROSECUTION |
| | ) |
| INVESTMENT GRADE LOANS, et al., | ) |
| | ) |
| Defendants. | ) Friday, July 7, 2006 |
| | ) San Jose, California |

Appearances:

| | |
|---|---|
| For the Debtor/<br>Plaintiff: | The Ellahie Law Firm<br>By:  Javed I. Ellahie, Esq., and<br>Adrienne Rakitan, Esq.<br>12 South First Street, Suite 600<br>San Jose, California  95113<br>(408) 294-0404 |
| For Creditor Milpitas<br>Countryside Estates<br>Development, Inc.: | Law Offices of Lawrence E. Smith<br>By:  Lawrence E. Smith, Esq., and<br>Tony Wu, Esq.<br>18 Crow Canyon Court, Suite 205<br>San Ramon, California  94583<br>(925) 820-4310 |
| Digital Court<br>Recorder: | United States Bankruptcy Court<br>Clerk of the Court<br>Sandy Morris<br>280 South First Street, Room 3035<br>San Jose, California  95113<br>(408) 535-5003 |
| Certified Electronic<br>Transcriber: | Palmer Reporting Services<br>P. O. Box 30727<br>Stockton, California  95213-0727 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

*Continued Hearings on Claim and Order to Show Cause* 2

1   Friday, July 7, 2006                                    11:49 o'clock a.m.

2                        P R O C E E D I N G S

3          THE COURT:  Item 9, Dimas, LLC.

4          MR. ELLAHIE:  Good morning, Your Honor.  Javed Ellahie

5   appearing on behalf of the debtor, Dimas.  Ms. Adrienne Rakitan

6   is also present.

7          MR. SMITH:  Good morning, Your Honor.  Larry Smith for

8   Milpitas Countryside Estates Development, Inc.  And Tony Wu is

9   also here.

10         THE COURT:  Okay.  Good morning.  Do you wish to be

11  heard, or do you want to submit the matter on your extensive

12  briefs?

13         MR. ELLAHIE:  I would like to have just a few more

14  comments if it's okay with Your Honor.

15         Basically, Your Honor, there's been a — excuse my

16  throat.  I've got a sore throat today.

17         I — I look at this case as — the Bankruptcy Rule, you

18  know, establish a deadline to filing — filing proofs of claims.

19  What the MCED wants is to treat the deadline really as a life

20  line, which means they can wait four years and then come into

21  court and say:  We can now file a claim.

22         The problem has been the extraordinary one of laches

23  that evolves.  Hence, in their reply they said that they only —

24  that they only found out about there was money when he saw the

25  first — the second disclosed statement.  That can't be correct.

*Continued Hearings on Claim and Order to Show Cause*                    3

1   I mean there's monthly ob- — the schedules initially say this is

2   a solvent estate.  Monthly operating reports have been filed

3   every month.  Most of them were given to the creditors every

4   month.  They received those.  So they — they knew it was a

5   solvent estate.

6          They rely on the stipulation supposedly, too, for the

7   position that we knew it was a claim.  But they don't attach a

8   copy of the stipulation.

9          The stipulation by its terms required approval by the

10  Court.  It was never submitted to the Court.  The stipulation by

11  its terms said only if an escrow closes within seven days and

12  there's some funding that comes through, then you can come back

13  and say:  I've got some — that you — that you're going to get

14  that money.

15         Otherwise, their right to pursue whatever the bank's

16  rights are, and we have a right to object to that.  So they

17  cannot hold us to that stipulation.

18         The line of cases — and it puts a burden on them.  I

19  mean it's — it's — excusable neglect doesn't mean any excuse.

20  Their only excuse seems to be that they didn't know that there

21  was any money in the estate.  That — you know, that's — that's

22  not a justifiable excuse.  The burden is still on them.  And

23  delay by itself causes prejudice.

24         Now what — what really gets me in this particular case

25  is that they're asking the Court to become a party to submitting

1  forged checks as part of their proof of claim.  I draw that in

2  the declaration of Ms. Rakitan.  The checks were obviously

3  forged.  And on the face of it they are forged.  They've —

4  they've changed a $10,000 check to an $18,000 check.

