

Steven C. Finley CSB# 074391
HENNEFER, FINLEY & WOOD, LLP
425 California Street, 19th Floor
San Francisco, CA 94104
Telephone: (415) 296-0111
Facsimile: (415) 296-7111
Email: sfinley@finleylaw.biz

Special Counsel for Debtor and Appellant Dimas, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

In re:                                          Case No.: 5:07-CV-4084 JF

DIMAS, LLC

                    Debtor and Appellant.

RE:

    Bankruptcy Case: 02-51420-MM
    Adversary No. 02-5453
    BAP No. n/a
    Appellant: Dimas LLC

**APPELLANT'S OPENING BRIEF**

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. THE BANKRUPTCY COURT DECISIONS .....................................................1

III. STANDARD OF REVIEW ................................................................................2

IV. DISTRICT COURT JURISDICTION ..............................................................2

V. STATEMENT OF THE CASE ...........................................................................2

VI. SUMMARY OF ARGUMENT.........................................................................7

VII. ARGUMENT ...................................................................................................8

   1) THE BANKRUPTCY COURT ABUSED ITS DISCRETION IN
      PERMITTING MCED TO FILE A CLAIM FOUR YEARS LATE –
      MCED MADE NO SHOWING OF EXCUSABLE NEGLECT...................8

      A) The *Pioneer* Factors - The danger of prejudice to the debtor,
        as non-moving party...............................................................11

      B) The Length of Delay and Potential Impact on Judicial Proceedings.........13

      C) The Reason for the Delay, Including Whether it was Within the
        Reasonable Control of the Movant............................................14

      D) Whether MCED's Conduct was in Good Faith................................15

      E) Equitable Relief - "An Elastic Concept".......................................16

   2) THE JUNE 22, 2001 JOINT VENTURE AGREEMENT IS BINDING
      ON, AND ENFORCEABLE BY, BOTH PARTIES ...............................16

      A) The Bankruptcy Court Erred in Concluding that John Ho Did Not
        Have Ostensible Authority to Enter the June 22 Agreement on
        Behalf of Dimas....................................................................16

      B) The June 22 Agreement Was Also Ratified by Dimas........................19

      C) MCED Has No Right, and In Fact Never Sought to, Rescind Based
        Upon Lack of Authority by Dimas' Agent.....................................24

   3) THE BANKRUPTCY COURT SHOULD HAVE INTERPRETED
      THE MEANING OF THE JUNE 22 AGREEMENT...............................25

4) THE JUNE 20 AND JUNE 22, 2001 JOINT VENTURE AGREEMENTS
MAY BE READ AS ONE CONTRACT..............................................27

    A) Amount of Investment..................................................................28

    B) Dimas' Net Equity Investment and Property Valuation ......................28

    C) Profit Distribution.......................................................................29

    D) Use of Investment Funds ............................................................30

5) AN AWARD OF RESTITUTION TO MCED IS CONTRARY TO LAW......34

    A) MCED Filed a Proof of Claim for "Money Loaned" and Never
       Sought to Amend that Claim......................................................35

    B) Restitution is Contrary to Law Where Dimas Did Not Know of
       MCED's Mistake...................................................................36

    C) Restitution is Not Available to a Party Who Received the Expected
       Exchange and Never Offered to Restore Benefits Received................37

6) MCED IS NOT ENTITLED TO RESTITUTION OF MONIES PAID
TO, AND RETAINED BY, RIDGEVIEW INVESTMENT, INC. -
$101,434.80...............................................................................40

    A) Ho Had No Actual Authority to Receive Monies on Behalf of
       Dimas...............................................................................40

    B) Ho Had No Ostensible Authority to Receive Monies Payable to
       Ridgeview............................................................................42

    C) Dimas Did Not Receive a Benefit From the Monies
       Retained by Ho (Ridgeview)......................................................43

    D) An Award of Restitution and Monies Paid to and
       Retained by Ridgeview as Dimas' Agent Pursuant to an
       Unenforceable Contract Violates the Restatement............................44

7) MCED IS NOT ENTITLED TO RESTITUTION OF THE $50,000
WHICH IT PAID FOR THE BENEFIT OF DIMAS IN 2002,
BECAUSE IT KNEW THAT DIMAS RECEIVED THE BENEFIT
PURSUANT TO THE JOINT VENTURE AGREEMENT OF
JANUARY 9, 2002......................................................................46

VIII. CONCLUSION..............................................................................47

## TABLE OF AUTHORITIES

**Cases**

*American Psychometric Consultants v. Work. Comp. App. Bd.*
36 Cal. App. 4th 1626, 1647 (1995)..............................................................37

*Boteler v. Conway* 13 Cal. App. 2d 79, 83 (1936)......................................24, 25

*Bustamante v. Intuit* 141 Cal. App. 4th 199 (2006)................................32, 33, 34

*Cadigan v. American Trust Co.*, 131 Cal. App. 2d 780, 786-787 (1955)..................32

*California Federal Bank v. Matreyek* 8 Cal. App. 4th 125 (1992)...........................36

*Crawford v. Hub Ranch of Paradise Valley* 134 Cal. App. 2d 256 (1955)................27

*In Re Dimas, LLC* 2008 U.S. Dist. LEXIS 8901 at 8.............................4, 10, 11, 27

*In Re Dix* 95 B.R. 134 (B.A.P. 9th Cir. 1988)...............................................2

*Flash Cleaners, Inc. v. Columbia Appliance Corp.*
156 Cal. App. 2d 455 (1957)...................................................................24, 25

*Frangipani v. Boeker* 64 Cal. App. 4th 860, 863 (1998).....................................33

*Ghirardo v. Antonioli* 14 Cal. 4th 39, 51 (1996), T75 at 30.................................36

*Harris v. Klur* 205 Cal. App 2d 574, 577 (1962)............................................27

*Holmes v. Lerner* 74 Cal. App. 4th 442 (1999)..............................................34

*In re Kilgore Meadowbook Country Club, Inc.*
315 B. R. 412, 417 (Bk. Ct. E. D. Texas 2004).............................................35

*Kyle v. Campbell Soup Co.*
28 F. 3d 928 (9th Cir. 1994)..................................................................11

*Manufacturers' Co. v. McKey* 294 U.S. 442, 443 (1935).....................................40

*Navrides v. Zurich Ins. Co.* 5 Cal. 3d 698, 703-704 ......................................22

*In Re Niles* 106 F. 3d 1456, 1459 (9th Cir. 1997)............................................2

*Oceanside 84 v. Fid. Fed. Bank* 56 Cal. App. 4th 1441, 1451 (1997).......................27

*Okun v. Morton* 203 Cal. App. 3d 805 (1988)...............................................34

*In Re Pac. Gas & Elec. Co.*
311 B.R. 84, 89 (Bankr. N.D. Cal. 2004)...............................................................10

*In re Paul Potts Builders, Inc.* 608 Fed. 2d 1279 (9th Cir. 1979)...........................40

*Pincay v. Andrews* 389 F. 3d 853 (9th Cir. 2004).........................................10, 13

*Pioneer Investment Services Co. v. Brunswick Assoc.*
507 U.S. 380 (1993)........................................................................10, 11, 13, 16

*Rakestraw v. Rodrigues* 8 Cal. 3d 67, 75 (1972).......................................22, 23

*In re Rebel Rents, Inc.*
346 B.R. 791, 882-803 (Bankr. C.D. Cal. 2005)....................................... 10, 13

*Reliance Finance Corp. v. Miller* 557 F.2d 674, 680 (9th Cir. 1977).......................29

*Reusche v. California Pacific Title Ins. Co.,*
231 Cal. App. 2d 731, 736 (1965)..................................................................19, 23

*Rivett v. Nelson,* 158 Cal. App. 2d 268, 276 (1958)...........................................18

*SanFran Co. v. Rees Blowpipe Mfg. Co.* 168 Cal. App. 2d 191, 204-205(1959)...........46

*Stein v. Simpson* 37 Cal. 2d 79, 82 (1951)........................................................40

*Terry v. Conlan* 131 Cal. App. 4th 1445 (2005).........................................32, 33

*In re Unioil, Inc.* 962 F. 2d 988, 992 (10th Cir. 1992)........................................35

*Volandri v. Hlobil* 170 Cal. App. 2d 656, 659-660 (1959).....................................23

*Weddington Productions, Inc. v. Flick* 60 Cal. App. 4th 793, 811 (1998)...................30

*In Re Zilog, Inc.* 450 F. 3d 996, 1000 (9th Cir. 2006)...........................10, 11, 13, 16

## Statutes and Rules

Bankruptcy Rule 8001...................................................................................2
Bankruptcy Rule 9006(b)(1)........................................................................7, 10
California Civil Codes §1635-1663...................................................................27
California Civil Code §1642.............................................................................32
California Civil Code §2307.............................................................................22

Civil Code §2310............................................................................................22

Civil Code §2314............................................................................................23

Civil Code §2317............................................................................................17

Civil Code §2318............................................................................................18

Civil Code §2332............................................................................................46

Civil Code §2334............................................................................................19

28 U.S.C. §158(a)(1) and (2)............................................................................2

# I. INTRODUCTION

The bankruptcy court permitted unsecured creditor Milpitas Countryside Estates Development, Inc. ("MCED") to file a claim for "Money Loaned" four years after the claims bar date. After an evidentiary hearing on MCED's claim and the debtor's adversary proceeding against MCED, the bankruptcy court awarded MCED restitution of $467,829 "based on its claim" and denied debtor any recovery on its adversary proceeding.

In this appeal, appellant debtor submits that:

1. Permitting MCED to file a late claim based on excusable neglect was an abuse of discretion under applicable law;

2. MCED failed to establish its claim that monies were loaned to the debtor, and the claim was never amended to seek restitution;

3. MCED is not entitled to restitution because a binding Joint Venture Agreement was entered into between the parties; and

4. Even if MCED were entitled to restitution, the amount ordered by the court is not fair, just or equitable or in accordance with applicable law.

Dimas does not appeal the court's denial of relief pursuant to the adversary proceeding.

## II. THE BANKRUPTCY COURT DECISIONS

The bankruptcy court's decision allowing the late filing of MCED's claim was made on July 7, 2006 and appears in the record at Tab No. 64.[1] In that decision the court concluded that under all of the circumstances and applicable law, MCED's four year delay in filing a claim was excusable neglect.

---

[1] Appellant's Designation of Record lists documents on file in this proceeding, together with trial exhibits admitted at the evidentiary hearing and the relevant decisions of the Bankruptcy Court at Tab Nos. 1-141, which have been provided to the court. A reference to a tab so provided will hereafter be "T," Tab 64 being "T64."

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

The bankruptcy court's Memorandum Decision ("Decision") awarding MCED restitution of $467,829 "based on its claim" was entered on July 24, 2007 and is found in the record at T75. In that Decision, the bankruptcy court included a 16 page discussion of the facts and made legal conclusions to the effect that the transaction between MCED and the debtor was not a loan, but was always intended to be a joint venture agreement. The bankruptcy court also concluded however that no enforceable joint venture agreement was entered into and that as a consequence, MCED was entitled to complete restitution of all monies invested.

## III. STANDARD OF REVIEW

The standard of review of the bankruptcy court's order permitting the filing of a late claim based upon excusable neglect, is abuse of discretion. *In Re Dix* 95 B.R. 134 (B.A.P. 9th Cir. 1988).

The bankruptcy court's decision awarding MCED restitution is reviewed on appeal for clear error in the findings of fact based upon the entire record presented (Bankruptcy Rule 8013), with application of the law to the facts reviewed afresh, or *de novo. In Re Niles* 106 F. 3d 1456, 1459 (9th Cir. 1997).

