**Document No. 4**
**Reporter's Transcript, Volume I**
**Testimony of Adrienne Rakitin**

1    September 18, UNITED STATES BANKRUPTCY COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3                        (SAN JOSE DIVISION)

4

5    In re:

6    DIMAS, LLC,                          Case No. 02-51420-MM

7                                         Chapter 11

8                                         San Jose, California
                                          February 20, 2007
9                                         10:11 a.m.

            Debtor.
10   _____/

11   DIMAS, LLC and ADRIENNE RAKITIN,

12            Plaintiffs,

13        v.                              A.P. No. 02-5453

14   INVESTMENT GRADE LOANS;
     MILPITAS COUNTRYSIDE ESTATES
15   DEVELOPMENT and JOHN HO,

16            Defendants.
     _____/

17

18                         **VOLUME I**

19              TRANSCRIPT OF TRIAL PROCEEDINGS
          a) AMENDED COMPLAINT FOR DAMAGES: (1) CONCEALMENT;
20         (2) BREACH OF CONTRACT; (3) ACTION TO REDEEM;
              (4) CONSPIRACY - WRONGFUL FORECLOSURE;
21        (5) CONSTRUCTIVE TRUST; (6) DECLARATORY RELIEF;
       (7) INJUNCTION; (8) RECOVERY OF USURIOUS INTEREST AND
22                REQUEST FOR DECLARATORY RELIEF
          b) HEARING ON OBJECTION TO CLAIM RE: MILPITAS
23         COUNTRYSIDE ESTATES & DEVELOPMENT, INC.

24
              BEFORE THE HONORABLE MARILYN MORGAN
25              UNITED STATES BANKRUPTCY JUDGE

```
 1  APPEARANCES:

 2  For Dimas. LLC:              HENNEFER, FINLEY & WOOD, LLP
                                 BY: STEVEN C. FINLEY, ESQ.
 3                               425 California Street, 19th Floor
                                 San Francisco, California 94104
 4

 5
    For Milpitas                 LAW OFFICES OF LAWRENCE E. SMITH
 6  Countryside and              BY: LAWRENCE E. SMITH, ESQ.
    John Ho:                     18 Crow Canyon Court #205
 7                               San Ramon, California 94583

 8

 9
    Court Recorder:              JACKIE JARVIS
10                               UNITED STATES BANKRUPTCY COURT
                                 280 South First Street
11                               San Jose, California 95113

12

13
    Transcription Service:       Jo McCall
14                               Electronic Court
                                 Recording/Transcribing
15                               2868 E. Clifton Court
                                 Gilbert, Arizona 85297
16                               Telephone: (480-361-3790)

17

18

19

20

21

22

23

24

25
```

3

1

I N D E X

2

| Plaintiffs' Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Rakitin, Adrienne Linda | | | | |
| By Mr. Finley | 5 | | 138 | |
| By Mr. Smith | | 67 | | 144 |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30

1  Q    Now, do you have any understanding of whether the City

2  of Milpitas ever received a subdivision improvement bond

3  from Dimas?

4  A    No, because Mr. --

5  Q    Wait.  Wait.  You don't have an understanding --

6  A    I'm sorry.

7  Q    Do you have an understanding or --

8  A    Oh yes, I do; I do have an understanding.

9  Q    What is your understanding?

10  A    That they never received the bond because Mr. Ho was

11  supposed to -- that was one of his responsibilities to the

12  venture partners to provide the surety bond, and if we

13  would have had the surety body, they would have released

14  the map to be recorded.

15  Q    And that never happened here?

16  A    No, it never happened.

17  Q    Okay.  Please look at Exhibit O, MCED Exhibit O.  This

18  on its face appears to be a letter from the City of

19  Milpitas to Dimas, LLC at Mr. Ho's address.  Do you see

20  that?

21  A    That's correct.  Yes, I see that.

22  Q    Did you ever see or receive a copy of this letter?

23  A    No.

24  Q    Please look at Exhibit P.  Exhibit P, although it's

25  very faint, but it's my understanding and I don't think

50

1          MR. SMITH: Objection.  It's leading, and it's

2   without foundation.