5       And — and you can see the coding at the bottom of the

6  check, and the bank cashed it.  It was a $10,000 check.  There's

7  two checks that they've submitted like that.  They've also

8  submitted joint venture agreements that are apparently forged.

9  They didn't think that goes to the merits of it.  It doesn't in

10 this case.

11      One of the reasons why excusable neglect is granted is

12 based on whether the creditor has acted in good faith.  That's a

13 display of, you know, horrible bad faith by them by submitting

14 forged checks to establish a proof of claim with this particular

15 Court.

16      They've not denied it didn't apply.  They just said

17 that's a material issue.  They're not denying that they're

18 forged checks.  So it's not a matter — it just shows that

19 there's bad faith.

20      The other real bad-faith issue in this particular case

21 is the whole issue of the foreclosure.  When the foreclosure was

22 happening under Bankruptcy Rule 4001 the IGL was required to

23 give them notice also.  IGL did not give them that notice.

24      They signed a note — agreement with IGL, advised this

25 Court that we were waiving the notice requirement.  Fine, you're

*Continued Hearings on Claim and Order to Show Cause*    5

1  disclosing to the court that you're waiving the notice

2  requirement so IGL can go forward with illegal foreclosure.

3         But they did not disclose to the Court they had

4  entered into an agreement with IGL to buy this very property and

5  had received an option to buy this property.  I've attached that

6  to the declaration on that — Ms. Rakitan that I filed.

7         One that foreclosure sale took place, apparently the —

8  I- — IGL and MCED were not able to — to conclude that deal.  And

9  MCED had to sue IGL.  And in their complaint they mentioned that

10  they had entered into this agreement to allow IGL to go forward

11  with the foreclosure and not object to their notice that had —

12  the motion that had not been properly served.

13         So I mean it leaves a real bad-faith question in the —

14  in the manner in which this creditor has behaved, because they

15  were causing — they're already acting in a manner to cause harm

16  to this bankrupt estate.

17         They also have prejudiced, because this is now four

18  years later they're filing a claim.  I mean in — Mr. Tony Wu was

19  involved from the start.  He filed a motion to appoint a trustee

20  in the bankruptcy case in 2002.  He's been getting operating

21  statements.  He's been involved — there was sued as — in

22  adversary proceedings.  They refused to enter into settlement

23  discussions.  And if the parties were in that settlement

24  discussion, this would have been all over.  They did not do

25  that.

*Continued Hearings on Claim and Order to Show Cause*                    6

1              If they had stayed in touch with it they would have

2     known what's going on.  They did not do that.  So they acted,

3     you know, throughout the span of this case as basically putting

4     their head — either putting their head in the sand or not going

5     forward with it.

6              Now I think there is an explanation for that.  The

7     first adversary proceeding that was filed against MCED they

8     objected to it on the ground that it was a noncore proceeding.

9     They filed a motion to dismiss that case.  I believe they choose

10    not to file a proof of claim because they're concerned that if

11    they file a proof of claim they might be brought into the case

12    that noncore defense that they're raising would — would be

13    denied.

14             The history — that's — that's basically my summation

15    at this point.

16             THE COURT:  Mr. Smith.

17             MR. SMITH:  Your Honor, I think we've set forth our

18    position in — in our brief.  I think that it's — it's certainly

19    clear to me that until the Court ruled on the motion for summary

20    judgment in favor of Dimas against Andy Lewis that it was

21    entirely unclear if this was a solvent estate or not.

22             And, in fact, as of September 9th the foreclosure by

23    Mr. Lewis and IGL seemed to indicate that there would be no

24    assets.  And it was only through what I understand to be seven

25    or eight hundred thousand dollars of fees that may or may not be

*Continued Hearings on Claim and Order to Show Cause*                    7

1    contested by special counsel that that foreclosure was set aside

2    and eventually there was money.