## IV. DISTRICT COURT JURISDICTION

This court has jurisdiction over an appeal taken from a bankruptcy court judgment, order or decree pursuant to 28 U.S.C. §158(a)(1) and (2), and Bankruptcy Rule 8001.

## V. STATEMENT OF THE CASE

The following facts are reflected in the bankruptcy court's Decision (T75) or in the record below and are pertinent to the issues raised by this appeal:

Debtor/appellant Dimas, LLC was the owner of a 24 acre undeveloped property in Milpitas, California, for which it had received a six-lot subdivision approval. Commencing in September 2000, Dimas sought investors with whom to joint venture the development and sale of

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1   the improved lots. The property was encumbered by three deeds of trust totaling $2.71 million

2   and had an appraised value of approximately $5 million. Dimas sought a joint venture by which it

3   would contribute its equity in the property, and investors would contribute the monies necessary to

4   develop, improve and sell the lots. Dimas contemplated that a construction loan would be obtained

5   to build custom houses on five out of six of the lots, and Dimas would retain the sixth lot for its

6   own use.

7

8       Dimas' managing member, Adrienne Rakitin met with John Ho, who had previously

9   participated in some development projects. Mr. Ho was to serve as project manager and search for

10  potential investors. Through Mr. Ho's efforts, Dimas entered into three joint venture agreements

11  by which investment funds were raised for development of the property. The joint venture

12  agreements of April 19 and May 15, 2001 identified MCED, the respondent herein, as the investor.

13  However, the corporation MCED was not formed until June 26, 2001.

14

15      On April 10, 2001, at Mr. Ho's request, Dimas provided him with a letter of authority

16  appointing him as the sole project and construction manager and business consultant for the

17  development of the property, with total authority to negotiate with any interested investor, and

18  stating that the final decision as to how to structure the joint venture would be made jointly

19  between Dimas and Mr. Ho (T80). Dimas also entered into an agreement with Mr. Ho's

20  corporation, Ridgeview Investment, Inc. engaging Ridgeview as construction manager for the

21  project, with a stated fee for defined Preconstruction and Construction Services (T82 –

22  "Construction Management Agreement").

23

24      In May 2001, through an introduction from Robert Liu, one of his employees, Mr. Ho was

25  introduced to Tony Hu. Mr. Ho met with Mr. Hu to outline the proposed joint venture and

26  provided Mr. Hu with a written investment proposal on May 24, 2001 describing the proposed

27

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1 joint venture (T84). By this time, Dimas had executed a $1.2 million Deed of Trust in favor of

2 MCED to secure investors capital under the terms of the joint venture agreement (T129).[2]

3      On June 20, 2001, Dimas executed another joint venture agreement with MCED, to which

4

5 Mr. Ho signed the name of Michael Jeng as President of MCED and returned the signed agreement

6 to Dimas (T85). In fact, unknown to Dimas, Michael Jeng was not the President of MCED, which

7 had not yet been incorporated.

8      Mr. Ho showed Tony Hu the April 10 Letter of Authority provided to him by Dimas, the

9 Construction Management Agreement, and the Deed of Trust. On June 22, 2001, Mr. Hu executed

10 a joint venture agreement with Dimas on MCED's behalf (T86). The terms of this agreement had

11

12 been drafted by Mrs. Rakitin and by Mr. Ho, who signed Mrs. Rakitin's name on the June 22

13 Agreement on Dimas' behalf and returned it to MCED. On June 26, 2001, MCED was

14 incorporated, and then ratified the June 22 Agreement by its subsequent performance. On July 16,

15 2001, Dimas recorded the $1.2 million Deed of Trust in favor of MCED as required by the June 22

16 Agreement. Dimas subsequently ratified the June 22 Agreement.

17

18      Some of the verbiage in the June 22 Agreement differs from that in the June 20 Agreement,

19 and both agreements are ambiguous as to whether MCED's investment of "needed working

20 capital" could be used for debt service, that is monthly payment of the mortgages on the property.

21      Between June 27, 2001 and August 17, 2001, MCED invested a total of $417,829, making

22 $317,859 payable to Dimas, and $99,970 payable to Ridgeview. All of the checks were given to

23 Mr. Ho. In September 2001, Mr. Hu of MCED learned that some of the funds invested had been

24

25 used to make mortgage payments to Dimas' secured lender (IGL). Mr. Hu stated MCED was

26

27 [2] Contrary to the recitation of facts in the bankruptcy court's July 7, 2006 hearing (T64 at 10:13-15) and cited in this court's Order denying motion for stay (2008 U.S. Dist. LEXIS 8901 at 2), there were no promissory notes underlying this Deed of Trust.

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1   willing to continue advancing monies to finance improvements on the property but not to pay the

2   high interest IGL mortgage.  MCED did not, however, terminate the June 22 Agreement, and Mr.

3   Hu testified that he was wiling to continue with development of the property on the condition that

4
5   title of the property be transferred to MCED so that he would have greater control.  Mr. Hu

6   testified that as of January 2002, he believed that MCED was still performing the agreement and

7   that it was still binding and in force.  Although Mr. Ho, purporting to act on behalf of MCED,

8   attempted to terminate the joint venture agreement by letter of September 23, 2001, Mr. Ho was in

9   fact without authority to do so on MCED's behalf.  Mrs. Rakitin of Dimas, who learned of the

10  June 22 Agreement in September 2001, made no attempt to reject or repudiate it, and Mr. Hu of

11
12  MCED testified that he received a note from Mrs. Rakitin at that time stating that she would

13  comply with his conditions.

14      On January 9, 2002, Dimas entered into another joint venture agreement with Countryside

15  Estates, LLC (T110), which Mrs. Rakitin of Dimas believed was a restructuring of MCED.  Robert

16  Liu, the Secretary and a director of MCED, witnessed this agreement.  MCED issued two checks

17  totaling $50,000 to Robert Liu to cure a default of Dimas' IGL loans.  Robert Liu of MCED was

18
19  aware that Dimas believed that it was receiving these monies pursuant to the January 9, 2002 Joint

20  Venture Agreement.

21      The IGL loans matured and became due on March 1, 2002, and when Dimas was unable to

22  cure the defaults under the note and IGL recorded a notice of trustee sale, Dimas filed a bankruptcy

23  petition on March 13, 2002 to stop the foreclosure sale.  Dimas listed MCED in its Schedule F as a

24
25  disputed claim in its Bankruptcy Petition, and the bankruptcy court set a deadline for the filing of

26  proofs of claim for July 9, 2002.  MCED did not file a claim, but moved with other creditors to

27

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1   dismiss the case and for assignment of a case trustee, both of which motions were denied on

2   August 9, 2002.

3       On July 11, 2002, MCED entered into a court approved Stipulation to remove its Fourth

4   Deed of Trust over Dimas' property and submit a demand in escrow for $250,000 and litigate the

5

6   balance of its claim in the Chapter 11 case. The Stipulation provided for payment to MCED out of

7   escrow upon Dimas obtaining a refinance loan of not less than $4.3 million (T114, Stipulation

8   ¶¶15 and 16; Decision T75 at 14:15-15:7). When the refinance did not materialize, counsel for

9   Dimas and MCED entered into a new agreement whereby MCED would reconvey its Deed of

10  Trust in return for payment of $250,000, regardless of the refinance, and the parties would litigate

11  the balance of MCED's claim in the bankruptcy court (T75 at 15:8-16:7). This later Stipulation of

12  August 28, 2002 was never noticed by MCED to the creditors or approved by the court and was

13

14  therefore unenforceable against the estate (T75 at 27:7-29:6). MCED reconveyed its Fourth Deed

15  of Trust on September 3, 2002, and Investment Grade Loans ("IGL"), the holder of the Third Deed

16  of Trust on the property, conducted a foreclosure sale of the property on September 10, 2002 (T75

17  at 16:27-28).

18

19      On December 3, 2004, appellant Dimas filed a Chapter 11 Plan of Reorganization and

20  Disclosure Statement with no provision for payment to MCED. The Plan of Reorganization and

21  Disclosure Statement were served on MCED (T45, T46, T47, T48 and T49). MCED still filed no

22  claim or objection to the Plan or Disclosure Statement. In August 2005, counsel for Dimas and

23  MCED had discussions with respect to MCED's claim, in which Dimas' counsel advised MCED's

24

25  counsel that MCED's claim was barred for failure to having filed a claim by December 2002

26  (Reporter's Transcript ("RT") Vol. III at 43:14-46:20 – see Appendix Doc. No. 7). Still MCED

27  made no motion for permission to file a late claim. On January 20, 2006, appellant Dimas filed an

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1  Amended Plan and Disclosure Statement with no provision for payment to MCED, which was also

2  served on MCED and its counsel (T50, T51 and T52).  MCED filed an objection to the amended

3  disclosure statement on February 16, 2006 (T53) and on June 9, 2006, filed a motion for extension

4
5  of time in which to file proof of claim.  The motion was heard by the court on July 7, 2006 (T64),

6  almost four years to the day after the deadline for the filing of proofs of claim.

7      MCED's Motion for permission to file a late claim was heard and granted by the court on

8  July 7, 2006 finding that there was "excusable neglect" within the meaning of Bankruptcy Rule

9  9006(b)(1) entitling MCED to file a late claim (T64 at 9-19).

10
    After receiving permission to file a late claim, MCED filed a proof of claim on October 4,
11
12  2006, for "Money Loaned" (T65), and then an amended proof of claim on October 19, 2006, for a

13  different amount, again for "Money Loaned."  In its Decision, the court rejected MCED's

14  contention that there was a loan transaction (T75 at 19-20), but awarded MCED restitution in the

15  full amount which it had invested, whether paid to Dimas or Ridgeview "based on its claim."  The

16
    court found that there had been no "meeting of the minds" between the parties who had intended
17
18  to enter a joint venture agreement, and that restitution by Dimas in the total amount invested

19  "appears to be in order."

20                    VI. **SUMMARY OF ARGUMENT**

21      Appellant's argument to this court is as follows:

22  1.  The bankruptcy court abused its discretion in allowing MCED to file a claim four years
23
        after the claims bar date;
24
25  2.  The bankruptcy court erred in awarding MCED restitution "based upon its claim," in light

26      of the fact that MCED filed a proof of claim for "Money Loaned" and at no time sought to

27      amend that claim;

28

3.  The bankruptcy court erred in reaching the legal conclusion that the June 22, 2001 Joint Venture Agreement was unenforceable against MCED;

4.  The bankruptcy court erred in reaching the legal conclusion that the June 20, 2001 and June 22, 2001 Joint Venture Agreements could not be construed as one agreement and enforceable as such;

5.  The bankruptcy court erred in awarding MCED restitution of all, or even part, of the monies invested pursuant to the June 22, 2001 Joint Venture Agreement.

By and large, and with a few notable exceptions, appellant does not take issue with the factual discussion or findings of the bankruptcy court, but rather the legal conclusions which the Court has drawn from those factual findings.

## VII. ARGUMENT

## 1. THE BANKRUPTCY COURT ABUSED ITS DISCRETION IN PERMITTING MCED TO FILE A CLAIM FOUR YEARS LATE – MCED MADE NO SHOWING OF EXCUSABLE NEGLECT

Appellant Dimas filed its Voluntary Petition for Bankruptcy under Chapter 11 on March 13, 2002, listing MCED in Schedule F as a disputed claim ("contract dispute") and listing MCED on the Proof of Service (T1). The bankruptcy court then set the deadline for the filing of a proof of claim by creditors as July 9, 2002 (T2). MCED joined with other creditors in moving to dismiss the case on April 15, 2002, and for the assignment of a case trustee in bankruptcy on May 18, 2002 (T4 and T8). These motions were denied on August 9, 2002 (T28 and T29). In June 2002 Dimas and MCED met to negotiate a revival of the development project. These discussions were unsuccessful (T75 at 13:26-14:6).