3          THE COURT: Is this a contested issue?

4          MR. SMITH: Yes, I believe it is, Your Honor.

5          THE COURT: Okay.

6          MR. SMITH: I mean --

7          THE COURT: Okay.  Do you want to rephrase the

8   question?

9          MR. FINLEY: I'll rephrase it, Your Honor.

10  BY MR. FINLEY:

11  Q    Did Mr. Ho tell you that his investors wanted him to

12  be involved as the project and construction manager?

13  A    That's correct.

14  Q    Okay.  Now, during this time, from September 11, 2000

15  up to this new agreement here, January 2002, what to your

16  knowledge did Mr. Ho actually do in connection with moving

17  this project along?

18  A    Nothing, except for -- I'm sorry, one thing -- he

19  assisted to get my house demolished.  I needed to have a

20  permit from the City, and there had to be drawings because

21  once the house was demolished, I was going to replace my

22  home with an R.V. trailer to live in.  And there's also a

23  construction trailer on the property for the contractors,

24  et cetera.  So Mr. Ho had to -- he did use his engineering

25  skills and had provided a drawing which the City required

51

1    as to the exact location of where my R.V. trailer was going

2    to be, so he did provide the engineering design back in May

3    2001 before I had the house demolished in the end of June.

4    So he did that, and that's -- I did the rest of the work as

5    far as updating everything.

6    Q    Okay.  So your house was demolished about May --

7    A    It was demolished at the end of June because --

8    Q    June of 2001.

9    A    -- '01, because it was in the way of the lower road

10   improvements.

11   Q    Okay.

12   A    That's why it had to be demolished.

13   Q    So the plan was to put in the public improvements --

14   A    Yeah, there were two private roads.  The bottom

15   private road which is really what always led to our house,

16   was going to have the design of the new map -- of the

17   final -- of the improvement map, of the final map; our

18   house was in the way of the lower private road and the

19   utilities easement, where the utilities went.

20   Q    So that's why you had it demolished.

21   A    That's correct.

22   Q    Now, during this period, Mrs. Rakitin, what were you

23   doing on behalf of Dimas to move the project forward?

24   A    Well, I had already gotten the preliminary public

25   report to start advertising.  I had everything ready for

52

1  the subdivision consultant to file the final public report

2  that we needed to have a recorded map to submit to the

3  Department of Real Estate for the final public report.  I

4  had gotten an extension from the City for another year for

5  the map to be recorded.  I had the contractors; I had the

6  improvement plans updated with my engineer in the City; I

7  had the substructure plans I was working on.  Mr. Ho did

8  meet with the project manager from P.G. & E.  I had already

9  submitted it in the years prior, but now that he was going

10 to be the project manager on that, he met with her

11 personally.

12 Q    Okay.

13 A    And what else -- everything was ready to go except for

14 getting the map recorded and pulling the permits to start

15 the construction.

16 Q    Okay.  Now going back to Exhibit 14, this new joint

17 venture agreement, attached to it is a memorandum -- this

18 is part of the same exhibit -- memorandum, it's No. 182 at

19 the bottom right --

20 A    I'm sorry, where --

21 Q    I'm looking in Exhibit 14 --

22 A    Okay.

23 Q    -- at the end of the agreement, there's a memorandum

24 attached.

25 A    Oh yes.

70

1  three weeks to get this loan through Investment Grade

2  Loans; is that correct?

3  A    That's correct.

4  Q    And so you were sort of desperate to get a loan, even

5  at these high interest rates?

6  A    Obviously, I had a three-week drop dead date; yes, I

7  was.

8  Q    Okay.  Now if you turn to Exhibit A, about midway down

9  the page, it says:

10          "Profit distribution and return of the equity

11           priority after all the project-related costs and

12           obligations are fully paid shall be as follows."

13 And first it shows investor capital of $850,000, Dimas

14 $2,500,000, and then a profit distribution.  Isn't it true

15 that your understanding was that any investment pursuant to

16 Exhibit A would get priority return before Dimas would

17 receive any money?

18 A    They would get priority from the profits of the sales;

19 that's correct.