3          We didn't find out — my client didn't find out — we

4    didn't receive the first disclosure statement.  I don't know —

5    Mr. — there's been no explanation of why that wasn't sent to me.

6    But it doesn't surprise me because we were really on the margin

7    of this case as long as the fight was between IGL and — and

8    Dimas.

9          The — there — there's been a lot said about this

10   stipulation not being filed.  It's in the Court's file.  It was

11   attached to an order of the Court.  And the important issue with

12   regard to the stipulation is not whether the stipulation was

13   effective in terms of $250,000 being paid out in escrow, rather

14   that there is an explicit admission in that stipulation that

15   Dimas knew that it had received $250,000 from — from Milpitas

16   Countryside Estates Development and knew that Milpitas was

17   alleging that it was owed $450,000.

18         That admission is not conditional upon whether or not

19   that stipulation was ever performed.  And the admission was

20   repeated again shortly before the foreclosure in September in a

21   declaration of Mr. Wu.

22         The forged-check issue, I have no way of knowing at

23   present whether there are forged checks.  What we did was submit

24   to the Court a proposed proof of claim that had as much

25   documentation as we could find that we thought supported our

*Continued Hearings on Claim and Order to Show Cause*                          8

1    case.

2              Whether or not 23,000 or $40,000 of those checks are

3    forged or not — didn't go to the estate, we don't — we don't

4    know.  What we do know is that it's very clear from the evidence

5    that we can present to the Court that Milpitas wrote a $250,000

6    check to Dimas and that — and within days that money went

7    directly to Andy Lewis.  We know that there are checks that were

8    written directly to Ms. Rakitan, to her son, to the title

9    company that substantially benefitted Dimas.

10             Whether the — the merits of the exact amount of the

11   claim and whether these checks were valid is something that —

12   that Dimas has reserved to litigate and if — if the claim is

13   allowed to go forward.

14             On the other hand, to say that that constitutes bad

15   faith on our part to submit all this evidence at this time I

16   believe there's been no showing of that.

17             Finally, the agreement — in terms of — the agreement

18   between my client and Andy Lewis — there was a lawsuit.  As I

19   recall, and I was- — I didn't represent Milpitas at that time —

20   that that was something that Dimas was — actually wanted to

21   happen, but it was part and parcel of a stipulation that Dimas

22   at that time, shortly before the foreclosure, believed it could

23   obtain refinancing and this foreclosure wasn't going to happen.

24             After it was clear the foreclosure happened, my client

25   tried to recover some of the $500,000 it expended, alleged that

1    Mr. Lewis had agreed to sell the property to them.

2         And, finally, in terms of prejudice, again that's

3    something could be raised in defense of the claim, but — but

4    there is no prejudice that would be apparent from — from the

5    Court looking at a $250,000 check from Milpitas Countryside

6    Estates Development that went directly to IGL, that — the

7    $16,000 check that went directly from Milpitas Countryside

8    Estates Development to the title company or to the Santa Clara

9    tax collector.

10        But we believe that the original stipulation not only

11   was an informal claim but, in fact, was an admission of at least

12   the $250,000 claimed by Milpitas and that — that there has been

13   excusable neglect since — until January of this year it wasn't

14   clear.  It was just like a no-asset Chapter 7 case.  It — it

15   didn't look like there would ever be any money for anybody.

16        THE COURT:  The matter is submitted?

17        MR. SMITH:  Yes, Your Honor.

18        MR. ELLAHIE:  Yes.

19        THE COURT:  Okay.  This is a very fact-intensive case.

20   And so I'm going to go ahead and make an extensive record so

21   that you have a clear record of the facts before the Court.

22        MR. SMITH:  Thank you, Your Honor.

23        THE COURT:  The issue is whether Milpitas Countryside

24   Estates' failure to file a timely proof of claim was the result

25   of excusable neglect warranting an extension of time to file its

1  claim.

2      Alternatively, Milpitas Countryside Estates asserts

3  that it timely filed an informal proof of claim.  So MCED

4  asserts an unsecured claim in the amount of $534,829.  Its claim

5  arises in connection with a joint venture agreement that was

6  entered into in 2001 to develop the debtor's 24-acre undeveloped

7  parcel of real property in Milpitas.