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1    On July 11, 2002, Dimas and MCED entered into a court approved Stipulation to remove

2    its Fourth Deed of Trust over Dimas' property and submit a demand in escrow for $250,000 and

3    litigate the balance of its claim in the Chapter 11 case.  The Stipulation provided for payment to

4
5    MCED out of escrow upon Dimas obtaining a refinance loan of not less than $4.3 million (T114,

6    Stipulation ¶¶15 and 16; Decision T75 at 14:15-15:7).  When the refinance did not materialize,

7    counsel for Dimas and MCED entered into a new agreement whereby MCED would reconvey its

8    Deed of Trust in return for payment of $250,000, regardless of the refinance, and the parties would

9    litigate the balance of MCED's claim in the bankruptcy court (T75 at 15:8-16:7).  This later

10   Stipulation of August 28, 2002 was never noticed by MCED to the creditors or approved by the

11   court and was therefore unenforceable against the estate (T75 at 27:7-29:6).  MCED reconveyed

12   its Fourth Deed of Trust on September 3, 2002, and Investment Grade Loans ("IGL"), the holder

13
14   of the Third Deed of Trust on the property, conducted a foreclosure sale of the property on

15   September 10, 2002 (T75 at 16:27-28). *Still MCED filed no proof of claim.*

16   On December 3, 2004, appellant Dimas filed a Chapter 11 Plan of Reorganization and

17   Disclosure Statement with no provision for payment to MCED.  The Plan of Reorganization and

18   Disclosure Statement were served on MCED (T45, T46, T47, T48 and T49).  **MCED still filed no**

19   **claim or objection to the Plan or Disclosure Statement**.  In August 2005, counsel for Dimas and

20   MCED had discussions with respect to MCED's claim, in which Dimas' counsel advised MCED's

21   counsel that MCED's claim was barred for failure to having filed a claim by December 2002 (RT

22
23   Vol. III at 43:14-46:20 – see Appendix Doc. No.7).  **Still MCED made no motion for permission**

24   **to file a late claim**.  On January 20, 2006, appellant Dimas filed a First Amended Plan and

25   Disclosure Statement with no provision for payment to MCED, which was also served on MCED

26   and its counsel (T50, T51 and T52).  MCED filed an objection to this amended disclosure

27

28

HENNEFER, FINLEY & WOOD, LLP
*ATTORNEYS AT LAW*

1  statement on February 16, 2006 (T53) and on June 9, 2006, filed a motion for extension of time in

2  which to file proof of claim.  The motion was heard by the court on July 7, 2006 (T64), almost

3  four years to the day after the deadline for the filing of proofs of claim.

4  
5      MCED's Motion for permission to file a claim was heard and decided by the court on July

6  7, 2006 (T64).  Citing *Pioneer Investment Services Co. v. Brunswick Assoc.* 507 U.S. 380 (1993)

7  and the Ninth Circuit decision of *Pincay v. Andrews* 389 F. 3d 853 (9th Cir. 2004), the bankruptcy

8  court found that there was "excusable neglect" within the meaning of Bankruptcy Rule 9006(b)(1)

9  entitling MCED to file a late claim (T64 at 9-19).

10     As this court stated in its Order denying motion for stay, the *Pioneer* factors to be applied

11  in determining whether there is "excusable neglect" must:

12  
13          "take account of all relevant circumstances surrounding the party's omission.

14          These include…the danger of prejudice to the debtor, the length of the delay and its

15          potential impact on judicial proceedings, the reason for the delay, including whether

16          it was within the reasonable control of the movant, and whether the movant acted in

17          good faith."

18  
19          2008 U.S. Dist. LEXIS 8901 at 8 (attached in Appendix), citing *Pioneer Inv. Serv.*

20          *Co. v. Brunswick Assoc.* 507 U.S. 380, 395.

21     The burden of presenting facts demonstrating excusable neglect is on the movant, MCED.

22  *In re Rebel Rents, Inc.* 346 B.R. 791, 882-803 (Bankr. C.D. Cal. 2005), citing *In Re Pac. Gas &*

23  *Elec. Co.* 311 B.R. 84, 89 (Bankr. N.D. Cal. 2004).  As the Ninth Circuit made clear *In Re Zilog,*

24  *Inc.*, a bankruptcy court's findings as to excusable neglect may constitute an abuse of discretion.

25  
26  
27  
28  

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1   *In Re Zilog, Inc.* 450 F. 3d 996, 1000 (9th Cir. 2006).[3]  See also *Kyle v. Campbell Soup Co.* 28 F.

2   3d 928 (9th Cir. 1994), decided shortly after the U.S. Supreme Court decision in *Pioneer, supra*, in

3   which the Ninth Circuit found that the district court had abused its discretion in finding excusable

4   neglect based upon an attorney's mistaken belief that a thirty day deadline to file a post-trial

5   motion for attorney's fees could be enlarged by three days when service of the motion was

6   effectuated by mail.  *Id.* at 932.

7

8   ### A) The *Pioneer* Factors - The danger of prejudice to the debtor, as non-moving party

9   In its Order denying motion for stay, this court summarized the bankruptcy court finding as

10  to prejudice by stating that:

11

12  > "Although MCED had not filed the claim previously, it actively had sought to

13  > protect its claim through the time of the foreclosure sale, <u>at which point the claim</u>

14  > <u>was filed</u>;" 2008 U.S. Dist. LEXIS 8901 at 8-9, emphasis added.

15  This summary of the bankruptcy court's finding is neither accurate nor borne out by the

16  record. The foreclosure sale took place on September 10, 2002 (T75 at 16:27-28), at which time

17  MCED believed that it had entered into a stipulation with the debtor by which a claim for

18  $250,000 would be allowed and paid, and that it would be permitted to litigate the balance (T75 at

19  28:10-22).  **As stated in the bankruptcy court's decision, MCED did not notice this**

20  **agreement to creditors or have it approved by the court** (T75 at 29:4-6) and it was therefore

21

22  unenforceable.  MCED filed no claim for $250,000 or any other amount until October 4, 2006

23  (T65), more than 4 years later, having received permission from the court on July 7, 2006 (T64).

24

25

26

27  ---

[3] The Ninth Circuit Court of Appeal's decision *In Re Zilog, Inc.*, reversing the finding of this court and the bankruptcy court, as to excusable neglect was filed June 15, 2006, three weeks prior to the court's decision in this case and was reported in The Recorder with the headline "Ninth Circuit Blasts Bankruptcy Court."

28

1  Accordingly, MECD's "protection of its position" *ceased* almost four years before its motion for

2  permission to file a late claim on June 9, 2006 (T58).

3      In fact, the bankruptcy court's finding with respect to the factor of prejudice is otherwise.

4  The bankruptcy court found that Dimas had not been prejudiced by "MCED's failure to press its

5

6  claim" because in Dimas' early 2005 settlement negotiations of its adversary proceeding against its

7  secured lender IGL "there is no indication that IGL would have increased its payment amount" had

8  Dimas known that MCED would continue prosecuting its claim and taken the claim "into account

9  in its settlement negotiations with IGL" (T64 at 15:16-16:14).  However, in its opposition to

10  MCED's motion to allow filing of late claim, Dimas submitted a declaration from its counsel

11

12  stating that MCED's failure to "raise its claim…led Dimas to believe that it did not have a claim

13  and Dimas relied upon this to arrive at a settlement with IGL" (T61 at¶10), and a declaration from

14  Dimas' principal, Adrienne Rakitin, stating that had Dimas known that MCED would file a claim:

15      "Dimas would have taken the MCED claim into account and sought a settlement

16      for a substantially higher amount or sought to have IGL pay for attorney's fees

17      incurred in the IGL matter." (T60 at ¶25).

18

19  In reply, <u>MCED offered no evidence or sworn testimony to the contrary</u> and argued that: "Dimas

20  negotiated the absolutely best deal it could reach because Dimas believed it would be the

21  beneficiary of the settlement." (T63 at 6:17-18), i.e. that MCED would not have a claim on the

22  proceeds.  The bankruptcy court also reasoned that Dimas was not prejudiced by having to litigate

23  MCED's claim four years later than it would have, had MCED filed a timely claim (T64 at 16:15-

24

25  18).

26      Under the circumstances of this case, appellant Dimas was clearly prejudiced by MCED's

27  four year delay in pressing its claim.  Had the claim been filed, determined and liquidated in 2003,

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1    or even in 2004, Dimas would have been able to factor the claim into its plans of reorganization

2    filed in December 2004 (T45-47) and in January 2006 (T50-52). Dimas would also have been able

3    to factor in the amount of any allowed claim into its settlement negotiations with IGL. MCED has

4    not established otherwise, and there is no basis for the bankruptcy court to conclude otherwise.

5    MCED's four year delay in filing its claim was not invited by any negligence or misleading

6    conduct on the part of Dimas (contrast the misleading letter sent to employees *In Re Zilog, Inc.,*

7    *supra* 450 F. 3d 996 at 1006-1007 (9th Cir. 2006)). Clearly, the memory of witnesses who

8    testified at the evidentiary hearing on MCED's claim, as to events which occurred in 2001, would

9    have been better in 2003 than in 2007.

10   All of this amounts to prejudice and MCED did not satisfy its burden in proving otherwise.

11   **B) The Length of Delay and Potential Impact on Judicial Proceedings**

12   The bankruptcy court conceded that:

13       "...Yes, a four year delay in filing its claim is long."

14       T64 at 16:20-21.

15   In fact, a four year delay is far longer than any delay found in reported cases in the Ninth Circuit.

16   See *Pincay v. Andrew, supra* 389 F. 3d 853 (30 day delay in filing notice of appeal); *Pioneer*

17   *Investment v. Brunswick, supra* 507 U.S. 380 (20 day delay in filing proof of claim); *In Re Zilog*

18   *Inc., supra* 450 F. 3d 996 (several months delay in filing proofs of claim); *In re Rebel Rents, Inc.,*

19   *supra* 326 B.R. 791 (15 day delay in filing notice of appeal).

20   Within this factor, the bankruptcy court was of the view that the four year late claim had no

21   adverse impact on the bankruptcy proceedings because (the court found) it would have made no

22   economic sense to engage in claims litigation until Dimas had settled with IGL (T64 at 16:21-

23   17:6). Even if this were true, the IGL litigation was resolved by June 2005 (T64 at 13:3-5), and in

1   August 2005, Dimas' counsel advised MCED's counsel that MCED's claim had been long time

2   barred (RT Vol. III at 43:14-46:20 – see Appendix Doc. No.7).[4]  A motion for permission to file a

3   late claim almost one year later in June 2006 is still untimely, and continued to further delay

4   Dimas' ability to complete its reorganization.

5

6   **C) The Reason for the Delay, Including Whether it was Within the Reasonable Control**

7   **of the Movant**

8       The burden of proof rests squarely upon MCED as movant to explain to the court why it

9   seeks to file a claim four years late.  No declaration from MCED was submitted in support of its

10  motion.  MCED's counsel did not submit any declaration in support of the motion (T58), and in

11  his reply papers submitted only a speculative declaration (and no declaration from MCED) to the

12  effect that he did not believe that MCED had received Dimas' original disclosure statement and

13  plan of reorganization served in December 2004 (T63 at 11-12).