20 Q    From any sale -- the priority of distribution of money

21 would go, after project-related costs and obligations,

22 would go first to the investors, then to Dimas, then there

23 would be a split, correct?

24 A    To the investors -- they had to re-mortgage the loan

25 of Andy Lewis.  First -- that was one of the conditions,

85

1  stated that.

2  Q    Well perhaps you would agree with me it doesn't say

3  that.

4  A    Well, I'd have to read it very carefully, if you don't

5  mind right now.  May I do that?

6  Q    Of course.

7      (Pause.)

8  A    It says profit sharing right here in No. 5.  The owner

9  is seeking additional investment capital to improve and

10  build the project for profit, not just Dimas' profit; it

11  was a joint venture partnership.

12  Q    Yes.

13  A    Yes.  And it said that the, number 5 -- I'm sorry,

14  what number did I just read that from?

15  Q    Well, you were just reading I believe from No. 5, is

16  what you referred to, Ms. Rakitin, but No. 7 makes it clear

17  that profit distribution occurs after the priority return,

18  the investor -- the investment capital --

19      MR. FINLEY: Your Honor, objection.  Counsel is

20  just testifying and arguing with Mrs. Rakitin now.

21      THE COURT: No, I think we're trying to clarify a

22  point, so I'm going to allow the question.

23      MR. FINLEY: Okay.

24  BY MR. SMITH:

25  Q    Paragraph 7 makes it clear, to my reading, that the

86

1  profit distribution provisions of the joint venture

2  agreement only come into play after the priority return of

3  the investor investment capital and return of Dimas, LLC's

4  equity, including Lot No. 6.

5  A    The profit distribution from the sales of the lots,

6  yes, that's correct.

7  Q    Nowhere does it say anything about sales of the lots.

8  A    Well, how else was there going to be profit?

9  Q    The project could have been sold as paper lots,

10  correct?

11  A    That isn't what the agreement said though.  It said we

12  would build and develop -- "develop, improve, and build the

13  subject property," meaning development of the lots, put

14  improvements in, build the houses -- that's clearly

15  explained in the PUD -- that was not part of the -- it's

16  part of the exhibits, okay, so it was not a paper

17  subdivision.  It was to develop; Mr. Ho was going to be the

18  construction manager, put the improvements in, to sell the

19  improved lots and make a profit from that.

20  Q    But isn't it true that when you signed this agreement,

21  you knew, under paragraph 7, that the investors, regardless

22  of whether the project was sold as paper lots or as a bulk,

23  that the investors would get their money first, and that's

24  the reason the deed of trust was going to be recorded.

25  A    It was from the sales of the lots, not to paper sell

1    reading of this agreement is whether it was your

2    understanding that the company which is defined as MCED,

3    Inc. had an obligation to keep the mortgage current.  Would

4    you look at paragraph 3 and this paragraph 3 appears also

5    in the later joint venture agreement which is Exhibit 7,

6    the one of June 20, 2001: "The company will keep existing

7    mortgage from Investment Grade Loans, Inc."  Did you have

8    any understanding as to whether -- now when you read it --

9    as to whether there's a word omitted in that?

10   A    I believe it may be --

11            MR. SMITH: Objection, Your Honor.

12            THE WITNESS: -- current.

13            MR. SMITH: Calls for speculation, to re-form a

14   document that --

15            THE COURT: No, I'll overrule the objection.

16   BY MR. FINLEY:

17   Q    When you signed this, Mrs. Rakitin, did you have an

18   understanding that paragraph 3 was -- "the company will

19   keep existing mortgage current"?

20   A    Yes.

21   Q    Okay.  And this was drafted by Mr. Ho?

22   A    Yes, it was.

23   Q    And would it be correct to say that Mr. Ho's English

24   is not to the highest standard?

25   A    Yes.  In fact, I did have to help him spell certain

151

CERTIFICATE OF TRANSCRIBER

     I certify that the foregoing is a correct transcript from the digital sound recording of the proceedings in the above-entitled matter.