8      MCED contends that it advanced funds to Dimas to cure

9  defaults to its senior secured lender, Investment Grade Loans,

10  to pay property taxes, to pay development costs in connection

11  with subdividing the property.  It also made some direct

12  advances to Adrienne Rakitan, the principal of Dimas.

13      In return for the advances Dimas executed promissory

14  notes to MCED and conveyed a deed of trust on the property in

15  the amount of $1.2 million.

16      When the parties reached an impasse in early 2002 on

17  the operation of the joint venture, MCED declined to continue

18  making payments on the Investment Grade Loan loans which were in

19  default.

20      The debtor commenced this Chapter 11 case on March

21  13th, 2002 to stop a foreclosure sale by IGL.  It scheduled the

22  claim of MCED in the amount of $450,000 as disputed.  MCED

23  received notice of the commencement of the case and that the

24  deadline to file proofs of claim was July 9th, 2002.

25      Notwithstanding that notice, MCED did not file timely

1   a proof of claim.  MCED did, however, participate in the Chapter

2   11 case.  Dimas commenced an adversary proceeding against MCED

3   and its principal on May 31st, 2002.  And that was to invalidate

4   the MCED deed of trust.  MCED filed a motion to dismiss the

5   adversary proceeding on July 10th, 2002, after the bar date had

6   passed.

7           That same date it filed an opposition to a motion by

8   Dimas to refinance the secured debt or, alternatively, to

9   subordinate the MCED deed of trust.  As a resolution of MCED's

10  objection to the debtor's motion to refinance, MCED and Dimas

11  entered into a stipulation that provided as follows:

12          Paragraph 13:  The parties agree that Milpitas, MCED,

13  did not pay the sum of $1.2 million to Dimas.  The parties also

14  agree that Milpitas asserts that it loaned to Dimas

15  approximately $450,000.  And Dimas asserts that it received

16  directly or indirectly from Milpitas the approximate sum of

17  $250,000.  The parties agree that the amount of this loan

18  remains in dispute.

19          Paragraph 15:  Dimas agrees to allow Milpitas to

20  submit to the escrow a demand in the amount of $250,000.  The

21  demand to be applied towards the claim of MCED.

22          Paragraph 16:  The payment of the demand is

23  conditioned upon Dimas obtaining a loan in the amount of not

24  less than $4.3 million.

25          So the Court approved this stipulation in connection

1    with the debtor's refinancing motion on July 12th, 2002.  MCED

2    voluntarily reconveyed its deed of trust on September 3rd, 2002

3    as an accommodation to Dimas so that it could obtain a loan.

4    The reconveyance was based on Dimas' agreement to pay to it

5    $250,000 within 60 days of a refinance.

6          Unfortunately, the debtor was unable to obtain a loan.

7    Pursuant to a stipulation with Investment Grade Loans, IGL

8    obtained relief from stay to proceed with a nonjudicial

9    foreclosure sale on its third deed of trust.  While the

10   foreclosure was pending, IGL and MCED negotiated a purchase

11   option for MCED in return for MCED's agreement not to oppose the

12   foreclosure sale.

13          IGL completed the foreclosure sale on September 10th,

14   2002.  It refused a tender by Dimas to cure the default under

15   the third deed of trust, asserting that it had made advances to

16   cure the defaults on the first and second deeds of trust.

17          Dimas commenced an adversary proceeding against IGL

18   and the foreclosure company on November 18th, 2002 for wrongful

19   foreclosure, seeking to set aside the foreclosure sale.  It also

20   named MCED as a defendant for its role in acquiring the purchase

21   option.

22          MCED answered the adversary complaint on January 24th,

23   2003.  At that juncture the Chapter 11 case became

24   litigation-driven, the outcome of which hinged on the

25   disposition of the adversary proceeding.

1        Following two years of acrimonious litigation between

2    the debtor and IGL, the Court granted partial summary judgment

3    to Dimas, setting aside the foreclosure sale.  Dimas and IGL

4    voluntarily participated in the judicially-supervised settlement

5    conference and entered into a settlement in June 2005.