14

15      MCED has been represented by its present counsel, Lawrence E. Smith, since at least

16  December 2002 (T63 at 9:8-9).  However, its motion for permission to file late claim contains no

17  "*mea culpa*" by Mr. Smith or any other attorney admitting to and explaining negligence in failing

18  to file a claim for four years.  No evidence whatsoever is provided of any reason for the delay in

19  filing a proof of claim *beyond MCED's control*.  MCED offers, as the reason for its delay, the

20  belief that it had an allowed claim of $250,000 and Dimas' consent to a late filed claim for the

21  balance of its claim, and the belief that Dimas had no assets after the foreclosure of its property in

22  September 2002 (T64 at 17:7-14).

23

24      However, as the court held in its subsequent decision on MCED's claim, the Agreement

25  between Dimas and MCED in August 2002 to pay MCED $250,000 and litigate the balance was

26

27  ────────────

28  [4] Reporter's Transcript testimony cited in this brief is attached by way of Appendix, Document Nos. 4-9.

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1  unenforceable under Bankruptcy Rule 9019 because it was not noticed to creditors or approved by

2  the court.  MCED and its attorneys had no reasonable basis to rely on this "Agreement" and have

3  offered no evidence of excusable neglect in failing to have this Agreement noticed and approved,

4  or failing to file a proof of claim reflecting the Agreement.  As to MCED's belief that Dimas had

5  no assets after foreclosure, MCED was fully aware of the fact that Dimas had sued IGL for

6  wrongful foreclosure and return of the property since MCED was a named party to that action

7  (T64 at 12:22-23, T137), that the foreclosure had been set aside by summary adjudication of the

8  court in 2004 (T64 at 13:1-3), and that Dimas had listed the value of its property in its petition at

9  $5.6 million, with IGL's secured claim of $3.02 million (T1, Schedule A Real Property).  Given all

10 of these circumstances, it would have been far more than a "prudent course of action" or an

11 "abundance of caution" for MCED to have filed a proof of claim.

12

13 **D)  <u>Whether MCED's Conduct was in Good Faith</u>**

14     This court, in denying Dimas' motion to stay pending appeal, summarized the bankruptcy

15 court's finding on this point as:

16     "Dimas did not cite any evidence demonstrating bad faith."

17     However, the burden of proof is not on Dimas to demonstrate bad faith on the part of

18 MCED, but rather upon MCED to demonstrate that its conduct was in good faith.  MCED did not

19 do so.  The facts show that after September 2002, MCED "lay back in the weeds," lulling Dimas

20 into the reasonable assumption that MCED was not pursuing its claim, and that Dimas would not

21 have to litigate that claim or factor that claim into its settlement negotiations with IGL.  Whether

22 MCED's conduct rises to the level of bad faith is certainly disputable, but that it does not qualify

23 as "good faith" is not.

27 ///

28

HENNEFER, FINLEY & WOOD, LLP
*ATTORNEYS AT LAW*

**HENNEFER, FINLEY & WOOD, LLP**
*ATTORNEYS AT LAW*

1

### E) Equitable Relief - An "Elastic Concept"

2      Since the decision in *Pioneer*, *supra*, the Ninth Circuit has understood excusable neglect

3

4  under Bankruptcy Rule 9006 to be "an elastic concept," the determination of which is an equitable

5  one taking into account all relevant circumstances surrounding the party's omission. As the Ninth

6  Circuit demonstrated *In Re Zilog, Inc.*, *supra* even though the determination is an equitable one,

7  the bankruptcy court is quite capable of abusing its discretion and making the wrong

8  determination. This has occurred here. A four year delay in filing a proof of claim is simply

9  unheard of and MCED has provided no convincing justification. The bankruptcy court required

10

11  that all claims be liquidated before approving a plan and disclosure statement (T64 at 13:19-22)

12  and MCED's failure to file its proof of claim and have its claim liquidated, has seriously delayed

13  Dimas' reorganization and the closure of these bankruptcy proceedings which are now in their

14  seventh year.

15

### 2. THE JUNE 22, 2001 JOINT VENTURE AGREEMENT IS BINDING ON, AND ENFORCEABLE BY, BOTH PARTIES

16

17

### A) The Bankruptcy Court Erred in Concluding that John Ho Did Not Have Ostensible

18

### Authority to Enter the June 22 Agreement on Behalf of Dimas

19      In its Decision, the bankruptcy court reached the legal conclusion based upon

20

21  uncontroverted facts that John Ho did not have ostensible authority to enter the June 22 Agreement

22  (T75 at 24:23-25:10). The basis for the court's conclusion is that:

23  1.  The April 10, 2001 Letter of Authority, which Dimas gave to Mr. Ho to show investors

24      (T80), gave him "total authority on behalf of Dimas and the Rakitins to negotiate with any

25      third party," and authority to "make the decision for the best interest of the project and

26      Rakitin family," but reserved "the final decision regarding how to structure the joint

27

28

1   venture relationship with any third party [to] be made <u>jointly</u> by Dimas, LLC, the Rakitins

2   and Mr. Ho."; and

3   2.   Tony Hu of MCED believed that Mrs. Rakitin had signed the June 22 Agreement on behalf

4        of Dimas, not that Mr. Ho was entering into the Agreement as Dimas' agent (T75 at 25:5–

5        7).

6

7   Ostensible authority is defined by California Civil Code §2317 as:

8        "Ostensible authority is such as a principal, intentionally or by want of ordinary

9        care, causes or allows a third person to believe the agent to possess"

10  The extent of John Ho's ostensible authority to represent to a third party that Mrs. Rakitin

11  had signed the June 22 Agreement, or to actually sign her name to the joint venture agreement,

12  arises directly from the terms of the Letter of Authority of April 10, 2001 (T80) and from whatever

13  other representations Mr. Ho made to MCED at the time.  Mr. Ho "believed that Rakitin gave him

14  wide latitude and authority on Dimas' behalf" (T75 at 5:13-14).  The testimony of Tony Hu, the

15  President of MCED, Robert Liu, the Secretary of MCED and John Ho was as follows:

16

17  1.   Tony Hu testified that he understood Mr. Ho to represent Dimas (RT Vol. II at 56:2-9 – see

18       Appendix Doc. No.5) and that Mr. Ho told him that Mrs. Rakitin had signed the Joint

19       Venture Agreement (RT Vol. II at 21:11-17 – see Appendix Doc. No.5);

20

21  2.   Robert Liu testified that Mr. Ho had told him that he had Mrs. Rakitin's power of attorney

22       (RT Vol. IV at 51:2-7 – see Appendix Doc. No.9), and that he was in complete control of

23       the project (RT Vol. IV at 27:17-23 – see Appendix Doc. No.9);

24

25  3.   Lawrence E. Smith, the attorney for John Ho and MCED at trial, testified that around

26       September 2000, Mrs. Rakitin had told him that she was giving John Ho complete

27

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

authority to do whatever he wanted since he was her savior (RT Vol. III at 151:9-19. 152:22-153:1 – see Appendix Doc. No.8).

The Letter of Authority (T80), using such terms as "total authority" clearly placed Mr. Ho in the position of being able to represent to a third party investor that the agreement which he had been authorized to negotiate had been *jointly* approved by him and Dimas, *whether it was or not.*

The only restriction placed upon Mr. Ho's ostensible authority, in regard to his authorized dealings with third party investors such as MCED, was that the final decision on the agreement would need to be made *jointly* between Ho and Dimas.[5]  This placed Ho in a position of being able to represent to MCED, <u>as he did</u>, that Dimas had agreed to and signed the document.  This creates a situation of estoppel on the part of Dimas:

> "One who consents to being represented by another as a joint adventurer may be estopped to deny that he is a joint adventurer as to third persons who enter into a transaction in reliance upon an ostensible agency [citations omitted], and who have dealt with the ostensible agent as an agent of the purported joint venturer, not as a principal [citation omitted]."

*Rivett v. Nelson*, 158 Cal. App. 2d 268, 276 (1958).

The joint approval restriction in the April 10, 2001 Letter of Authority enabled Ho to (falsely) represent that Dimas' approval had been obtained.  **As a consequence, Dimas was bound by the June 22 Agreement.**

///

///

---

[5] Civil Code §2318 provides that: "Every agent has actually such authority as is defined by this Title, unless specially deprived thereof by his principal, and has even then such authority ostensibly, except as to persons who have actual or constructive notice of the restriction upon his authority."

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1    Civil Code §2334 provides that:

2        "A principal is bound by acts of his agent, under a merely ostensible authority, to

3        those persons only who have, in good faith, and without want of ordinary care,

4        incurred a liability or parted with a value, upon the faith thereof."

5

6    In *Reusche v. California Pacific Title Ins. Co.*, 231 Cal. App. 2d 731, 736 (1965), the court found

7    that a principal's liability on a contract for the ostensible agent's acts rested on the doctrine of

8    estoppel and its essential elements of representation of the principal, justifiable reliance thereon by

9    the third party and change of position or injury resulting from such reliance.

10        On the present <u>undisputed facts</u>, Dimas placed Ho in a position where he was able to

11

12    *credibly* represent that Rakitin had signed the June 22 Agreement, and as a consequence MCED

13    relied upon the Agreement by investing monies pursuant to its terms, and receiving a recorded

14    Deed of Trust over Dimas' property (T129, T75 at 5:26-28, 9:1-10:9).

15        Contrary to the court's legal conclusion, Ho *did have* ostensible authority to enter the June

16    22 Agreement and both Dimas and MCED were bound as a result.

17    **B) <u>The June 22 Agreement Was Also Ratified by Dimas</u>**

18

19        The bankruptcy court, in its decision entered July 24, 2007 (T75), rejected MCED's

20    contention that it had loaned monies to debtor Dimas, and reasoned that the parties intended to

21    enter into a joint venture (T75 at 19-20). Appellant agrees. A number of joint venture agreements

22    were entered into by appellant Dimas before MCED's incorporation on June 26, 2001 (T87).

23    While some of these agreements named MCED as a party and purported to be signed on behalf of

24

25    MCED, because they were all pre-incorporation agreements, they could not be enforced against

26    MCED unless they were knowingly adopted and ratified after incorporation (T75 at 25:15-20).

27

28

1  The bankruptcy court found that the June 22 Agreement was ratified by MCED after

2  incorporation:

3          "The evidence reflects that the only pre-incorporation agreement that MCED

4          ratified was the June 22, 2001 Joint Venture Agreement."

5

6          (T75 at 25:23-24).

7      The uncontroverted evidence at trial was that Tony Hu, the President of MCED, had

8  executed the June 22 Agreement with the referenced exhibits attached (Decision T75 at 8:4; T86),

9  after having had it explained to him, that MCED invested monies in accordance with the June 22

10 Agreement (Decision T75 at 9:12-13 and T91) and considered the Agreement to be in full force

11 and effect until it was terminated effective March 13, 2002 by Stipulation between Dimas and

12

13 MCED of July 11, 2002 (T114 at ¶14).  Nothing in the bankruptcy court's Decision contradicts

14 these facts or findings.  In other words, for MCED's part the June 22 Agreement was considered

15 binding and enforceable.

16     The bankruptcy court however, found that the June 22 Agreement was not enforceable

17 against MCED *because it had not been agreed to by appellant Dimas*.  The court reasoned further

18

19 that Dimas had signed and agreed to the June 20, 2001 Joint Venture Agreement, but not the June

20 22 Agreement (T75 at 23:3-8).  While it is undisputed that Dimas' principal, Adrienne Rakitin, did

21 not sign the June 22 Agreement (T75 at 8:24-25), the evidence at trial confirms that the June 22

22 Agreement was later ratified by appellant Dimas.

23     The bankruptcy court's Decision gives scant attention to the issue of Dimas' ratification of

24

25 the June 22 Agreement.  The Factual Discussion recites as follows: "Ho acknowledged that he

26 executed the Agreement on Rakitin's behalf but testified that she later ratified it." (T75 at 8:26-

27 27).  The Legal Discussion dismisses ratification without explanation as follows: "Although he

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

testified that Dimas later ratified the June 22 Agreement, his testimony is not credible, and the facts do not support it." (T75 at 25:8-9).