DATED: September 14, 2007

                          By:   /s/ Jo McCall

# Document No. 5
# Reporter's Transcript, Volume II
# Testimony of Tony Hu

1

1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (SAN JOSE DIVISION)

4

5    In re:

6    DIMAS, LLC,                          Case No. 02-51420-MM

7                                         Chapter 11

8                                         San Jose, California
                                          February 21, 2007
9                                         10:05 a.m.

            Debtor.
10    _____/

11    DIMAS, LLC and ADRIENNE RAKITIN,

12            Plaintiffs,

13        v.                              A.P. No. 02-5453

14    INVESTMENT GRADE LOANS;
      MILPITAS COUNTRYSIDE ESTATES
15    DEVELOPMENT and JOHN HO,

16            Defendants.
      _____/

17

18                    **VOLUME II**

19            TRANSCRIPT OF TRIAL PROCEEDINGS
         a) AMENDED COMPLAINT FOR DAMAGES: (1) CONCEALMENT;
20         (2) BREACH OF CONTRACT; (3) ACTION TO REDEEM;
              (4) CONSPIRACY - WRONGFUL FORECLOSURE;
21       (5) CONSTRUCTIVE TRUST; (6) DECLARATORY RELIEF;
      (7) INJUNCTION; (8) RECOVERY OF USURIOUS INTEREST AND
22              REQUEST FOR DECLARATORY RELIEF
          b) HEARING ON OBJECTION TO CLAIM RE: MILPITAS
23         COUNTRYSIDE ESTATES & DEVELOPMENT, INC.

24
              BEFORE THE HONORABLE MARILYN MORGAN
25              UNITED STATES BANKRUPTCY JUDGE

2

```
 1 | APPEARANCES:
   |
 2 | For Dimas. LLC:          HENNEFER, FINELY & WOOD, LLP
   |                          BY: STEVEN C. FINLEY, ESQ.
 3 |                          425 California Street, 19th Floor
   |                          San Francisco, California 94104
 4 |
   |
 5 |
   | For Milpitas             LAW OFFICES OF LAWRENCE E. SMITH
 6 | Countryside and          BY: LAWRENCE E. SMITH, ESQ.
   | John Ho:                 18 Crow Canyon Court #205
 7 |                          San Ramon, California 94583
   |
 8 |
   |
 9 |
   | Court Recorder:          JACKIE JARVIS
10 |                          UNITED STATES BANKRUPTCY COURT
   |                          280 South First Street
11 |                          San Jose, California 95113
   |
12 |
   |
13 |
   | Transcription Service:   Jo McCall
14 |                          Electronic Court
   |                          Recording/Transcribing
15 |                          2868 E. Clifton Court
   |                          Gilbert, Arizona 85297
16 |                          Telephone: (480-361-3790)
   |
17 |
   |
18 |
   |
19 |
   |
20 |
   |
21 |
   |
22 |
   |
23 |
   |
24 |
   |
25 |
```