6        Under the terms of the settlement if Dimas failed to

7    pay IGL the first installment of the settlement amount of $4

8    million within 30 days of Court approval of the settlement IGL

9    would become entitled to take title to the property upon payment

10   to Dimas of $1.8 million.

11       Upon Dimas' default under the term of the set- — terms

12   of the settlement IGL paid to Dimas $1.8 million and obtained

13   title to the property.

14       Only after the debtor participated in the settlement

15   conference in 2005 did the debtor begin to file objections to

16   claims and try to fix the amounts of the disputed claims.  In

17   that regard the debtor objected to the claims of MCED, IGL,

18   Daniel Snyder, and Berliner Cohen.

19       Although Dimas filed a plan and disclosure statement,

20   the Court declined to approve the disclosure statement until the

21   debtor liquidated the disputed claims in order to fix the amount

22   of distributions to creditors.  Because Dimas had failed to

23   prosecute the adversary proceeding against MCED the Court

24   issued, in December 2005, an order to show cause why the

25   proceeding shouldn't be dismissed as to MCED.  And the Court is

1  currently in the process of adjudicating the remaining disputed

2  claims.

3         So here MCED requests leave of Court to file its proof

4  of claim at this time asserting that it initially relied on its

5  deed of trust, then relied on Dimas' agreement to pay to it

6  $250,000 as assurances of its participation in a distribution.

7         Following the foreclosure by IGL, however, MCED

8  asserts that it appeared creditors would receive nothing since

9  the property was the debtor's sole asset.  It submits that the

10  circumstances constitute excusable neglect for failing to file a

11  timely proof of claim in the case.

12         Now MCED — excuse me — the Dimas responds that MCED

13  has not shown excusable neglect and that allowing the claim,

14  four years after the bar date, would vitiate the purpose of a

15  deadline.  The parties stipulate that the scope of this hearing

16  is limited to timeliness of MCED's claim, expressly reserving

17  the right to litigate the substantive merits of the claim

18  separately.

19         As the parties have noted, the factors that *Pioneer*

20  identified as the balancing test for determining whether there's

21  been excusable neglect are, first, the danger of prejudice to

22  the nonmoving party; second, the length of the delay and its

23  potential impact on judicial proceedings; third, the reason for

24  the delay, including whether it was within the reasonable

25  control of the movant; and, finally, whether the moving party's

1    conduct was in good faith.

2         This determination is at bottom an equitable one,

3    taking into account all relevant circumstances surrounding the

4    party's omission.

5         Now *Pioneer* adopted a broader and more flexible test

6    for excusable neglect.  And that's pointed out in the Ninth

7    Circuit's recent case, *Pincay versus Andrews*, 389 F.3d 853, page

8    856.

9         The Court has to examine all of the circumstances

10   involved rather than holding that any single circumstance in

11   isolation compels a particular result regardless of the other

12   factors.

13        Here I'm quoting from a case, *Briones versus Riviera*

14   *Hotel and Casino*, which was a Ninth Circuit case from 1997 found

15   at 116 F.3d 379, page 382, note 2.

16        So looking first at the issue of prejudice to the

17   nonmoving party, Dimas asserts that it's prejudiced by MCED's

18   failure to press its claim, saying that it would have taken into

19   account in its settlement negotiations with IGL the existence of

20   the claim if it had known about it.  It contends that it did not

21   believe MCED would continue prosecuting its claim.

22        But, truthfully, that doesn't seem to me to be a

23   reasonable assumption.  MCED actively sought to protect its

24   position until the time of the foreclosure sale.  Dimas also

25   affirmatively acknowledged that MCED asserted a claim but that

1   it was disputed.

2          Moreover, there is no indication that IGL would have

3   increased its payment amount to acquire the property.  For much

4   of the relevant period the posture of the case lent itself to

5   resolving the IGL claim first.