The Decision does not state why Mr. Ho's testimony "is not credible" or why "the facts do not support it."

The evidence at trial, as to the issue of ratification, was as follows:

1. Mr. Ho testified that the June 22 Agreement was prepared jointly by Mrs. Rakitin and himself. (RT Vol. III at 71:8-14 – see Appendix Doc. No.6).

2. Mr. Ho testified that he subsequently discussed this Agreement with Mrs. Rakitin in his office (RT Vol. III at 72:22-23).

3. Mr. Ho testified that he had subsequently asked Mrs. Rakitin to acknowledge the June 22 Agreement (RT Vol. III at 76:8-15).

4. Mrs. Rakitin testified, by affidavit introduced into evidence, that she was advised of the Dimas obligations under the June 22 Agreement in September 2001 and that a copy was provided to her by Mr. Hu (T128 at ¶12).

5. Mr. Hu, MCED's President, testified that in late September 2001 or early October 2001 he received a note from Mrs. Rakitin stating that she would comply with his conditions (RT Vol. II at 19:9-20:10 – see Appendix Doc. No.5).

6. Dimas recorded a $1.2 million Deed of Trust with attached partial lien release clause in favor of MCED, as required by the June 22 Agreement (T86, page D1092 at ¶1; T129) on July 16, 2001 (Decision, T75 at 5:27-28) and received a check for $250,000, also as called for by the June 22 Agreement.[6]

---

[6] As recited in the bankruptcy court's Decision, the June 20, 2001 Joint Venture Agreement called for a $1.35 million, not the $1.2 million Deed of Trust which was recorded (T85 at Page D1220 ¶1) and a payment to Dimas of $100,000, not the $250,000 check which was provided (T85 at Page D1221 ¶11).

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1   There was no evidence or testimony at trial that after learning of the June 22 Agreement

2   Mrs. Rakitin rejected the Agreement or refused to comply with its terms. On the contrary, all of

3   the evidence was that Dimas acceded to its terms and performed its conditions.

4       The trial court does not explain why it found Mr. Ho's testimony as to Dimas' ratification

5   of the June 22 Agreement "not credible." The court certainly credited his testimony on numerous

6   other issues such as his lack of authority to terminate the joint venture on behalf of MCED (T75 at

7   11:23-24); MCED's willingness to continue to fund "project developments" (T75 at 11:19-20; and

8   that Countryside Estates, LLC was unrelated to MCED (T75 at 16-17).

9       Mr. Ho, who was represented at trial by the same attorney representing MCED and was

10  being sued by Dimas in its adversary proceeding, had no interest or motive to shade his testimony

11  in favor of Dimas. As stated in MCED and Ho's joint post-trial brief:

12          "The two (MCED and John Ho) have much in common as codefendants in the

13          adversary proceeding...Ho supports the validity of Milpitas' claim...and...was the

14          agent of Dimas for much of the time period involved in this proceeding."

15          (T72 at 1:26-2:7).

16  California Civil Code §2307 et seq. sets forth the law of ratification:

17          "An agency may be created, and an authority may be conferred, by a precedent

18          authorization or a subsequent ratification."

19          (Cal. Civ. Code §2307).

20      The usual conduct which will establish ratification, is voluntary acceptance of the benefits

21  of the transaction by the principal (Civil Code §2310; *Rakestraw v. Rodrigues* 8 Cal. 3d 67, 75

22  (1972)). Specifically, a principal may ratify the forgery of his signature by his agent (*Rakestraw v.*

23  *Rodrigues, supra* 8 Cal. 3d at 73-74, citing *Navrides v. Zurich Ins. Co.* 5 Cal. 3d 698, 703-704 and

*Volandri v. Hlobil* 170 Cal. App. 2d 656, 659-660 (1959)), and by accepting benefits under a forged agreement, without further enquiry effectively ratifies thee agreement. *Reusche v. California Pac. Title Ins. Co., supra* 231 Cal. App. 2d 731 at 734-8.

Voluntary ratification requires knowledge of the material facts of the transaction, since it may be rescinded if made upon imperfect knowledge (Civil Code §2314). A principal whose agent enters into a transaction without actual or ostensible authority, and who, after obtaining knowledge of the transaction retains the benefits received, <u>and does not attempt to rescind the transaction</u>, is deemed to have ratified it. See *Rakestraw v. Rodrigues, supra* 8 Cal. 3d at 74-75:

> "The doctrine of exoneration by ratification, however, is limited, so far as the agent is concerned, to those cases where there remains with the principal, after his first complete knowledge of the transaction, the power to rescind and failing so to do he is properly charged with full acceptance of all the responsibilities of the contract, even to the exoneration of his agent, because, with the ability to rescind, if he had rescinded, the transaction would be at an end and nobody would be injured.
>
> [citation omitted]."

Here, the uncontroverted evidence at trial was that Mrs. Rakitin, appellant Dimas' principal, was subsequently informed of the June 22 Agreement, accepted the benefits of the Agreement in the form of investments totaling $366,394.20 (Decision, T75 at 31:18-32:11), recorded the Deed of Trust in favor of MCED on July 16, 2001, and made no attempt to rescind or repudiate the Agreement on the basis of the forgery of her signature. <u>The truthful testimony of Mrs. Rakitin at trial that Mr. Ho forged her signature to the June 22 Agreement, does not constitute rescission or repudiation of the Agreement.</u>

///

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1    Finally, appellant Dimas' subsequent ratification of the June 22 Agreement did not in any

2    way prejudice MCED, whose President, Tony Hu, testified that he considered the Agreement to be

3    binding and effective until terminated by Stipulation of July 11, 2002 (RT Vol. II at 26:18-22 – see

4    Appendix Doc. No.5; 39:1-7; T114 ¶14).

5

6    **C) MCED Has No Right, and In Fact Never Sought to, Rescind Based Upon Lack of**

7    **Authority by Dimas' Agent**

8    The bankruptcy court's award of restitution to MCED is based upon the finding that

9    MCED may avoid enforcement of the June 22 Agreement because Dimas' agent, John Ho, lacked

10    actual or ostensible authority to sign Mrs. Rakitin name to the Agreement, and that Dimas did not

11    subsequently ratify the Agreement  (T75 at 24:4-25:10).

12    Dimas is a limited liability company and the bankruptcy court expressly found an agency

13    relationship between Dimas and Mr. Ho (T75 at 24:23-24).  One who contracts with an agent of a

14    corporation (Dimas):

15

16    "Generally cannot question his authority to bind the corporation.... This is a general

17    rule of agency (2 Cor. Jur. 467).  If an agent exceeds his authority, ***his principal***

18    ***may complain but a third person may not.***"

19

20    *Boteler v. Conway* 13 Cal. App. 2d 79, 83 (1936) emphasis added (Seller was not

21    able to repudiate changes to a contract made by the secretary of the buyer

22    corporation on the basis of lack or excess of authority).

23    The same rule was applied in *Flash Cleaners, Inc. v. Columbia Appliance Corp.* 156 Cal.

24    App. 2d 455 (1957), where the court held that a seller could not question the authority of the buyer

25

26    corporation's agent in order to dispute the assertion of the buyer's right to rescission under the

27    contract:

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

"It is asserted by Columbia [the seller] that the record does not disclose ostensible or actual authority for Barton to act for Flash in the execution of the contract in question. ***Columbia is bound by the familiar rule to the effect that one dealing with a corporation's agent cannot question the agent's authority***.

(*Boteler v. Conway, supra* 13 Cal. App. 2d 79 [56 P. 2d 587]; *Chandler v. Hart* 161 Cal. 405 [119 P. 516, Ann.Cas. 1913B 1094]; *Barrell v. Lake View Land Co.*, 122 Cal. 129 [54 P. 594]; *Guarantee Loan Co. v. Fontanel*, 183 Cal. 1 [190 P. 177]; *Shively v. Eureka T. Gold Mining Co.*, 5 Cal. App. 236 [89 P. 1073]; *Pores v. Purity Milk Co.*, 135 Cal. App. 2d 305 [287 P. 2d 169]."

*Flash Cleaners, Inc. v. Columbia Appliance Corp., supra* at 458, emphasis added.

MCED may not avoid enforcement of the June 22 Agreement for lack of authority on the part of Dimas' agent, Mr. Ho.

## 3. THE BANKRUPTCY COURT SHOULD HAVE INTERPRETED THE MEANING OF THE JUNE 22 AGREEMENT

Because the bankruptcy court found that Mr. Ho did not have ostensible authority to enter into the June 22 Agreement, and that Dimas did not ratify the June 22 Agreement, it failed to provide a legal interpretation of that Agreement based upon parol and other evidence submitted at trial. Rather, the bankruptcy court compared the provisions of the June 22 Agreement with the June 20, 2001 Joint Venture Agreement (signed by Dimas), found there to be "significant differences" and therefore no meeting of the minds (T75 at 23:3-24:2).[7] As argued above

---

[7] As discussed below, there are in fact no irreconcilable material differences between the June 20 and June 22, 2001 Joint Venture Agreements preventing a "meeting of the minds." The provisions in those two Agreements are the same with respect to the critical issues of whether MCED's investment could be used for debt service, and whether MCED is entitled to a return of its investment regardless of any profit being made by the joint venture on the sale of the lots (T85 ¶¶3 and 5, T86 ¶¶3 and 5).

1    however, the June 22 Agreement *is* enforceable against both parties and the court should have

2    interpreted the agreement based on the evidence, including parol evidence, received.

3    The testimony at trial and the legal arguments of the parties, reveal that MCED and Dimas

4    had differing interpretations of:

5

6    1.  Whether MCED's investment of working capital could be used to keep current the IGL

7        mortgage on the property, that is for debt service; and

8    2.  Whether MCED was entitled to recover its investment in the joint venture regardless of any

9        profit arising from the sale of the lots.

10   As to the first, the June 22 Agreement provides that:

11

12       "The Company will keep existing mortgage from Investment Grade Loans, Inc."

13       (T86 ¶3).

14   "The Company" is defined as <u>MCED</u> (T86 at 1st page). From this provision, Dimas

15   (Rakitin) believed that MCED was obligated to make the mortgage payments. MCED was of the

16   opposite view and believed that MCED was not required to make the mortgage payments and that

17   "needed working capital" did not include debt service (T75 at 23:19-22). In addition to taking the

18   testimony of Dimas (Rakitin) and MCED (Hu) as to their understanding of Paragraph 3, the court

19   received testimony from John Ho, who testified that he had drafted Paragraph 3 of the June 22

20   Agreement. Mr. Ho's understanding of Paragraph 3 was that the investment monies from MCED

21   *could be used* to pay the mortgage, that is to "keep it current" (RT Vol. III at 77:3-13 – see

22   Appendix Doc. No.6).

23

24   ///

25   ///

26   ///

27

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

As to the second issue, return of investment capital, Dimas (Rakitin) testified that she understood Paragraph 5 to mean that the investors would receive a priority return of capital *only from the sale of the improved lots 1 through 5* (RT Vol. I at 70:8-19; 85:25-86:6 – see Appendix Doc. No.4).[8] On the other hand, MCED (Hu) testified that he regarded the monies invested by MCED as a loan secured by a lien (RT Vol. II at 25:21-26:4 – see Appendix Doc. No.5).

Under California law, extrinsic and parol evidence is admissible as an aid in the interpretation of a contract to show what parties mean by uncertain or ambiguous phrases. *Crawford v. Hub Ranch of Paradise Valley* 134 Cal. App. 2d 256 (1955).