3

```
 1                          I N D E X
 2    Plaintiff's witnesses:    Direct Cross Redirect Recross
 3    Wang, Robert
 4         By Mr. Finley           5
 5         By Mr. Smith                   7
 6
      Hu, Tony
 7
           By Mr. Finley           8              80
 8
           By Mr. Smith                  55
 9
10    Jeng, Michael
11         By Mr. Finley          50
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  percent.

2  Q    So it was going to be a risky undertaking; is that

3  right?

4  A    Therefore I chose less risky way to loan the money

5  than be returned the loan.

6  Q    Oh, I see.

7  Q    Would you please look at Exhibit K, please.  This is

8  in the Milpitas binder.  Take your time and look at this

9  document, Mr. Hu.  Is that your signature on that document?

10 A    Yes.

11 Q    And did your secretary or somebody else translate it

12 for you so you understood what you were signing?

13 A    Yes.

14 Q    Now, this document is titled "Joint Venture

15 Agreement."  Do you understand what a joint venture is?

16 A    But the name of the agreement does not represent the

17 nature of the agreement.  Agreements in business have ten

18 thousands of kinds, and it depends on the content of the

19 agreement; one can determine the nature of the agreement.

20 Q    Fair enough.  But actually my question to you was

21 whether you understand what a joint venture is.

22 A    I understand what a joint venture is.  The name is not

23 the most important.  The content is more important.

24 Q    I think everyone is going to agree with you on that

25 point, but I'm just asking you do you have an understanding

17

1   is the Articles of Incorporation of MCED, Inc. on June 26,

2   2001, and the incorporator is Robert Liu.  Is that the

3   manager of your accounting?

4   A    He was the secretary.

5   Q    Secretary of the company?

6   A    Yes, but he was not on the payroll.  He was just

7   helping me to file this company.

8   Q    Okay.  Now when you formed this company, who held the

9   offices?  Who were the officers of the company?

10  A    I was.

11  Q    You held all offices?

12  A    Except Robert Liu was the secretary.

13  Q    Okay.  And who were the shareholders, please?

14  A    Gauw Yi Miao and Chi Miao.

15  Q    I think you're going to need to spell that for me.

16  A    G-a-u-w.  Y-i  M-i-a-o.  M-i-a-o, last name.

17  Q    That's one of the shareholders?

18  A    Yes.

19  Q    Okay.  And who's the other one?

20  A    C-h-i  M-i-a-o.

21  Q    Did these two people you just named, did they hold all

22  the shares in MCED, Inc.?

23  A    No, no, I'm the major shareholder.

24  Q    Oh, I see.  What percentage do you own?

25  A    Sixty percent.

19

1  interest loan on the property; is that correct?

2  A    Yes.

3  Q    And when you learned that, did you refuse to provide

4  any further funds pursuant to the joint venture agreement?

5  A    Wrong.

6  Q    Wrong.  So what did you do when you learned that?

7  A    I was willing to give her funds to support the land

8  improvement, but not to repay the high interest loan.

9  Q    Okay.  So you were willing to provide funds under the

10  agreement, but you were not willing to pay the mortgage; is

11  that what you're saying?

12  A    Yes, that's right, because the spirit of the agreement

13  is such.

14  Q    Okay.  And when did you -- did you explain that to

15  anybody that you were willing to provide funds under the

16  agreement but not to pay this high interest mortgage?  Did

17  you explain that to somebody?

18  A    Everybody knew.

19  Q    My question is, who did you tell that to?

20  A    Robert Liu.  John Ho.  Mrs. Rakitin, she also knew.  I

21  learned that later.

22  Q    Did you tell Mrs. Rakitin directly?

23  A    Not directly.  In September, Mrs. --

24       THE INTERPRETER: I'm sorry, what's her name?

25       MR. FINLEY: Rakitin.

20

1    THE WITNESS:  -- Rakitin wrote a note to John and

2  John passed it on to Robert and Robert to me.  It said,

3  please discuss this matter with Tony.  Whatever conditions

4  you would enforce, I will comply.

5  BY MR. FINLEY:

6  Q    Okay.  So you didn't have a direct conversation with

7  Mr. Rakitin; is that right?

8  A    In the end of September or early October, I don't

9  remember the exact date, Robert brought Ms. Rakitin to my

10 office.

11 Q    Okay.  Mr. Hu, would you please look at Exhibit M, M

12 for Mary.  Is this a check -- do you recognize this check?

13 A    I do.