6          A determination of other claims would have been

7   unnecessary if there were no assets in the case.  While Dimas

8   complains that MCED declined to participate in the litigation or

9   the settlement conference with IGL, there's nothing in the

10  record to indicate that it was invited to the settlement

11  conference, which was not mandatory.

12         In fact, Dimas failed to prosecute the adversary

13  proceeding against MCED such that the Court issued an OSC for

14  dismissal as to MCED.

15         Dimas also asserts prejudice based on the need to dig

16  through old documents to present a defense to the claim, but

17  that burden is no greater than the inconvenience imposed on any

18  litigant whether or not the claim is timely.

19         On the issue of length of delay and the impact on

20  judicial proceedings, yes, a four-year delay in filing its claim

21  is long.  However, I have to find that there's been no adverse

22  effect on these judicial proceedings.

23         The pendency of the litigation with IGL precluded any

24  meaningful progress in the Chapter 11 case.  In fact, it

25  wouldn't have made any economic sense to incur administrative

1  expenses and devote resources to claims resolution until there

2  had been a resolution of the IGL claim.

3          So because the debtor commenced claims litigation

4  after Dimas reached the settlement with IGL, resolution of the

5  MCED claim does not significantly delay the plan process or the

6  closing of the case.

7          Third, the reason for the delay and whether it was

8  within the movant's control, MCED explains that it relied on its

9  deed of trust and then subsequently on Dimas' agreement to pay

10  it $250,000 after it reconveyed the deed of trust by

11  stipulation.

12          It also appears after the foreclosure by IGL that

13  there would be no assets with which — excuse me — with which to

14  make a distribution to unsecured creditors.  So for those

15  reasons MCED failed to file a timely proof of claim.

16          These appear to the Court to be both plausible and

17  reasonable bases not to file a claim.  Obviously, the more

18  prudent course of action would have been to have filed a claim

19  in an abundance of caution.

20          However, excusable neglect is, in the words of the

21  Ninth Circuit, somewhat an elastic comment and not limited

22  strictly to omissions caused by circumstances beyond the control

23  of the movant.  I'm citing to the *Pincay* case at page 857 and

24  yet also was citing to *Pioneer Investment*.

25          Now in *Pincay* the Ninth Circuit upheld the trial

1   court's allowance of a late notice of appeal where counsel had

2   delegated that task of calculating the deadline to a paralegal

3   who misread the rule.

4          While the Ninth Circuit recognizes the lawyer's

5   failure to read an applicable rule is one of the least

6   compelling excuses that can be offered, it nonetheless concluded

7   that the trial court had not abused its discretion in finding

8   that its neglect was excusable.

9          Indeed, the concept of excusable neglect has become

10  considerably more liberal since *Pioneer Investment* and *Pincay*.

11         Turning to the issue of good faith, Dimas here asserts

12  that MCED acted in bad faith in refusing to participate in the

13  litigation and the settlement conference.  As I previously

14  discussed, the posture of this case dictated that IGL's claim be

15  resolved first.

16         It doesn't appear that MCED wholly failed to

17  participate as Dimas has suggested.  In fact, it appears that

18  Dimas failed to prosecute the adversary proceeding against MCED.

19  The debtor has also failed to cite any direct evidence

20  suggesting bad faith other than the purportedly forged checks.

21         I am going to say that I think that it is premature to

22  consider the substantive merits of that argument, which I'm

23  going to reserve for a separate determination later.

24         When I balance all of the circumstances of MCED's

25  omission, I have to conclude that the neglect was excusable and

1    that it would be equitable to allow it to file its claim at this

2    time.

3              Okay.  So we don't have to reach the issue of informal

4    proof of claim.

5              And that brings me to ask you how you wish to proceed,

6    whether we should set this matter for a telephonic CMC or

7    whether you know already how you wish to proceed.

8              Mr. Ellahie.

9              MR. ELLAHIE:  Could I just make one — see if I can get

10   the Court to modify the allowance of the proof of claim to the

11   $250,000 that MCED relies on —

12             THE COURT:  I think we'll be determining the amount

13   later.  The issue before the Court that you all agreed upon was

14   simply timeliness.