Having received all of this extrinsic and parol evidence, it was the duty of the bankruptcy court, as the trial court, to construe any ambiguous provisions of the contract to give the contract a reasonable, fair and just meaning. *Harris v. Klur* 205 Cal. App 2d 574, 577 (1962). California Civil Codes §1635-1663 set forth a number of applicable rules of contract interpretation for use by the court. The proper interpretation of a written instrument is essentially a judicial function to be exercised according to the generally accepted canons of interpretation. *Oceanside 84 v. Fid. Fed. Bank* 56 Cal. App. 4th 1441, 1451 (1997).

## 4. THE JUNE 20 AND JUNE 22, 2001 JOINT VENTURE AGREEMENTS MAY BE READ AS ONE CONTRACT

The June 20, 2001 Joint Venture Agreement (T85) was signed by Adrienne Rakitin on behalf of Dimas, and the June 22 Agreement was signed by Tony Hu on behalf of MCED (T75 at 6:18 and 8:4). These Agreements were not "drafts" but final agreements, which each signatory believed that the other had signed.[9] Having found that both Dimas and MCED intended to enter

---

[8] See also Decision (T75 at 8:10-11).

[9] Contrary to the statement in this court's Order denying appellants' motion for stay (*In Re Dimas* 2008 U.S. Dist LEXIS 8901 at 9), the June 20 and 22 Agreements were not considered by either party to be "drafts."

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

into a joint venture agreement (T75 at 19-20), and that each of the parties signed what they believed to be a final and binding agreement, the bankruptcy court compared the June 20 and June 22 Agreements and found there to be "significant differences" as to material terms which prevented a "meeting of the minds" (T75 at 23:3-24:2). As briefed above, appellant believes that the June 22 Agreement was binding and enforceable because Mr. Ho had ostensible authority to enter into that agreement for Dimas, and it was subsequently ratified by Dimas. Consequently there should have been no need for court to compare and differentiate the June 20 and June 22 Agreements.

The significant differences between the two Joint Venture Agreements (T85 and T86) as noted by the bankruptcy court are as follows:

### A) Amount of Investment

The June 20 Agreement contemplated an investment of $1.35 million, to be secured by a deed of trust in the same amount (T85 ¶¶1 and 2). The June 22 Agreement, using identical language, contemplated in investment of $1.2 million, secured by a deed of trust in the same amount (T86 ¶¶1 and 2).

In fact, Dimas executed and recorded a Deed of Trust in the amount of $1.2 million thereby performing and ratifying the June 22 Agreement. There was no difference in the contemplation of the parties as to the amount of the investment. Dimas had stated that $1.2 million was sufficient (RT Vol. III at 78:10-12 – see Appendix Doc. No.6).

### B) Dimas' Net Equity Investment and Property Valuation

"Rakitin intended that Dimas would make a $2.04 million equity contribution to the joint venture based on a property valuation of $4.75 million. Hu, on behalf of

1    MCED, understood that Dimas' equity contribution would be $2.29 million based

2    on a property valuation of $5 million."

3    (T75 at 23:11-14).

4

5    The difference pointed out here by the bankruptcy court in Paragraphs 4 of both

6    Agreements is that the stated value of the property has been increased by $250,000 from $4.75

7    million to $5 million, thus increasing Dimas' net equity by the same amount. This $5 million land

8    value figure is consistent with Mr. Ho's letter of May 24, 2001 to Tony Hu outlining the "terms of

9    the deal" (T84, Part 1, ¶1).

10    Given that this is an increase in Dimas' net equity from the June 20 Agreement by .5%, and

11    that it inures in favor of Dimas (in other words a change to which Dimas would and did readily

12    agree), it can hardly be considered a material difference preventing a meeting of the minds as to

13    land value. See *Reliance Finance Corp. v. Miller* 557 F.2d 674, 680 (9th Cir. 1977) (mistake must

14    go to essence of contract). Notably Paragraphs 4 of both Agreements are otherwise identical and

15    reference the "attached Preliminary Title Report from Stewart Title Insurance Company dated

16    August 24, 2000" (T85 and T86 ¶¶4 and first recital on Page 1 of both Agreements).

17

18    **C)  Profit Distribution**

19    Both Joint Venture Agreements contain the recital in the first page that:

20        "The owner is seeking additional investment capital to develop, improve and build

21        the subject property for profit."

22

23    Paragraphs 5 of the Agreements deal with "profit sharing," using different formulas – 65%

24    to investors and 35% to Dimas in the June 20 Agreement, and a double return on investment to

25    MCED, return of owner's net equity and then a 50/50 split in the June 22 Agreement. However,

26    when Paragraph 5 of the June 20 Agreement is read together with Paragraphs 6 and 7, it is

HENNEFER, FINLEY & WOOD, LLP
*ATTORNEYS AT LAW*

apparent that the profit sharing formula in both Agreements *is essentially the same*, the only

difference being that in the June 22 Agreement, MCED receives an additional $1.2 million before

a lesser final distribution of 50/50, while in the June 20 Agreement MCED receives a greater

percentage – 65%, but no additional return of capital.

The court also notes that MCED (Hu) believed that it would receive "a priority distribution

of its initial capital plus 100% return on investment (T75 at 23:17-18), while Dimas (Rakitin)

believed that profit distribution would be made "pro rata from the sale of the improved lots and

only after the mortgages had been paid" (T75 at 23:16-17).[10]  However, there is nothing in the

language of the Joint Venture Agreements to support these disparate understandings – the verbiage

in both Agreements is the same.  Construction of the Agreements is a unique function of the court.

The fact that the parties may have different understandings as to the meaning of the words, or even

the nature of the transactions,[11] in no way negates the existence of an agreement, objectively

manifested by the parties in a document.  *Weddington Productions, Inc. v. Flick* 60 Cal. App. 4th

793, 811 (1998) (unexpressed intentions or understandings do not bear upon whether there is

"mutual assent").

**D) Use of Investment Funds**

The most, and probably the only, critical misunderstanding between the parties was as to

whether MCED's investment funds could be used to service the existing mortgage on the property,

the existence of which MCED had full knowledge (T86 ¶4 and first recital page 1, T84, part 1 ¶2

"Current mortgage against the property is $2,710,000").

---

[10] This interpretation is strongly supported by the partial lien release provision attached to the $1.2 million Deed of Trust provided to MCED (T129).

[11] Mr. Hu testified that he understood that he was entering into a loan transaction (RT Vol. II at 13:2-5 – see Appendix Doc. No.5), a notion rejected by the bankruptcy court.

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

The court concluded that Dimas (Rakitin) understood that MCED's investment of "working capital" could be used to service the mortgage, but that MCED (Hu) "expected that Dimas would retain the existing mortgages" and that "MCED was not required to make the payments" (T75 at 23:19-23).

However, *the critical verbiage in both Agreements is the same*:

"The company will keep existing mortgage from Investment Grade Loans, Inc."

(T85 and T86, Paragraph 3).

The court received parol evidence as to what the parties understood by this paragraph. Both Mrs. Rakitin and John Ho, who prepared the Agreements, testified that they understood that the word "current" was missing from this paragraph, which should have read:

"The company will keep *current* existing mortgage from Investment Grade Loans, Inc."

(RT Vol. I at 140:17-22 – see Appendix Doc. No.4; Vol. III at 77:3-13 – see Appendix Doc. No.6).

Tony Hu of MCED testified that, even though "the company" is defined as MCED, he understood that this meant that Dimas would retain the existing mortgage (RT Vol. II at 32:13-22; 34:8-12; 60:6-12 – see Appendix Doc. No.5).

In their briefs submitted to the bankruptcy court after trial, the parties disagreed as to the meaning of "needed working capital" contained in Paragraph 2 of both Agreements (T85 and T86). Dimas contended that "working capital" included "any monies which are necessary to keep the joint venture operational, including monies needed for debt service"(T71 at 19:8-10), whereas MCED insisted that the term had no such meaning (T73 at 6, footnote 1).

As discussed above, given that the two Agreements contain identical verbiage as to "needed working capital" and "keep existing mortgage," the proper role of the bankruptcy court was to construe the rights and obligations of the parties based upon the documents and the testimony received.

California Civil Code §1642 provides that:

> "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

The language of California Civil Code §1642 has been broadly construed as a declaration of common law principles. The several writings need not each be contracts, and need not be executed on the same day or within any particular time. *Cadigan v. American Trust Co.*, 131 Cal. App. 2d 780, 786-787 (1955). Clearly, the bankruptcy court could have interpreted the two documents, the June 20 and June 22 Agreements as one contract under applicable California law. Instead, however, the court cited and discussed two recent state Court of Appeal decisions, which declined enforcement of agreements on the grounds that the parties had failed to agree on material and essential terms (T75 at 21:9-23:2).

In the first case, *Terry v. Conlan* 131 Cal. App. 4th 1445 (2005), the parties had entered into a written and signed settlement agreement, which the trial court had held to be enforceable and entered judgment accordingly (131 Cal. App. 4th at 1454). The Court of Appeal reversed finding that the settlement agreement was not enforceable because the parties had omitted material terms necessary to carry out the settlement agreement:

> "Here, although the parties agreed to the goals of the settlement, they clearly did not agree to the means of achieving the goals...This failure to agree to the material

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1    means to achieve to goal of the settlement demonstrates the settlement's

2    unenforceability."

3       (*Terry, supra* 131 Cal. App. 4th at 1459.)

4

5    The Court of Appeal noted that:

6       "…Agreement to the goals alone may not result in a judicially enforceable

7       settlement agreement."

8       (*Terry, supra* 131 Cal. App. 4th at 1458, fn. 3.)

9       The Court of Appeal in *Terry, supra* was not dealing with the construction or proper

10   interpretation of contract provisions, *but rather with the failure of the contract to make provisions*

11   *as to material terms.* The decision is not analogous because there is no argument, or finding under

12   the present facts, that Dimas and MCED failed to agree upon *any material terms necessary to*

13   *carry out the joint venture.* As the bankruptcy court found, both parties clearly intended to enter

14   into a joint venture agreement (T75 at 19-20), and, in contrast to *Terry, supra* omitted no terms

15   necessary towards fulfilling their goals. The role of the bankruptcy court should have been to

16   construe the two documents together, and, where necessary, give precedence to the later document

17   in the event of inconsistency. See *Frangipani v. Boeker* 64 Cal. App. 4th 860, 863 (1998).

18

19       The second case discussed by the bankruptcy court is *Bustamante v. Intuit* 141 Cal. App.

20   4th 199 (2006). In *Bustamante, supra* the trial court, and the Court of Appeal refused to enforce an

21   alleged oral contract between two parties to a joint venture, finding that the oral contract alleged

22   was no more than an unenforceable "agreement to agree" because the fundamental conditions

23   precedent to any agreement had failed, i.e. formation of the joint venture company (Intuit Mexico),

24

25   funding of the joint venture, commitment from venture capitalists or private investors.

26

27   *Bustamante, supra* 141 Cal. App. 4th at 212-213. The alleged oral agreement in *Bustamante, supra*

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1  was no more than "preliminary negotiations with no agreement or specification of material terms."

2  141 Cal. App. 4th at 213-214.  The decision in *Bustamante, supra, supra* is also not analogous to

3  the present facts because here Dimas and MCED both signed what they considered to be a binding

4
5  joint venture agreement, neither of which omitted any material terms with respect to the formation

6  and operation of the joint venture.

7          In *Bustamante, supra*, the Court of Appeal distinguished two cases, the facts of which are

8  more analogous to the present: *Holmes v. Lerner* 74 Cal. App. 4th 442 (1999) (terms of partnership

9  agreement were not too indefinite to be enforced because the parties had manifested their mutual
10
11 intent to form a partnership and engage in business; subsequent acts of the parties provided

12 sufficient certainty to determine the existence of a breach and remedy); *Okun v. Morton* 203 Cal.