14 Q    And is it your handwriting on the check?

15 A    No.  I signed the signature.

16 Q    You signed it, but you didn't write out the check.

17 A    It belonged to Monica from our accounting department.

18 Q    Okay.  On whose account was this check written?

19 A    Milpitas Countryside, Inc.

20 Q    So are you saying the corporation had an account at

21 the FCB Taiwan California Bank?

22 A    Yes.

23 Q    Okay.  And in the memo section, it says City of

24 Milpitas.  Do you see that?

25 A    Yes.

21

1   Q    Do you have any understanding of why it says that?

2   A    The project manager, John Ho, informed me that there

3   is an urgent need to pay the bond to the City of Milpitas.

4   Since we've signed the agreement on June the 27th, so in

5   support of that company, I sent this check because I was

6   told if we don't pay the bond, there will be a problem with

7   the licensing.

8   Q    And did you give Mr. Ho this check?

9   A    Robert Liu came to my office and picked it up, and he

10  signed for it, and I don't know who he passed it on to.

11  Q    Okay.  Now just going back very quickly, Mr. Hu, to

12  the agreement that you signed, which is Exhibit K, do you

13  see there's a signature on behalf of Dimas?  Did you see

14  Mrs. Rakitin sign this?

15  A    No.

16  Q    Okay.  Did anybody tell you that she had signed this?

17  A    John Ho.

18  Q    Okay.  And did he provide you with a copy of this

19  signed agreement for your files?

20  A    Not a copy, but original.

21  Q    He gave you the original.

22  A    He gave me the original.

23  Q    Mr. Hu, please look at Exhibit P.  This is quite

24  faint, the exhibit.  Is that your signature on that check?

25  A    I think so.

25

1   for 238,000 plus dollars to Investment Grade Loans.  Did

2   you ever see a copy of that cashier's check?

3   A    I only saw it after this got into court.

4   Q    Okay.  I know I've asked you this before, I'm sorry,

5   but did you find out around this time, July, August,

6   September, that most of your $250,000 had been applied to

7   pay for mortgage payments?

8           MR. SMITH: Your Honor, it's vague as to time.  I

9   would suggest just ask when he found out?

10          MR. FINLEY: All right.  I'll rephrase it.

11  Counsel is quite right.

12  BY MR. FINLEY:

13  Q    When, if at all, did you find out that most of the

14  $250,000 check was paid to Investment Grade Loans for the

15  mortgage?

16  A    After this case came to the court.

17  Q    I see.  So you didn't even know that in September of

18  2001; is that right?

19  A    I had no idea that most of the -- that a sum went to

20  pay the mortgage in September of 2001.

21  Q    Now, I understood from something you said in your

22  previous testimony that you believe that this $250,000 was

23  a loan; was that your understanding?

24  A    This loan is lent to Dimas or Ms. Rakitin, not the

25  high interest loan; it's different.

26

1  Q     You're saying that you thought the $250,000 that you

2  paid to Dimas was a loan; is that true?

3  A     Yes, it is a loan lent to her.  Therefore, I put a

4  lien on the land.

5  Q     Therefore you put a lien on the land, and what is that

6  lien on the land?

7  A     Well, before I signed the agreement, one of the

8  conditions is to have a lien on the property, so I saw with

9  my own eyes the lien, then I signed.

10  Q     Is that the 1.2 million dollar deed of trust?

11  A     Yes.  According to the agreement, the maximum loan is

12  1.2 million.

13  Q     Right.  Okay.  So did you regard the joint venture

14  agreement then as a loan on behalf of MCED, Inc.?

15  A     Yes, because all I took care of was to provide the

16  funds.  I didn't involve myself with the planning, with the

17  building, so of course it's a loan.

18  Q     I see.  And did you regard -- even though the joint

19  venture agreement that you signed was entered into a few

20  days before MCED was formed, did you still regard that as a

21  binding agreement after MCED was formed?

22  A     Yes.  I formed MCED for that purpose.

23  Q     Okay.  And did you ever see any kind of a promissory

24  note -- do you know what a promissory is?

25  A     I don't know.

1  Inc. pay funds under the joint venture agreement to pay the

2  mortgage?

3  A    Somebody made the request, but it was not according to

4  the agreement because the agreement says -- stated not to

5  pay the mortgage.

6  Q    Could you please show me where it says that in the