15             MR. ELLAHIE:  I was looking at the very excuse when,

16   too, saying because we had agreed to two fifty.  That's not

17   excusable, and the rest is.  Okay.

18             THE COURT:  We'd look at all the factors, and the only

19   issue I looked at was whether or not to allow a late-filed

20   claim.

21             MR. ELLAHIE:  I see.  Okay.  I — I believe we could

22   probably just set it for trial.  It would probably be easier,

23   unless the Court wants to do a formal CMC.

24             THE COURT:  Mr. Smith, do you agree?

25             MR. SMITH:  Yes, Your Honor.  That would be fine.

1          THE COURT:  Except I'm wondering what the remaining

2    issues are.

3          MR. ELLAHIE:  Well, obviously the proof of claim they

4    filed would be the — that would be the issue with the joint

5    venture itself, because whether it was a loan or a joint venture

6    that's an issue.

7          Just — just one question on the facts that seem to

8    have gone into the Court's record.

9          Dimas had not signed a promissory note for the 1.2

10   million.  It was a separate note for about 60,000 and 40,000.

11   So it's — there's an issue on whether this is a joint venture or

12   a loan.

13          There is issues as to who give the money and to whom,

14   because the checks had been written by several different

15   entities to several different entities.

16          And then we have our own other complaint, which I

17   suppose we should probably do it at the same time, that we —

18   that Dimas did not prosecute with respect to the foreclosure —

19   illegal foreclosure sale that went on and MCED's participation

20   in that particular foreclosure sale.

21          MR. SMITH:  Your Honor, after hearing Mr. Ellahie's

22   comments, I think that it would be useful if we had a case

23   management conference to give Mr. Ellahie and I a chance to see

24   if we could, at least, define the issues —

25          THE COURT:  Yes.

*Continued Hearings on Claim and Order to Show Cause*                    21

1          MR. SMITH:  — before the Court before we start

2    discovery and just sort of willynilly toward trial.

3          THE COURT:  Yes.  That was exactly my response.

4          Mr. Ellahie, how much time did you envision, by the

5    way, that this matter would take to try?

6          MR. ELLAHIE:  I would say about two days, Your Honor.

7          THE COURT:  Okay.  So if we're talking about a two-day

8    trial, then I am going to send out the Court's Trial Setting

9    Conference Order.  And what that's going to do is make you very

10   specifically define what are the undisputed issues; what are the

11   disputed factual issues, the disputed legal issues; and also

12   define who your witnesses are going to be; what your exhibits

13   are going to be; how much time you're going to need for each of

14   your witnesses.  We'll probably put on a timed trial.  And what

15   your objections are going to be to the other side's exhibits.

16         It seems to me that maybe what I ought to do first is

17   give you a discovery cutoff.  We are trying to expedite this

18   case, so I want to make sure that we keep you on a short leash

19   as far as discovery goes.

20         How much time did you have in mind, Mr. Smith?

21         MR. SMITH:  I — in deference to my young children, I —

22   I — August is going to be very bad for me.  The last time we

23   were here I asked for 30 days for discovery, and then realized

24   when I got back to my office that you couldn't conduct discovery

25   of documents within 30 days.  So I would think sometime in —

*Continued Hearings on Claim and Order to Show Cause*                    22

1    maybe the end of September would give us time to —

2              MR. ELLAHIE:  I — I'm sorry.

3              I thought we already had a discovery cutoff.  The last

4    time we were here the Court set a 30 days' cutoff.

5              THE COURT:  Did I set one, —

6              MR. ELLAHIE:  Yeah, we set a 30-day discovery cutoff.

7    That's come and gone.  So —

8              THE COURT:  — because I don't have that in my mind.

9              MR. ELLAHIE:  Yeah, because that was —

10             THE COURT:  You think discovery is complete?

11             MR. ELLAHIE:  Well, that was — that was the deadline

12   we set, and I think we are bound by that.

13             THE COURT:  Okay.

14             MR. ELLAHIE:  So there's no more discovery to be in

15   this case.