13 App. 3d 805 (1988) (provision in investment agreement, considered together with properly

14 admitted parol evidence, enabled the court to construe the investment agreement since the basic

15 structure of future undertakings had been established). *Bustamante, supra* 141 Cal. App. 4th at

16 213-215.  Here, the court has properly admitted parol evidence as to the meaning of the joint
17
18 venture agreement, and both parties have performed and accepted benefits under the agreement -

19 MCED having invested monies and Dimas having recorded a deed of trust for $1.2 million in

20 favor of MCED.

21 **5.  AN AWARD OF RESTITUTION TO MCED IS CONTRARY TO LAW**

22         Having found there to be no contract between the parties, the bankruptcy court proceeded

23 to order "restitution of benefits received" (T75 at 30).  The court awarded MCED the entire
24
25 amount of its investment, $467,829 "based on its claim," even though only $366,394.20 was

26 received by or for the benefit of Dimas (T75 at 31-32).

27
28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1    The bankruptcy court's award of restitution to MCED should be set aside for several

2  reasons:

3  **A. MCED Filed a Proof of Claim for "Money Loaned" and Never Sought to Amend that**

4  **Claim**

5

6    After receiving permission to file a late claim, MCED filed a proof of claim on October 4,

7  2006 for "Money Loaned" (T65), and then an amended proof of claim on October 19, 2006, for a

8  different amount, again for "Money Loaned" (T66). In its decision, the court rejected MCED's

9  contention that there was a loan transaction (T75 at 19-20).

10

11    At no time, prior to, during or after trial did MCED move to amend its claim by seeking

12  restitution of monies paid under an unenforceable contract. As a result, Dimas was prejudiced

13  because it *had no notice of the true nature of MCED's claim*. While MCED made no motion to

14  amend its proof of claim, any post-trial amendment seeking restitution rather than recovery of

15  money loaned must be disallowed:

16       "Amendment of a proof of claim is freely permitted so long as the claim initially

17       provided adequate notice of the existence, *nature* and amount of the claim as well

18       as the creditor's intent to hold the estate liable."

19

20    *In re Unioil, Inc.* 962 F. 2d 988, 992 (10th Cir. 1992), emphasis added.

21  See also *In re Kilgore Meadowbook Country Club, Inc.*315 B. R. 412, 417 (Bk. Ct. E. D. Texas

22  2004)(a proof of claim must comply with Federal Rule of Bankruptcy Procedure 3001 by alleging

23  facts sufficient to support the claim).

24

25    MCED never filed a proof of claim for restitution of monies, or for rescission of contract,

26  and never sought to amend its proof of claim. The bankruptcy court's decision is therefore based

27

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1  upon a claim the nature of which the debtor Dimas had no notice, and must be disallowed for that

2  reason alone.

3  **B.  Restitution is Contrary to Law Where Dimas Did Not Know of MCED's Mistake**

4          Having found that no contract was formed between the parties (a legal conclusion with

5  which appellant Dimas disagrees), the court then proceeded to conclude that Dimas had been

6  unjustly enriched by the amount of MCED's investment and was required to make restitution

7  pursuant to the Restatement (First) of Restitution §15 and 40,[12] citing *Ghirardo v. Antonioli* 14

8  Cal. 4th 39, 51 (1996), T75 at 30.

9

10         However, in *Ghirardo, supra* the court held that:

11

12              "...a party who does not know about another's mistake, and has no reason to

13              suspect it, may not be required to give up the benefit if he also relied on it to his

14              detriment."

15  *Ghirardo, supra* 14 Cal. 4th at 51, discussing Comment c to Restatement (First) of Restitution §15

16  and also citing *California Federal Bank v. Matreyek* 8 Cal. App. 4th 125 (1992), where borrowers

17  were not required to reimburse a bank for a prepayment penalty, when the bank had mistakenly

18  accepted a payoff without penalty since the borrowers "did not know of the mistake and also

19  detrimentally relied on the bank's promise" (*Id* at Page 132-134).

20

21         In the present case, according to the court's findings in its Factual Discussion, Dimas

22  (Rakitin) was totally unaware of MCED's mistake, namely Mr. Hu's understanding that MCED's

23  investment could not be used to keep the existing mortgages current:

24              "Based on her understanding of Paragraph 3 of the Joint Venture Agreement, she

25              believed that MCED was obligated to keep the existing mortgages current.  Rakitin

26

27  ─────────────────────────────

28  [12] Restatement (First) of Restitution §§15 and 40, and Comments and Illustrations are attached in the accompanying Appendix.

HENNEFER, FINLEY & WOOD, LLP
*ATTORNEYS AT LAW*

wrote to Ho on September 18, 2001 expressing her concerns and asserting that MCED was in breach of its financial obligations under the June 20, 2001 Joint Venture Agreement " (T75 at 11:7-10).

In fact, the bankruptcy court's conclusion that "the evidence shows that the parties had agreed to different terms" (T75 at 23:24) is based upon a recitation of the differing beliefs of Hu and Rakitin. Nowhere in the court's Factual or Legal Discussion does the court any way indicate that Dimas (Rakitin) was aware of MCED's mistake. Where the plaintiff and the defendant are equally to blame, or equally innocent, for the mistake under which the money was paid, restitution is not available if the payee has altered his or her position. *American Psychometric Consultants v. Work. Comp. App. Bd.* 36 Cal. App. 4th 1626, 1647 (1995).

The court's legal conclusion to the effect that Dimas and MCED were mutually mistaken as to the terms of the joint venture agreement attributes no finding of fault to one party or the other (T75 at 20:28-24:2). Dimas clearly altered its position in the belief that it had entered into a binding joint venture agreement by executing and recording a deed of trust in favor of MCED over its property (T129) and by not seeking other joint venture partners.

## C. Restitution is Not Available to a Party Who Received the Expected Exchange and Never Offered to Restore Benefits Received

A third reason why the doctrine of restitution or unjust enrichment is inapplicable here, even accepting the court's finding of mutual mistake as to the existence of an agreement, is that:

1. MCED received what it had bargained for – namely a $1.2 million Deed of Trust over Dimas' property; and

2. After discovering the mistake on Dimas' part – namely that Dimas believed that it was entitled to use the investment monies to pay the mortgage (T75 at 10:12-15), MCED made

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

**HENNEFER, FINLEY & WOOD, LLP**
*ATTORNEYS AT LAW*

1    no effort to rescind the agreement or *restore benefits which it had received* – namely the

2    deed of trust over Dimas' property.

3    As to the first point, the bankruptcy court cites in support of its order for restitution the

4
     Restatement (First) of Restitution, §15:
5

6        "§15. Mistaken Belief in Existence of Contract with Payee

7        A person is entitled to recover money which he has paid another pursuant to the

8        terms of a supposed contract with or offer from the other which, because of the

9        payor's mistake of fact as to the existence of consent, of consideration or of a
10
         required formality, he erroneously believed to exist, *if he does not get the expected*
11
         *exchange*." (Emphasis added.)
12

13   and Comment C to §40:

14       "What the parties think to be an agreement may not be one, either because there is

15       ambiguity in the language used and each is justified in his interpretation, or because

16       the parties, justifiably or with equal fault, are mistaken s to the terms agreed upon.
17
         Likewise, their agreement may be so indefinite as to promise or performance that it
18
         is not enforceable as a contract, so that restitution for what has been performed is
19
         required to prevent unjust enrichment.  As in the other cases where there is lack of
20
         mutual consent or consideration, the one rendering the services is entitled to
21
         restitution *if he does not get the expected exchange*." (Emphasis added.)
22

23       CT 75 at 30:2-21.

24   In this case however, MCED *did get the expected exchange*, namely the recordation of a $1.2
25
     million deed of trust against the property, rendering the principle of restitution under the
26
     Restatement §§15 and 40, as cited by the court, inapplicable.
27

28

After learning of Dimas' understanding that MCED was obligated to keep the existing mortgage current (T75 at 11:7-9), Mr. Hu of MCED did not attempt to rescind or terminate the joint venture agreement, and disclaimed the letter of termination written by Ho on September 23, 2001 (T75 at 11:11-25). Mr. Hu of MCED testified that:

> "He would have been willing to continue with the development of the property on the condition that title to the property be transferred to MCED so he would have control and the ability to refinance the debt."

(T75 at 12:3-5).

Mr. Hu testified further that he never refused to fund advances for project development costs (T75 at 11:19-20) and that as of January 2002 he understood the Joint Venture Agreement still to be in force and considered that MCED was still performing (RT Vol. II at 39:1-12 – see Appendix Doc. No.5). In sum, under the Restatement provisions cited by the court, restitution and unjust enrichment are inapplicable where one of the mistaken parties (MCED) receives an expected benefit under the agreement, learns of the other party's mistaken belief, and remains willing to perform the agreement.

Restitution should also not be awarded in favor of MCED because MCED has never voluntarily offered to restore the benefits which it received pursuant to the allegedly unenforceable Joint Venture Agreement, namely the $1.2 million Deed of Trust over the property. Quite the opposite. After Dimas filed its bankruptcy petition, on April 15, 2002 MCED filed a motion requesting to change the scheduling of its claim from unsecured to secured (T5), thereby seeking to enforce its Deed of Trust. Since MCED had not invested $1.2 million pursuant to the June 22 Agreement and would not reconvey its Deed of Trust, Dimas was forced to commence an Adversary Proceeding on May 31, 2002 against MCED to void MCED's Deed of Trust on the

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

HENNEFER, FINLEY & WOOD, LLP
*ATTORNEYS AT LAW*

1   property so that Dimas could obtain a refinance (T75 at 14:8-9) and prepared and filed with the

2   court a motion to expunge the Deed of Trust, together with an *ex parte* application to shorten time

3   on the application (T30-35).

4

5       Restitution and unjust enrichment are both equitable remedies subject to the well known

6   equitable maxim of "He who seeks equity must do equity." *Manufacturers' Co. v. McKey* 294 U.S.

7   442, 443 (1935); *In re Paul Potts Builders, Inc.* 608 Fed. 2d 1279 (9th Cir. 1979). This doctrine

8   applies to a claim for restitution. *Stein v. Simpson* 37 Cal. 2d 79, 82 (1951). A party such as

9   MCED which has not voluntarily offered to restore the benefits received under an unenforceable

10  contract has done no equity and is not entitled to equitable relief.

11

12  **6. MCED IS NOT ENTITLED TO RESTITUTION OF MONIES PAID TO,**

13      **AND RETAINED BY, RIDGEVIEW INVESTMENT, INC. - $101,434.80**

14      The court found that of the $467,829 invested by MCED, $101,434.80 was paid to

15  Ridgeview Investment, Inc. (John Ho's development company), and not received by Dimas (T75

16  at 32:14-16).[13] The bankruptcy court concluded that MCED was entitled to restitution of these

17  monies as well because John Ho was "Dimas' agent for purposes of receiving those advances"

18  (T75 at 32:17-18).

19

20      The bankruptcy court reasoned that Mr. Ho had both actual and ostensible authority to act

21  as Dimas' agent in accepting advances from MCED (T65 at 33:4-6).

22  **A. Ho Had No Actual Authority to Receive Monies on Behalf of Dimas**

23      The court's conclusion that Mr. Ho had actual authority to receive MCED's monies as

24  Dimas' agent is based upon the "Standard Form of Agreement Between Owner and Construction

25

26  _____

[13] $101,434.80 is the difference between total investments by MCED ($467,829) and the amounts which the evidence

27  established that Dimas or its principal, Adrienne Rakitin, or its secured lender, Investment Grade Loans, Inc.) received
    ($366,394.20). See T75 at 31:1-32:11.