7  agreement, in the -- and refer to Exhibit K.  Where does it

8  say in the agreement that the agreement is that MCED will

9  not pay the mortgage?

10  A    In the agreement, there was no mentioning of MCED

11  paying the mortgage, therefore it means it doesn't need to

12  pay the mortgage.

13  Q    Okay.  Please look at paragraph 3.  Paragraph 3 says:

14        "The company will keep existing mortgage from

15        Investment Grade Loans, Inc."

16  Did you understand the company -- the company is defined as

17  MCED, Inc.  Did you understand that?

18  A    My understanding of the company here means Dimas.

19  Q    Please look at the very first paragraph of the

20  agreement.  The very first paragraph defines Dimas as the

21  owner and MCED as the company.  Do you see that?  Do you

22  see that, Mr. Hu?

23        THE COURT: I can see that they're looking at the

24  wrong paragraph.

25        MR. FINLEY: Oh.

34

1   only for the purposes of the affirmative defense against

2   the claimant, MCED, Inc. and not for the basis of any

3   affirmative relief against any party to this action.

4           THE COURT: Okay.  Your standing objection is

5   noted.  Thank you, Mr. Smith.

6           MR. SMITH: Thank you, Your Honor.

7   BY MR. FINLEY:

8   Q   Okay. Mr. Hu, have you read that very first paragraph

9   of the joint venture agreement?

10  A   Yes.

11  Q   And you see that the company is defined as MCED, Inc.?

12  A   Yes.

13  Q   Okay.  Now before you signed this, you said you had it

14  translated by an assistant, and you understood it, correct?

15  A   Yes.

16  Q   Did Mr. Fujinaga, Esq., your advisor, assist you in

17  understanding this?

18  A   No.

19  Q   Who was it then?

20          MR. SMITH: Your Honor, I object to the extent

21  that the question involves information protected by the

22  attorney-client privilege, so --

23          THE COURT: I don't know that he's going into the

24  substance; he's just asking if he was advised by his

25  attorney.

39

1  Q   Okay.  Did you have an understanding that as of

2  January 2002, the June 22nd agreement that you signed was

3  still in force?

4  A   Yes.

5  Q   Okay.  And did you have an understanding that MCED was

6  performing that agreement as of January 2002?

7  A   I did.  I do.

8  Q   You do.  And did you have any understanding that MCED

9  or Dimas ever terminated that agreement of June 22nd, 2001?

10 A   I don't know if there was.

11 Q   You don't know if MCED ever terminated that agreement?

12 A   It was not terminated.  Never.

13 Q   Okay.  Now would you please look at Exhibit 14.  And

14 in this joint venture agreement, the party entering into it

15 is Countryside Estates, LLC.  Do you have any knowledge of

16 that entity?

17 A   No.

18 Q   Okay.  And do you know that MCED, Inc. has any

19 ownership interest in an entity by the name of Countryside

20 Estates, LLC?

21 A   No.

22 Q   It does not.  Okay.

23 A   It does not.

24 Q   If you look at this Exhibit 14 together with the

25 addendum and the memorandum and the addendum attached, did

56

1    A    No.

2    Q    Exhibit D, did you see that before March of 2002?

3    A    Yes.

4    Q    And did you see it on or about April 10th of 2001?

5    A    No.

6    Q    Do you recall when you saw it?

7    A    In the middle of May when I met with John, he showed

8    me this letter to represent that he has been appointed to

9    be a representative for Dimas, LLC.

10   Q    How about Exhibit E?  Did you see that before March of

11   2002?

12   A    No.

13   Q    How about Exhibit F?  Did you see that before March of

14   2002?

15           MR. FINLEY: Exhibit what?

16           MR. SMITH:  I said F.

17           THE INTERPRETER: F?

18           MR. SMITH:  Yes.

19           THE INTERPRETER: I'm sorry.

20           THE WITNESS: Yes.

21   BY MR. SMITH:

22   Q    And when did you first see Exhibit F?

23   A    Also in middle of May, John showed this agreement and

24   the appointment letter together to me.

25   Q    At the same meeting?

60

1  A    I was aware that they borrowed money from the bank in

2  the past.

3  Q    Did anyone tell you the amount of monthly payment that

4  was due on that mortgage?

5  A    No.

6  Q    Now paragraph 3 of Exhibit K says:

7         "The company will keep existing mortgage from

8          Investment Grade Loans, Inc."

9  What was your understanding of that provision?

10 A    My understanding was that there would be no refinancing