16             THE COURT:  All right.  If discovery has been set,

17   then I think you would be.

18             MR. SMITH:  I understood that that discovery cutoff

19   was with respect to this pending motion as to whether — at that

20   point the issue was whether there would be something, perhaps,

21   in Ms. Long's files that would bear upon the agreements between

22   Dimas and MCED.  But —

23             THE COURT:  I can go back and listen to the tape.  Do

24   I need to do that?

25             MR. ELLAHIE:  I — I believe discovery has been cutoff,

*Continued Hearings on Claim and Order to Show Cause*                           23

1    Your Honor.  That was true, yeah.

2              THE COURT:  Okay.  I will go back and I will listen to

3    the tapes and see whether, in my opinion, it was with respect to

4    some other issue or with respect to this issue.

5              MR. ELLAHIE:  Yeah, because the motion had not been

6    filed by them by that time, so we're just letting them do their

7    discovery so then they could file their motion for whatever they

8    want to do.  Okay.  So I guess we still have to set a CMC date

9    then.

10             THE COURT:  Well, what I'm thinking, though, it is

11   going to take a substantial amount of time for you all to do the

12   work necessary for the trial setting.  And I'm thinking that

13   maybe I should set you on that for mid-September.

14             Ms. McGowan, do we have a date in mid-September?

15             THE CLERK:  We've — we've got something for the Court.

16        (Court and Clerk confer off the record at 12:21 p.m.)

17             THE COURT:  Okay.  How about September 14th at 1:30.

18   That will mean that you will need to have your statement on

19   file.  I'll make it need to be filed by September 8th.

20             MR. ELLAHIE:  Your Honor, —

21             THE COURT:  You'll see that the instructions that I

22   send to you require that it be a joint proposed form of order.

23   If you're not able to agree, there are instructions for what you

24   do.

25             MR. ELLAHIE:  All right, Your Honor.  We should be

*Continued Hearings on Claim and Order to Show Cause*                        24

1   able to agree, I think.

2           MR. SMITH:  Is there an agreement or is it, in fact,

3   the case that the opposition to the claim of Milpitas and the

4   adversary proceeding against Milpitas are now, in fact,

5   consolidated?  I mean so that when we're talking about discovery

6   cutoffs or — or not and trial-setting conference that we're

7   looking at all of the — the whole basket?

8           THE COURT:  I think either the adversary rules are

9   going to apply to the objection to claim, or we'll consolidate

10  them and have them heard together.  It only makes sense to me —

11          MR. ELLAHIE:  Yes, Your Honor.  I believe so.

12          And — and —

13          THE COURT:  Okay.

14          MR. ELLAHIE:  When I said the discovery cutoff —

15  cutoff, I was talking about the objection to claim.  I do not

16  know if — in the adversary proceeding your discovery cutoff date

17  was set.  So maybe —

18          THE COURT:  Okay.

19          MR. ELLAHIE:  — that is still open.  So that's that

20  information, because I was not involved with that proceeding.

21          THE COURT:  Okay.  But it's dealing with the same

22  issues.

23          MR. ELLAHIE:  All right.

24          MR. SMITH:  And, second, I think we did submit a

25  proposed proof of claim with our moving papers.  Would the Court

*Continued Hearings on Claim and Order to Show Cause*                    25

1    like us to — to resubmit that proof of claim?

2              THE COURT:  Yes.

3              MR. ELLAHIE:  Thank you, Your Honor.

4              THE COURT:  Okay.  Very well.  Good luck.

5              MR. SMITH:  Thank you, Your Honor.

6              THE COURT:  Thank you for your efforts.  They're

7    appreciated.  We're adjourned.

8              THE CLERK:  All rise.

9         (The matter was concluded at 12:23 o'clock p.m.)

10                             —o0o—

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State of California                )
                                   )    SS.
County of San Joaquin              )


        I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify I am not a party to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber through the American Association of Electronic Reporters and Transcribers, Certificate No. 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.



                                        Susan Palmer
                                        Palmer Reporting Services

                                        Dated September 11, 2006