28

1    Manager" ("Construction Manager Agreement") entered into between Dimas and Ridgeview

2    Investment, Inc. dated April 21, 2001 (T82), which, together with the April 10, 2001 Letter of

3    Authority (T80), were reviewed by Mr. Hu of MCED before signing the June 22 Agreement and

4    
5    before the investment of MCED monies (RT Vol. II at 56:2-24 – see Appendix Doc. No.5).  The

6    April 10, 2001 Letter of Authority simply appoints John Ho as the construction manager for the

7    project, and the Construction Manager Agreement (T82) sets forth the terms under which he had

8    been engaged by Dimas, as owner.  Contrary to the court's conclusion, nowhere in the

9    Construction Manager Agreement (T82) is Ridgeview or Mr. Ho given <u>actual authority</u> to receive

10   funds on behalf of Dimas.  The bankruptcy court summarizes the effect of the Construction

11   Manager Agreement as:

12   

13            "Ridgeview was generally required to furnish business administration and

14            management services in connection with the construction of improvements on the

15            property.  Those services included oversight and evaluations of project costs and

16            budget."

17            (T75 at 32:21-23).

18   

19        This summary of the provisions of the Construction Manager Agreement is not entirely

20   accurate in describing the construction manager's services in the Preconstruction Phase (Article

21   1.1) and the Construction Phase (Article 1.2), and does not provide any actual authority for the

22   construction manager to receive funds on Dimas' behalf.

23        The bankruptcy court also cites: "[T]he role of Ridgeview and Ho...in both the June 20,

24   2001 and June 22, 2001 Joint Venture Agreements," which provide in paragraphs 8 and 7

25   respectively identical language employing Ho (Ridgeview Investment Limited, LLC) as sole

26   
27   project manager to conduct daily business affairs of the joint venture, with a project management

28   

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

41

1  fee of 5% of the "total project cost indicated at project cost and profit analysis statement (see

2  attached Exhibit E) with the project management fee to be paid on a progress payment basis." (T75

3  at 32:24-33:2).

4       However, this provision in the Joint Venture Agreements is no basis for providing

5  Ridgeview/Ho with actual authority to receive funds from MCED, since the court has concluded

6  that both Joint Venture Agreements are void and unenforceable as there was no "meeting of the

7  minds." Even if the provision were binding and enforceable, it provides for a payment *by the joint*

8  *venture* (not Dimas or MCED alone) to Ridgeview/Ho of a project management fee of 5% of

9  project costs as stated in the project cost and profit analysis statement on a progress payment basis.

10 The Project Costs and Profit Analysis Statement (T78 at p. D1199 and T83 at p. D1217) lists the

11 tasks involved, all of which take place during and after construction. There was no construction

12 and Mr. Ho performed none of these tasks.[14]

13      Even more telling, Mr. Hu of MCED testified that MCED paid monies to Ridgeview

14 because "Ridgeview is one of the contractors who signed construction contracts" (i.e. the

15 Construction Manager contract) (RT Vol. II at 63:18-64:13 – see Appendix Doc. No.5) and

16 testified that *there was nothing in the Joint Venture Agreement which he signed stating that*

17 *Ridgeview was authorized to receive monies for Dimas* (RT Vol. II at 88:15-21).

18 **B. Ho Had No Ostensible Authority to Receive Monies Payable to Ridgeview**

19      The court also concludes that:

20           "Even absent actual authority, Dimas by its conduct, conferred ostensible authority

21           to Ho to act as Dimas' agent in accepting the advances from MCED."

22           {T75 at 33:5-6}.

---

[14] See discussion in C below as to (no) benefit received by Dimas.

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1   On the other hand, as discussed above, the court had previously concluded, in cursory fashion, that

2   Mr. Ho did not have ostensible authority to enter into the June 22 Agreement on behalf of Dimas.

3       Mr. Ho may well have had ostensible authority on behalf of Dimas to receive payments

4
5   *made out to Dimas* and in fact MCED's first two payments totaling $317,859 were made out to

6   Dimas and given to Mr. Ho (T75 at 9:4-14). There is no factual basis for a finding that Mr. Ho

7   had ostensible authority to receive payments made out to Ridgeview. MCED paid a total of

8   $149,970 made out to Ridgeview (T75 at 31:7-12). On what basis could MCED have believed

9   that Ridgeview was entitled to this amount?

10  **C. Dimas Did Not Receive a Benefit From the Monies Retained by Ho (Ridgeview)**

11
12       The bankruptcy court reasoned further that MCED was entitled to restitution from Dimas

13   for monies paid to Ridgeview because:

14            "Funds that Ho retained on account of his fees, <u>to the extent allowable under the</u>

15            <u>construction contract with Dimas</u> appear to have been a reasonable allocation in

16            view of the scope of Ho's authority as an agent for Dimas."

17            (T75 at 33:16-19), emphasis added.

18
19       However, an examination of the Construction Manager Agreement and the evidence

20   received at trial with regard to the services rendered by Ridgeview (Ho) readily reveal that

21   Ridgeview (Ho) was not entitled to be paid $101,434.80 for services provided. Article 7 of the

22   Construction Manager Agreement is titled "Payments to the Construction Manager." Article 7.1.1

23   provides for an "initial payment", being a minimum payment, under Paragraph 15.1 of $25,000 on

24
25   account of Preconstrucion Services. Article 7.1.2 provides for subsequent payments for "Basic

26   Services" to be made monthly in proportion to services performed on the bases set forth in Article

27   15. "Basic compensation" as defined in Article 15 is comprised of Preconstruction Phase services

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

with a fee of $100,000 and Construction Phase services of $450,000 payable monthly in the amount of $20,000, being 4% of the total project cost.  Article 15.6 provided that "the project shall commence upon recordation of final map."  No final map was ever recorded (T75 at 33:14-15; RT Vol. III at 136:7-9 – see Appendix Doc. No.6) because Mr. Ho, as project manager, never obtained the necessary surety bond (RT Vol. I at 30:1-16 – see Appendix Doc. No.4).  Accordingly Ridgeview (Ho) was not entitled to payment for any Construction Phase services under the Construction Manager Agreement.

As to "Preconstruction Phase services," there was no evidence presented at trial and the court made no findings to the effect that Ridgeview (Ho) performed any Preconstruction Phase services as defined in Article 1.1 of the Construction Manager Agreement.  All of the Preconstruction Phase services (as defined in Article 1.1.1 through 1.1.8) required coordination between the construction manager and the architect.  Mr. Ho testified that there was no architect on the project and admitted that Preconstruction Phase services required architect coordination (RT Vol. III at 132:10-11 – see Appendix Doc. No.6).  Mrs. Rakitin testified that Mr. Ho did virtually nothing to move the project forward and that she did the work necessary for map recordation (RT Vol. I at 50:14-52:15 – see Appendix Doc. No.4).

There is no basis upon which the court may properly conclude that Dimas received a benefit from the monies paid to and retained by Ridgeview pursuant to the Construction Manager Agreement.

## D. An Award of Restitution and Monies Paid to and Retained by Ridgeview as Dimas' Agent Pursuant to an Unenforceable Contract Violates the Restatement

The bankruptcy court cites Restatement (First) of Restitution §15 as the basis for its award of restitution to MCED (T75 at 30:2-8).  Earlier in its Decision, as discussed above, the court

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

concluded that Mr. Ho did not have actual or ostensible authority to enter into the June 22 Agreement on Dimas' behalf and that the June 22 Agreement was not ratified by Dimas (T75 at 24-25).

Comment f to Restatement (First) Restitution §15 discusses the situation (as the court found here) where no contract is formed because a purported agent has no power to bind his principal, and the other party gives money to the purported agent:

"A person giving money to a purported agent who has no power to bind his principal thereby, is not entitled to restitution from the principal unless the money comes to the principal's possession or control or is used for his benefit. *Delivery to the purported agent is not of itself delivery to the principal and the principal is bound by the retention by the agent only if the principal ratifies it*." Emphasis added.

The illustrations to Comment f are as follows:

"8. A, the local agent of P, authorized to receive payment of accounts receivable but not to borrow money, borrows from T $1000 on P's account and deposits it to P's credit in the bank in which P has an account. Not knowing the source of the money, P withdraws it from the bank. T is entitled to restitution form P.

9. *Same facts as in Illustration 8, except that A keeps the money. T is not entitled to restitution from P*." Emphasis added.

Comment f and the accompanying Illustrations make it clear that unless Dimas ratified the June 22 Agreement, MCED's payments to Ridgeview (Ho) the "purported agent," retained by Ridgeview (Ho), may not be recovered from Dimas. If Dimas, as principal had ratified the June 22

**HENNEFER, FINLEY & WOOD, LLP**
ATTORNEYS AT LAW

1   Agreement, it would be binding and enforceable according to the court's reasoning and restitution

2   would be inapplicable.

### 7. MCED IS NOT ENTITLED TO RESTITUTION OF THE $50,000 WHICH IT PAID FOR THE BENEFIT OF DIMAS IN 2002, BECAUSE IT KNEW THAT DIMAS RECEIVED THE BENEFIT PURSUANT TO THE JOINT VENTURE AGREEMENT OF JANUARY 9, 2002

8       On January 9, 2002, Dimas entered into a new joint venture agreement with an entity titled

9   Countryside Estates, LLC and on the same date, January 9, 2002 and then on February 7, 2002

10   entered into signed addendums to that agreement (T110, T75 at 12:12-14). Robert Liu, **who was**

11

12   **the Secretary and a director of MCED** (T5, RT Vol. II at 17:11-12 – see Appendix Doc. No.5)

13   witnessed the agreement, and the addendums pursuant to which Dimas was to receive $40,000

14   (T110). Mr. Liu testified at trial that he had borrowed this $40,000, and another $10,000 from

15   MCED on Dimas' behalf, which *he understood Dimas was receiving pursuant to the January 9,*

16   *2002 Joint Venture Agreement* (RT Vol. IV at 65:9-14 – see Appendix Doc. No.9; T75 at 12:25-

17   13:16).

18

19       While Mr. Hu of MCED was unaware of the January 9, 2002 Agreement (T75 at 12:27-

20   28), Robert Liu, the Secretary and a director of MCED *was aware of it.* The well-established rule

21   in California is that the knowledge of a corporate official is imputed to the corporation itself. Civil

22   Code §2332; *SanFran Co. v. Rees Blowpipe Mfg. Co.* 168 Cal. App. 2d 191, 204-205(1959)

23   (knowledge of an officer of the corporation is the knowledge of the corporation). Under these

24

25   uncontroverted facts, MCED is not entitled to restitution of the $50,000 paid on January 7 and

26   February 7, 2002 pursuant to the principles set forth in Restatement (First) Restitution §15.

27   MCED (through its officer Robert Liu) was under no "mistake of fact as to the existence of

28

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW

1  consent…erroneously believed to exist." MCED paid the monies knowing that Dimas received

2  them, and the benefit they bestowed, pursuant to the January 9, 2002 Joint Venture Agreement,

3  which Dimas had executed and which an officer of MCED had witnessed. As a result, MCED

4

5  knew full well the basis upon which Dimas received the monies (as a payment pursuant to a Joint

6  Venture Agreement and not a loan). Restitution and unjust enrichment are inapplicable.

7  ## VIII.    CONCLUSION

8  For all the reasons expressed above, Dimas submits that the bankruptcy court's decision

9  should be reversed and MCED's claim denied in whole or in part.

10

11

12  Dated: April 8, 2008                          Respectfully,
                                                   HENNEFER, FINLEY & WOOD, LLP

13

14

15  By: _____

16                                                 Steven C. Finley
                                                   Special Counsel for Debtor and Appellant
                                                   Dimas, LLC

HENNEFER, FINLEY & WOOD, LLP
ATTORNEYS AT LAW