11 of the property.  No other banks will be contacted to

12 refinance the company, to keep the existing mortgage.

13 Q    Okay.  Did you know the terms of that mortgage when you

14 signed Exhibit K?

15 A    No.

16 Q    Did you know that the existing mortgage from Investment

17 Grade Loans was in default at the time you signed Exhibit K?

18 A    No.

19 Q    Now paragraph 5 of Exhibit K provides for profit

20 sharing from the joint venture and 5.1 says return the

21 company's original $1,200,000 investment.  What was your

22 understanding of that provision?

23 A    Because we were the fourth lien, so I understand that

24 once they pay all the one, two, and three liens, pay off

25 that money owed, then the rest of the money will come to me.

1   paid right away, the bond for the City, so I wrote a check

2   out of Pacific Technology's account to pay for this bond,

3   and then once Milpitas Countryside Estates' bank account was

4   established, the money was reimbursed back to Pacific

5   Technology.  I have bank records to show that.

6   Q    And would you look at Exhibit O.  Did you see that

7   document?

8   A    I have seen it.

9   Q    And who gave you Exhibit O?

10   A    John Ho.

11   Q    And did Mr. Ho tell you that that was what had happened

12   to the check, the funds from the checks that's Exhibit M?

13   A    Yes.

14   Q    Could you look at Exhibit S.  Is that your signature?

15   A    Yes.

16   Q    And that check is made payable to Ridgeview, correct?

17   A    Yes.

18   Q    And can you tell me why a check for $14,970 was written

19   to Ridgeview by Milpitas Countryside Estates Development,

20   Inc.?

21   A    This is to pay the City fees.  I had a list of the fees

22   from the City that was provided by John, and I'm not sure

23   why this was not attached, that list was not attached to

24   this exhibit.

25   Q    That may be my fault.  Was Exhibit S negotiated by

64

1  Ridgeview?

2  A    Ridgeview says that because this is working capital, it

3  needs to be put in the development planning funds.

4  Ridgeview is one of the contractors who signed construction

5  contracts.

6  Q    So did you understand that this money was being paid to

7  Ridgeview on behalf of the development project?

8  A    Yes.

9  Q    And what about Exhibit T?  It's a $60,000 check payable

10  to Ridgeview.  Can you tell me why that was written?

11  A    Same reason as the last one.  Ridgeview presented to me

12  that they have to pay fees to the City and also the

13  preparation for the project.  They came to me for the money.

14  Q    And who came to you on behalf of Ridgeview?

15  A    John and Robert.

16  Q    John Ho and Robert Liu?

17  A    Yes.

18  Q    And what about Exhibit U?  Why was that check written?

19  A    August.

20  Q    And why?

21  A    My memory -- according to my memory, I think I was told

22  there was some kind of tax we have to pay.

23  Q    By who?  Who told you that?

24  A    John Ho.

25  Q    And do you have the originals of the checks that are in

1  A    I'm not sure what the differences are.  I think they

2  are the same.

3  Q    Okay.  And 5.2, Mr. Hu, the company was also going to

4  get from the profit generated from income from Lots 1

5  through 5, an additional 1.2 million dollars; isn't that

6  right?

7  A    This is the plan, the intention.

8  Q    Yes.  That's the agreement; isn't it?

9  A    Yes.

10  Q    And then after you get the return of the investment

11  from the profits and another 1.2, then in paragraph 5.4,

12  there's another 50/50 split of the remaining profits,

13  correct?

14  A    Yes.

15  Q    Mr. Hu, where in this agreement does it say that

16  Ridgeview, Mr. Ho's company, was authorized to receive money

17  on behalf of Dimas?

18  A    No.

19  Q    It doesn't.  And yet you made most of your payments to

20  Ridgeview; didn't you, and not to Dimas?

21  A    Yes.

22  Q    And, Mr. Hu, where in the agreement does it say that if

23  this project never gets developed, if it never gets done,

24  which it didn't, that you'd get repaid your investment?

25  A    Say it again?  Repeat your question?

103

1

2

3

4

5

6                       CERTIFICATE OF TRANSCRIBER

7

8

9            I certify that the foregoing is a correct

10   transcript from the digital sound recording of the

11   proceedings in the above-entitled matter.

12

13   DATED:   September 22, 2007

14

15                    By:   /s/ Jo McCall

16

17

18

19

20

21

22

23

24

25