# HENNEFER, FINLEY & WOOD, LLP

ATTORNEYS AT LAW
425 CALIFORNIA STREET
NINETEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE: (415) 296-0111
FACSIMILE: (415) 296-7111

STEVEN C. FINLEY
EMAIL: SFinley@finleylaw.biz

April 4, 2008

*Via U.S. Mail*
Gordana Macic
United States District Court
Northern District of California
280 South First Street
Courtroom 3, 5th Floor
San Jose, CA 95113-3099

**RECEIVED**

APR 0 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

> Re:  *In Re Dimas, LLC* - Bankruptcy Case No. 02-51420
> *Dimas, LLC v. Investment Grade Loans, Andy Lewis, et al.*
> Adversary No. 02-5453
> Appeal to U.S. District Court – Case No.: 5:07-CV-4084 JF

Dear Ms. Macic:

Please find enclosed two corrections to the record on appeal as designated by Appellant, Dimas, and LLC.

1.  Tab 74 should be replaced with the attached document titled "Dimas' Reply Brief," dated April 6, 2007.

2.  Tab 128 ("Declaration of Adrienne Rakitin," dated August 30, 2002) is missing Exhibit D, attached hereto.

I have forwarded these documents correcting the record on appeal to Brook Esparza at the Appeals Department of the U.S. Bankruptcy Court. If you have any questions in this regard, please do not hesitate to call.

Sincerely,

Steven C. Finley

Enclosures
Cc:  Brook Esparza, U.S. Bankruptcy Court (*Via U.S. Mail*)
     Larry Smith, Esq. (*Via U.S. Mail*)
L-Court5.doc

**TAB 74**

1  Steven C. Finley CSB# 074391
   HENNEFER, FINLEY & WOOD, LLP
2  425 California Street, 19th Floor
   San Francisco, CA 94104
3  Telephone: (415) 296-0111
   Facsimile: (415) 296-7111
4  Email: finley@finleydeaton. com

5  Special Counsel for Debtor in Possession Dimas, LLC

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10  In re:                              | Case No.  02-51420-MM

11  DIMAS, LLC,                         | Chapter 11

12                    Debtor.

13

14  ─────────────────────────────       | Adversary No.  02-5453

15  DIMAS, LLC,
                    Plaintiff,          | **DIMAS' REPLY BRIEF**

16  vs.

17

18  INVESTMENT GRADE LOANS, ANDY        | Trial Dates:   February 20-23, 2007
    LEWIS, MILPITAS COUNTRYSIDE         | Trial Judge:   Honorable Marilyn Morgan
19  ESTATES DEVELOPMENT, INC. , THE
    FORECLOSURE COMPANY, JOHN HO,
20  AND DOES 1 through 40,

21                    Defendants.

22

23

24

25

26

27

28

# I.  INTRODUCTION

## a.  MCED's Claims

MCED received permission to file a late claim, and then filed a claim and an amended claim for "Money loaned." In its Post- Trial brief, MCED does not argue that it ever loaned money to Dimas, but rather that the monies it invested under a joint venture agreement, should be repaid under the terms of that agreement, or that its investment should be returned by way of restitution because:

1) There was "no meeting of the minds" and therefore no enforceable agreement; or

2) MCED was fraudulently induced to enter into the agreement and is now entitled to rescind the agreement after trial.

As a fall back position, MCED claims that Dimas' attorney agreed to allow MCED's claim for $250,000 in return for the removal of MCED's invalid Deed of Trust, but concedes that this alleged agreement was never the subject of a noticed motion or approved by the court.

Under the Joint Venture Agreement, which MCED's President, Mr. Hu, signed, it is made unambiguously clear that any return of investment is to be *out of profits* after development and sale of the lots. Because MCED cut off funding, there was no development and sale of the lots and no profit. The monies which are now the property of the estate resulted from the settlement of litigation with Dimas' secured lender, IGL: monies received after transfer of the *undeveloped* property to IGL in satisfaction of its three Deeds of Trust.

Neither of the parties contest that the applicable joint venture agreement is the one which MCED signed (Exhibit K). The fact that MCED interprets one provision of that agreement differently than Dimas, does not amount to a basis to avoid the agreement for a lack of "meeting of the minds" or otherwise. If any difference in the interpretation of a contract provision were to lead to nullification of the contract, the principle of sanctity of contracts would be quickly destroyed. Similarly, knowing that there were three Deeds of Trust on the property totaling $2,710,000 (Exhibit I Part I ¶ 2), MCED's failure to inquire as to the status of the mortgage on the property, and the monthly payments, before signing the joint venture

agreement, does not establish a basis on which MCED is entitled to rescind the joint venture agreement for "fraudulent non-disclosure." MCED is not entitled to rescind the agreement after trial and almost six years after discovery of the alleged fraud in September 2001. MCED has never given any notice of its intent to rescind or offered to restore to Dimas the benefit (a Deed of Trust over the property) received under the contract, or ever made any claim of fraud. The allegedly fraudulent party, John Ho, was, ironically, jointly represented by MCED's attorney at trial. [1]

As its final alternative, MCED relies upon an alleged agreement between counsel on August 28, 2002 that MCED would be entitled to payment of a claim of $250,000 in return for reconveyance of its clearly invalid fourth Deed of Trust of $1. 2 million. MCED admits that the Stipulation which was approved by the court made any such payment conditional upon a refinancing which Dimas never obtained, but argues that after, and independent of, this stipulation, counsel agreed that MCED would be paid $250,000 unconditionally in return for reconveyance of its Deed of Trust. The only document upon which MCED relies states clearly that the Deed of Trust was reconveyed for "$0. 00." Further, this allegation that MCED's disputed claim became an allowed claim by alleged agreement of counsel, post-petition, would have required a motion noticed to creditors and approval by the court after a hearing, none of which occurred.

b. **Dimas' Claims:**

MCED dismisses Dimas' Adversary Proceeding alleging conspiracy to wrongfully foreclose upon its property by asserting that it was entitled to falsely advise the court that it had received notice of IGL's stipulation for relief from stay, while at the same time entering into a "deal" with IGL to purchase the property after foreclosure, with full knowledge that the foreclosure was wrongful because it was based on a demand for an amount in excess of IGL's

---

[1] Mr. Smith, attorney for **both** the allegedly fraudulent party (Mr. Ho) and the victim (MCED) states that they do not have "identical interests." (MCED Post-Trial Brief at p.1). However, in light of MCED's Post-Trial argument of fraud, there is a serious and unwaivable conflict of interest casting doubt on the credibility of Mr. Smith's "joint clients."

In Re Dimas, LLC, No. 02-51420MM

1    third Deed of Trust.  MCED first attempts to disclaim the Complaint which it filed against IGL

2    in superior court as "unverified" even though Mr. Hu, in trial testimony, verified all of the

3    allegations, and then argues that because the joint venture agreement was terminated by

4    Stipulation on July 11, 2002, MCED no longer had a fiduciary duty and "was entitled to

5    negotiate with IGL as it wished."  Whether or not MCED still owed Dimas a fiduciary duty is

6    not germane to Dimas' claim of conspiracy to wrongfully foreclose.  MCED aided and abetted

7    IGL's foreclosure, knowing that it was wrongful and seeking to gain an advantage as a result.

8        Dimas' claims for set-off against any allowance of MCED's claims, turn around the

9    issue of whether MCED breached the joint venture agreement.  MCED does not dispute that

10   after September 2001, it refused to invest the monies which it had committed to the project

11   unless Dimas transferred title to Mr. Hu.  Nor does MCED disavow the letter of withdrawal

12   written on its behalf by Mr. Ho and copied to its attorney/advisor, Todd Fujinaga, Esq.  MCED

13   is undoubtedly in breach of the joint venture agreement and is left only with the argument that

14   Dimas was not damaged as result.  However, Mr. Ho's own profit projections of December

15   2001 (Exhibits AD and AF), after he became the project manager for the joint venture, were

16   adopted by MCED in its state court complaint against IGL alleging damages for loss of profits

17   in excess of $5 million.  Any claim which MCED might have under the joint venture agreement

18   is more than offset by the damages which it caused by cutting off funding which eventually led

19   to foreclosure and loss of the undeveloped property.

20   II.    **THE JOINT VENTURE AGREEMENT WHICH MCED SIGNED AND RATIFIED**

21          **IS ENFORCEABLE AND GOVERNS ITS RIGHTS AND OBLIGATION.**

22          In its Post-Trial brief, MCED appears to be under the misconception that Dimas seeks to

23   enforce the agreement of June 20, 2001 (Exhibit J), which was executed by Mrs. Rakitin  on

24   behalf of Dimas and purportedly by Michael Jeng on behalf of MCED.  As the trial testimony

25   and evidence revealed, MCED had not yet been incorporated, Michael Jeng was not an officer

26   of MCED and Exhibit J was not really signed by Michael Jeng, but by Mr. Ho.  Exhibit J and

27   the previous joint venture agreements evidence Dimas' (Mrs. Rakitin's) state of mind that

28   In Re Dimas, LLC, No. 02-51420MM

Dimas sought joint venture partners, not lenders; however, Dimas does not argue that Exhibit J is enforceable as against MCED.

*Dimas does argue however that Exhibit K the joint venture agreement signed by MCED's President, Tony Hu, on June 22, 2001, is enforceable against MCED and governs the rights and obligations of the parties.* MCED points out that Mrs. Rakitin did not execute Exhibit K but argues that Mr. Ho most likely signed the agreement on her behalf with ostensible authority to do so (MCED Post-Trial brief at p. 6). Both parties ratified the agreement after MCED's incorporation and neither party ever sought to rescind or void the agreement for any reason before it was terminated by Stipulation of July 11, 2002. MCED went so far as to attach a "re-signed" and altered version of Exhibit K as the documentary basis of its Proof of Claim (see Dimas' Closing brief at footnote 7). Mr. Hu of MCED testified that he fully understood the joint venture agreement before he signed it on behalf of MCED.[2] After its incorporation a few days later MCED adopted and ratified the agreement by its conduct and acceptance of benefits (the Deed of Trust). MCED admits that on May 24, 2001, Mr. Hu received a letter from Mr. Ho (Exhibit I) outlining the joint venture agreement, and that between May 24 and June 22, 2001 when Mr. Hu signed the agreement, "further negotiations" were conducted.

As discussed in more detail below, MCED's argument to the effect that there is no "enforceable joint venture agreement" turns not around any differences between Exhibit J and Exhibit K, but rather around the parties' different understanding of whether MCED's contribution of working capital under the terms of **Exhibit K** could be used to pay the mortgage on the property (MCED Post-Trial brief at 19-20.) This difference in the understanding of the parties rights and obligations under Exhibit K is a matter of contractual interpretation of the terms of the agreement as to which the court has received extrinsic evidence, and does not go to the very existence of an agreement.

---

[2] **Mr. Hu's testimony was that he has been in the U.S. for 16 years with extensive business experience, and has been his own boss since he was very young. MCED's Post-Trial brief makes the unsupported statement that he had been in the U.S. "only for a few months." (p. 5:20).**

In Re Dimas, LLC, No. 02-51420MM

**DIMAS' REPLY BRIEF**

4

### a. **MCED is Not Entitled to Recover Its Investment Under the Terms of the Joint Venture Agreement**

The first of MCED's various arguments is that there *was a joint venture agreement* (Exhibit K) and "under the terms of that agreement MCED is entitled to priority payment from joint venture assets" before any distributions to Dimas (MCED Post-Trial brief at 18-19). That argument, which bears no relation to the claim of "Money loaned" in MCED's Proof of Claim, relies on paragraph 5 of the joint venture agreement: **"The profit sharing from the Joint Venture** (income generated from lot 1 through lot 5) shall be as follows:

5. 1 Return the Company's [MCED's] original $1, 200,000 investment. . ."

MCED's interpretation of this paragraph completely ignores the words "profit sharing from the joint venture" and the whole purpose and intent of the agreement as stated in the Preface to all of the Terms and Conditions: "Therefore the parties hereby have agreed to the terms and conditions stipulated hereinafter **to develop, improve, and build the subject property lot 1 through 5 for profit."**

There is no reasonable construction of this joint venture agreement which would entitle MCED to a return of its investment *where there is no profit.* By definition a joint venture entails a sharing of profits and losses, in contrast to a loan where the lender does not share in the profit of the enterprise or run the risk of loss, other than insolvency (See Dimas' Closing Brief at pp. 15-16.) The monies which MCED paid pursuant to the joint venture agreement were *invested*, and not loaned, for the common goal of profit. The joint venture agreement contains no provision entitling MCED to a return of its investment other than by way of profit sharing as a result of the development and sale of the subject lots. Of the many bases on which MCED seeks to recover its investment, it does not claim that the joint venture, after termination, must be dissolved and subject to a mutual accounting. California law is clear to the effect that one joint venturer may not maintain an action against the other, whether for monies loaned or work, labor or services provided, until there has been such a final accounting and settlement of affairs. See *Drdlik v. Ulrich*, 203 Cal. App. 2d 360, 365 (1962).

### b. The Joint Venture Agreement Is Not Void For Lack of "Meeting Of The Minds."

MCED argues in the alternative that there was a failure to reach agreement on a material provision, as to whether MCED's investment could be used for debt service and therefore the entire joint venture agreement is unenforceable for a lack of "a meeting of the minds." (MCED Post-Trial brief at 19-20.) Without any legal argument or authority in support, MCED submits that this is the "more appropriate analysis." Under this analysis, MCED claims to be entitled to restitution of the benefits it has conferred on Dimas. Alternatively, as discussed below, MCED contends it was fraudulently induced to enter into the joint venture agreement by way of nondisclosure and now, after trial, is entitled to rescind.

MCED contends that because the parties have different interpretations as to what constitutes "working capital for the project"(Exhibit K ¶ 2) or "project related cost" (Exhibit K ¶8) the agreement must be unenforceable for lack of "meeting of the minds." Whether or not one party's interpretation is correct goes to construction or interpretation of the contract and is not of itself sufficient to effect the validity of the original contract or to show that the minds of the parties did not meet. *Warehousemen's Union Local No. 206 v. Continental Can Co.* 821 F.2d 1348, 1350-1 (9th Cir.1987). If an executed written contract which objectively signifies the parties mutual assent contains within itself difficulties of construction about which the parties disagree, this does not enable a party to contend that the minds never met. *Id.* As in this case, where a party contends that a contract is ambiguous, the court may admit extrinsic evidence, including oral evidence to resolve ambiguities. *Blumenfeld v. R.H. Macy Co.* 92 Cal.App.3d 38, 44 (1979), (extrinsic evidence to explain the meaning of a written instrument is relevant to prove a meaning to which the language of the instrument is reasonably susceptible): "Under the objective test of contract formation. a 'meeting of the minds' is uneccessary. A party is bound even if he misunderstood the terms of a contract and actually had a different, undisclosed intention. (*Brant v. California Dairies, Inc.* 1935 4 Cal.2d 128, 133; 1 Witkin, Summary of Cal. Law (8th Ed. 1973) Contracts ss 244, 522. . .)" *Blumenfeld v. R.H. Macy Co.* 92 Cal.App. 3d at 46.

1
2     The recent decision of the sixth District Court of Appeal in *Bustamante v. Intuit Inc.* 141
3     Cal.App.4th 199 (2006) bears directly upon this issue. In *Bustamante, supra,* the Court of
4     Appeal affirmed the trial court decision that the terms of an alleged oral contract were too
5     uncertain to create a joint venture agreement. since they were no more than an "agreement to
6     agree." The court in *Bustamante* affirmed the objective standard for determining mutual assent
7     by the outward manifestations or expressions of the party, and not their unexpressed intentions
8     or understanding (141 Cal.App.4th at 208) and reasoned that an enforceable joint venture exists
9     where the parties have agreed upon the "essential terms," the structure and operation of the joint
10    venture (141 Cal.App.4th at 213-215). Here, the parties have in Exhibit K agreed upon all of
11    the essential terms of the joint venture, including its structure and operation. The only
12    difference between them, as evidenced at trial is the *interpretation* of the provision relating to
13    the permitted use of MCED's investment. The terms of Exhibit K are sufficiently certain for the
14    court to determine the existence of a breach of the contract and an appropriate remedy.

15        Under California law, if there is mutual assent as to the *subject matter and the parties to*
16    *the agreement*, a contract results but it may be *voidable* and subject to *rescission* where there is
17    a harmful mistake as to a basic or material fact which induced the plaintiff to enter into it.
18    California Civil Code Section 1577, *Golem v. Fahey*, 191 Cal.App.2d 474, 476 (right to rescind
19    may be waived for failure to give notice.) Here, MCED may (but has not) argue that Mr. Hu's
20    belief that MCED's investment would not be used for debt service is a mistake as to a "basic
21    material fact" which would entitle MCED to rescind. In order to support the recission of a
22    contract, the mistake of fact must be material to the contract and must be such that it animated
23    and controlled the conduct of the party and must go to the essence of the object in view. *Reid v.*
24    *Landon*, 166 Cal.App.2d 476, 483 (1958).

25        Assuming that MCED was genuinely mistaken as to the permitted use of its investment
26    funds, such a mistake would not qualify as a mistake as to a *material matter or as to an*
27    *essential element or the subject matter.* See *Williams v. Puccinelli*, 236 Cal. App. 2d 520
28

In Re Dimas, LLC, No. 02-51420MM

(1965) (lessee could rescind lease of second floor building to install and operate a restaurant and bar, where "live load" requirements of building code would not so permit).

Whether Mr. Hu's mistaken belief that MCED's investment would not be used for debt service was genuine is also questionable. First, Mr. Hu knew that the property was encumbered by three Deeds of Trust totaling $2,710,000 (Exhibit I) and testified that he understood from paragraph 3 of the joint venture agreement that this mortgage would be "kept" by MCED during the course of the joint venture project which he expected to take somewhere between two to four years. Mr. Hu also knew from reading the joint venture agreement (paragraph 2) that MCED was committing $1.2 million for "as needed working capital." MCED agrees that "working capital" means "any monies necessary to keep the joint venture operational" (MCED Post-Trial brief at 22-23; Dimas Closing Brief at 19: 8-10). Mr. Hu also knew that the first $250,000 of MCED's investment was to go towards the Rakitin family's living expenditures and project related cost (Exhibit K ¶8). Nothing in the joint venture agreement (Exhibit K) states that MCED's investment would *not* be used for debt service and knowing of the three Deeds of Trust totaling $2.7 million, and that the Rakitins needed money for living expenses (Exhibit K ¶8), it would have been entirely reasonable to expect Mr. Hu to inquire as to the status of the mortgage and whether any part of MCED's investment was to be used for payment of the mortgage. Relief from mistake may not be granted if the mistake is caused by the neglect of a legal duty on part of the person making the mistake. Civil Code section 1577.[3]

It is also unclear from Mr. Hu's testimony and MCED's Post-Trial brief whether Mr. Hu's objection is to the use of MCED's investment for the payment of any mortgage, regardless of the interest rate, or only to the payment of IGL's mortgage with an interest rate of 17 %. It would appear that his objection is to the payment of a high interest or "Mafia" loan since he testified that he was willing to continue funding if the property were transferred to him and then refinanced with a lower interest rate.

---

[3] MCED may also not rescind the agreement now, post-trial and nearly six years later, on grounds of mistake or fraud. See sections "c" and "d" below.

In Re Dimas, LLC, No. 02-51420MM

Mr. Hu's alleged mistaken belief that MCED's investment would not be used for payment of the mortgage is not sufficiently material and does not go to the heart of the agreement to the extent necessary to entitle MCED to rescind on that basis. Before MCED refused to provide further funding, it had invested a total of $467,000, of which $276,000 was used for debt service. Of that $276,000, MCED had agreed to pay Dimas $250,000 to be deducted from Dimas' equity in the joint venture. "as the Rakitin family's living expenditure for the fiscal year of 2001 and 2002 and reimbursement for the direct project related cost." On July 11, 2001, MCED made this payment (Exhibit P) marked "Joint Venture Payment." MCED cannot now, in good faith, argue that it objected to Rakitin using this $250,000 to cure the default and pay the mortgage on the property. This is clearly a "project related cost." Further, MCED's investment, secured by the Deed of Trust was limited to $1.2 million and therefore, provided that MCED invested these monies (which it did not), its return of investment *from profits after development of the property* was protected, whether the investment was used for debt service or otherwise.

### c. MCED is Not Entitled to Rescind the Joint Venture Agreement For Alleged Fraudulent Non-Disclosure

As an alternative argument, also raised for the first time, MCED argues that it is entitled to rescind the joint venture agreement for alleged fraudulent non-disclosure on the part of Mr. Ho, for his failure to disclose the interest rate on the mortgage ("hard money loan"), and that the mortgage was in default when MCED executed the agreement. MCED argues that it was induced to invest in the project by these nondisclosures (MCED Post-Trial brief at 19-21 and 23-24).[4]

MCED has never previously asserted fraud on the part of Dimas. MCED's Proof of Claim for "Money loaned" in no way suggests the nature of a claim for fraud and may not be

---

[4] MCED also complains that after it had entered into the agreement, Mr. Ho, who was then project manager for the joint venture, misrepresented that he had paid the City of Milpitas for a subdivision improvement bond and that the $250,000 was used for "Rakitin family's living expenditure... and reimbursement for the direct project related cost." However, theses complaints arose after MCED had already entered into the joint venture agreement and do not bear upon MCED's claim of fraudulent inducement.

In Re Dimas, LLC, No. 02-51420MM

1  amended Post-Trial for this purpose. *In Re: Unioil Inc* 962 F.2d 988, 992 (10th Cir. 1992)

2  (amendment of Proof of Claim freely permitted "so long as the claim initially provided adequate

3  notice of the    nature    of the claim. . . The court should not allow truly new claims to

4  proceed under the guise of amendment.") (emphasis added) See also *In Re: Kilgore* 315 B.R.

5  412, 417 (Bk. Ct. E.D. Texas 2004) (Proof of Claim to comply with FRBP 3001 by alleging

6  facts sufficient to support the claim).[5]  Any fraud claim must be barred for this reason alone.

7      In the usual case of fraudulent inducement, where the promisor knows what he is signing

8  but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by

9  reason of fraud, is *voidable*.  In order to escape from its obligations, the aggrieved party must

10  rescind by prompt notice and offer to restore the consideration received, if any." 1 Witkin

11  Summary of California Law, 9th Edition Contracts s. 403 at p. 363.

12      The testimonial and documentary evidence submitted at trial show that Mr. Hu knew of

13  the mortgage on Dimas' property and the amount (Exhibit I), and knew the extent of Mr. Ho's

14  authority on behalf of Dimas (Exhibit D).  There was *no* evidence or testimony to the effect that

15  Mr. Ho ever affirmatively represented to Mr. Hu that MCED's investment would not be used

16  for debt service.  Despite "further negotiations" which took place between the May 24, 2001

17  letter outlining the joint venture agreement (Exhibit I) and June 22, 2001 when MCED signed

18  the joint venture agreement (Exhibit K), and the fact that Mr. Hu was being advised by his

19  attorney, Tod Fujinaga, and his accountant, Mr. Hu never made any inquiries as to the rate of

20  interest or monthly payment on the mortgage, whether it was current and whether any of

21  MCED's investment would be used for debt service.  Mr. Hu never met Mrs. Rakitin prior to

22  the signing of the joint venture agreement, and she made no representations to induce his

23  signature.  Mr. Ho testified that his understanding of the joint venture agreement was that it

24  obliged MCED to pay the IGL mortgage ("keep [current] existing mortgage from IGL"), but

25

26

27  [5]  See also FRCP 9 and Bankruptcy Rule 7009 which require specificity of pleading of fraud in adversary proceedings.

28  In Re Dimas, LLC, No. 02-51420MM

that until September 2001 he did not verbally discuss this obligation with Mr. Hu or the fact that $276,000 of investment money of MCED had been used to pay the mortgage.

As MCED states in its Post-Trial brief (at pgs. 9-10), the evidence then was that Mr. Hu ". . . refused to make any further payment towards the project unless the property was transferred to his name so that he could refinance the IGL loans. . ." (pg. 10: 1-2). However, MCED made no claim at that time (September 2001) or at any other time up until the filing of its Post-Trial brief that it had been fraudulently induced to enter into the agreement, gave no notice of rescission and did not offer to restore what it had received, namely a recorded fourth Deed of Trust for $1.2 million.

### d. Rescission and Restitution

In its Post-Trial brief, for the first time, MCED seeks rescission of the joint venture agreement on grounds of fraudulent inducement by reason of non-disclosure, or mistake. At no time prior to the filing of its Post-Trial brief has MCED ever provided Dimas with a notice of rescission, ever made a claim that it was fraudulently induced to enter into the joint venture agreement or ever offered to restore or reconvey to Dimas the Deed of Trust executed in its favor. No writing or no pleading served or filed by on behalf of MCED ever mentions the words "rescission" or "fraud", including MCED's Answer in this adversary proceeding, or in an Adversary Proceeding number 02-5237 (Dimas Exhibits 27-28), its Motion to file late claim (whereby "MCED requested and obtained leave to file a Proof of Claim for monies advanced to Dimas")[6] or in its Proof of Claim for "Money loaned."

California Civil Code section 1691 provides that:

"Subject to Section 1693, to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind if he is free from duress, menace, undue influence or disability and is aware of his right to rescind:

a.    Give notice of rescission to the party as to whom he rescinds; and

---

[6]   **MCED Post-Trial Brief at 16:5-6**

In Re Dimas, LLC, No. 02-51420MM

b.  Restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other do likewise, unless the latter is unable or positively refuses to do so."

Civil Code section 1693 provides in effect that delay in giving notice of rescission shall not prevent relief based upon rescission unless delay is substantially prejudicial to the other party. One who chooses to rescind a contract, which has been breached must do so promptly on discovery of breach, and may not wait to see whether the contract turns out to be profitable or unprofitable. *Richter (B.C.) Contracting Co. v. Continental Cas. Co.* 230 Cal.App.2d 491, 499 (1964).

The evidence at trial was that Mr. Hu of MCED found out in September 2001 that part of his investment was used for debt service, which he considered to be a breach of the joint venture agreement. Mr. Hu also testified that he considered the joint venture agreement to be "still on foot." Attached to MCED's Proof of Claim as a supporting document is a re-signed copy of the joint venture agreement in which MCED has made an alteration to the dollar amount stated in words in paragraph 8. Although MCED has known since September 2001 of the facts and circumstances which it believes to constitute fraud or mistake, it has given no notice of rescission, and in fact every action which it has taken has been inconsistent with rescission.

Further, MCED never offered to restore or reconvey to Dimas the recorded Deed of Trust in its favor for $1.2 million. Dimas incurred substantial attorney's fees in the range of $60,000 to bring an Adversary Proceeding (number 025453) against MCED for slander of title and to expunge the Deed of Trust which was ultimately reconveyed on September 3, 2002. The reconveyance was not accompanied by a notice of rescission. In fact, MCED argues that the reconveyance was only given in return for an agreement to allow its claim for $250,000 (See IV below).

Dimas has also been substantially prejudiced in this proceeding by MCED's failure to ever previously seek rescission or make a claim for fraud or mistake by not being advised of the nature of MCED's claim prior to trial and being given the opportunity to prepare its defenses.[7]

## III.    THE PAYMENTS IN 2002

On January 7, 2002, MCED paid Robert Liu a total of $50,000 (Exhibits AG and AK). At the same time on January 9, 2002, Dimas entered into a new joint venture agreement with Countryside Estates LLC, which called for payments to Dimas or IGL of $40,000 pursuant to the terms of that agreement (Exhibit AJ, Memorandum at p. D1228). This agreement was signed by John Ho as Manager of Countryside Estates LLC, and Robert Liu (the Secretary of MCED) witnessed the agreement (Exhibit AJ). Dimas received the monies from Robert Liu, and paid the monies to IGL pursuant to the terms of the joint venture agreement (Exhibits AH, AI and AL). Tony Hu of MCED testified that MCED loaned the monies to Robert Liu with the knowledge that he would pass them on to Dimas. MCED received a check in repayment from Robert Liu to hold as security. Robert Liu testified that he was fully aware of the Joint Venture Agreement of January 9, 2002 and that he borrowed the monies from MCED for Dimas' benefit. Dimas did not receive the monies as a loan, but pursuant to the Joint Venture Agreement, and there was no evidence whatsoever to the effect that Dimas authorized Robert Liu to *borrow* the money from MCED on its behalf or that MCED had any reason to believe that Robert Liu had this authority.

Although Mr. Hu testified he was unaware of the January 9, 2002, joint venture agreement, Mr. Liu, MCED's secretary certainly was, since he witnessed the agreement. Mr. Ho's letter to Dimas of February 18, 2002, in which he speaks of the addendum to that agreement "for the most part address[ing] Tony's main concerns," further demonstrates MCED's awareness of the new agreement. Mr. Hu also testified that he regarded the Joint Venture Agreement to be "still on foot." Accordingly, the January and February 2002 payments

---

[7] Not only did MCED not include any claim for rescission in its Proof of Claim, it also did not file a Trial Brief, in advance of trial, as required by the court's Pre-Trial Order, which would have given Dimas some notice or awareness of the various theories upon which it intended to proceed.

In Re Dimas, LLC, No. 02-51420MM

1   from MCED to Robert Liu cannot be deemed to be loans made by MCED to Dimas. These are

2   either payments pursuant to the Joint Venture Agreement or loans to Robert Liu for which he is

3   responsible.

4

5   **IV.    THERE IS NO AGREEMENT TO PAY $250,000 FOR THE REMOVAL OF MCED'S
        DEED OF TRUST**

6          Finally, by way of a back up argument, MCED claims that because Mrs. Rakitin of

7   Dimas allegedly referred to MCED's investment as "loans," (which she disputes) and because a

8   Recital to the July 11 Stipulation referred to the amount of "this loan" remaining in dispute,

9   MCED's investments under the joint venture agreement should be "treated as loans." MCED

10  also argues that Ms. Long's letter of August 28, 2002 (not the July 11, 2002 Stipulation)

11  constitutes an agreement by which MCED would be allowed an unsecured claim of $250,000

12  and be permitted to litigate its remaining claim of in excess of $200,000.

13         The first argument – namely that MCED's joint venture investment was converted into a

14  loan by reason of debtor's disputed characterization of the monies as a "loan" or by a Recital in

15  a Stipulation has no merit at all. As set forth in Dimas' Closing Brief, alleged (and disputed)

16  post-bankruptcy characterizations do not create a debt where there was none.[8] The joint venture

17  agreement (Exhibit K) did not contain a provision allowing MCED to convert its joint venture

18  investment into a loan, and in June 2002, when Mrs. Rakitin is alleged to have characterized

19  MCED's investment as a loan, MCED gave no consideration in return which would have

20  created a binding and enforceable agreement. See California Civil Code sections 1550(4), 1605.

21         MCED's argument to the effect that the August 28, 2002 letter from Ms. Long to Mr.

22  Reza (but not the July 11, 2002 Stipulation) created an allowed unsecured claim in

23  consideration for reconveyance of MCED's Deed of Trust on September 3, 2002, is flatly

24  contradicted by the letter itself which makes it clear that the Deed of Trust was being

25  reconveyed "for the sum of **$0.00.**" Any such post-petition agreement elevating MCED's status

26

27  _____

    [8]   See Dimas' Closing Brief at pp. 16-17.

28  In Re Dimas, LLC, No. 02-51420MM

from "disputed contract" to allow unsecured claim would have required notice to Dimas' creditors, a hearing and approval by the court.[9] (Dimas' Closing Brief at 20-22).

## V.    CONCLUSION

In its Post-Trial Brief, MCED has abandoned the claim set forth in its Proof of Claim that it loaned monies to Dimas. Instead, it now concedes that the monies were invested under a joint venture agreement, and seeks to recover the monies either under the terms of the agreement itself, or by the argument that the agreement is unenforceable or subject to rescission because there was "no meeting of the minds" as to the meaning of one of the provisions or because it was fraudulently induced to enter into the agreement by virtue of non-disclosure. As a back up argument, MCED now claims that its joint venture investment was converted to a loan because in post-bankruptcy meetings Mrs. Rakitin is alleged to have said so or because the word "loan" appears in a recital to a Stipulation. Again, alternatively, MCED argues that, post-petition, counsel for Dimas and MCED agreed to allow MCED's unsecured claim for $250,000 in return for reconveyance for its Deed of Trust.

The reality of this case is that MCED entered into a joint venture agreement by which it was to fund a development project for $1.2 million and be repaid with a substantial bonus (double its investment plus 50% of net profits) out of development profits. MCED abruptly cut off funding after investing $467,000 when it discovered that the joint venture project manager was using the investment monies in a manner of which it disapproved, but which it should have known was permissible under the terms of the agreement. The denial of further funding led to the abandonment of the development project and the eventual foreclosure and loss of the property. MCED's own actions caused the loss of its investment. The lack of sincerity of MCED's claim for "money loaned" is revealed by the fact that MCED made no claim in this bankruptcy (even for a supposedly allowed claim of $250,000) until it discovered that Dimas had received funds from the settlement of litigation with the secured lender.

---

[9]  See 11 U.S.C sections 363(b) and 549(a).

In Re Dimas, LLC, No. 02-51420MM

MCED's claim should be denied in its entirety for several reasons:

1)      Its Proof of Claim for "Moneys loaned" does not reveal the nature of its claim, and may not now be amended post-trial;

2)      The terms of the joint venture agreement provide only for return of MCED's investment *out of profits*;

3)      There is an enforceable contract between the parties, as to which there is a difference of interpretation and not a failure of the entire contract;

4)      MCED is not entitled to rescind for alleged fraudulent non-disclosure when it has never previously made any claim of fraud, never provided any notice of rescission or offered to restore the benefits it received, namely a recorded Deed of Trust;

5)      MCED never gave any consideration for a new agreement by which it would be entitled to convert its joint venture investment into a loan and a disputed characterization by the debtor does not constitute a binding and enforceable agreement to that effect; and

6)      There was no post-petition agreement to allow MCED an unsecured claim of $250,000; in any event such agreement would have required a noticed motion, hearing, and approval by the court.

Dated:   April 6, 2007

Respectfully submitted,

HENNEFER, FINLEY & WOOD, LLP

By: *Steven Finley*

Steven C.  Finley
Special Counsel for Debtor Dimas, LLC

**PROOF OF SERVICE**
[Code Civ. Proc. § 1013(a)]

I, the undersigned, declare that I am over the age of eighteen (18) years, and not a party to the within entitled action. I am employed at Hennefer, Finley & Wood, LLP, 425 California Street, 19th Floor, San Francisco, CA 94104. On the date listed below, I caused the following document(s) to be served:

- **DIMAS' REPLY BRIEF**

on the parties in said cause, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

Lawrence Smith, Esq.
18 Crow Canyon Court
Suite 205                              *Via US Mail*
San Ramon, CA 94583

X   **BY MAIL** Having full knowledge of the outgoing mail system at this firm, in that all mail in the outgoing basket is deposited each evening in the United States Mail, in the City and County of San Francisco, State of California, I enclosed a true copy of said document(s) in a sealed envelope, with fully-paid postage thereon in the outgoing mail basket.

**BY PERSONAL SERVICE** I caused each such envelope to be delivered by hand to the addressee(s) noted above.

**BY FACSIMILE** I caused the said document to be transmitted by Facsimile.

**BY FEDERAL EXPRESS MAIL** I caused each such envelope to be deposited into a designed Federal Express mail box for pick up on the date of execution of this Declaration.

**BY ELECTRONIC MAIL** I caused said document to be transmitted by Electronic Mail to the addressee(s) noted above.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on April 6, 2007 at San Francisco, California.

Karen Neri

-1-
**PROOF OF SERVICE**

**Exhibit D to TAB 128**

09/19/2001  16:31    4884335516          ARTMEDIA ~MABEL          PAGE  81

## Joint Venture AGREEMENT

This JOINT VENTURE AGREEMENT (hereinafter "The Agreement"), is entered by and between DIMAS, LLC. ("The Owner") and Milpitas Countryside Estate Development, Inc. (hereinafter "The Company") on the __22nd__ day of June, 2001.

## RECITALS

Whereas, DIMAS, LLC. is the owner of that certain real property located at 1499 Country Club Dr., Milpitas, CA 95035 (see attached preliminary title report from Stewart Title Insurance Company, dated August 24, 2000)., the legal description is provided hereinafter in Exhibit "A", APN: 029-03-011

Whereas, the subject property has been approved by City of Milpitas for PUD 6-Lots Subdivision (see attached documents in Exhibit "B"). DIMAS, LLC. is in the process of finalizing all the necessary requirements from the City of Milpitas, CA to record the said Subdivision Map, Tract No. #8652 prepared by Sandis Number Jones, Registered Civil Engineer (see attached sub-division map as in Exhibit "C")

Whereas, the public off-site improvement drawings for the subject subdivision has been prepared by Mark Satts, Registered Civil Engineer (see attached documents in Exhibit "D"), the public off-site improvement permit is ready to be issued subject to the improvement bonds required by the City of Milpitas, CA.

Whereas, the Owner is seeking additional investment capital to develop, improve and build the subject property for profit.



Ⓐ π EXHIBIT _22_
Deponent A. Rakitin
Date 9-29-04 Rptr. JW
WWW.DEPOBOOK.COM

D1091

## TERMS and CONDITIONS

Therefore, the parties hereby have agreed to the terms and conditions stipulated hereinafter to develop, improve, and build the subject property—lot 1 through 5—for profit.

1. Due to the facts that all of the approval and subdivision agreement have been executed by and between DIMAS, LLC. and City of Milpitas, CA. and Preliminary Public Subdivision Report from D.R.E. has been issued and Final Public Subdivision Report is pending to be issued. It is very difficult to change the title from DIMAS, LLC. to the Joint Venture Parties without affecting the approval process and further delay of the project. Therefore the parties have agreed to let DIMAS, LLC. maintain the title of the subject property as the owner of the record and DIMAS, LLC. will permit a deed of trust in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00) to be recorded in favor of the company upon close of escrow.

2. The Company will invest One Million Two Hundred Thousand Dollars ($1,200,000.00) to the Joint Venture as needed working capital for the project.

3. The Company will keep existing mortgage from Investment Grade Loans, Inc.

4. The Owner will invest the net equity of the subject property, which is determined by the following terms agreed upon between the Owner and the Company: (a) The subject property will be valued at Five Million Dollars ($5,000,000.00) less encumbrances against the property, which is Two Million Seven Hundred Ten Thousand Dollars ($2,710,000.00) stated in the Preliminary Title Report issued by Stewart Title Insurance Co. dated August 24, 2000.

5. The profit sharing from the Joint Venture (income generated from Lot 1 through Lot 5)shall be as follows:

    5.1 Return the Company's original One Million Two Hundred Thousand Dollars ($1,200,000.00) Investment.

2

5.2    Then the Company will receive additional One Million Two Hundred Thousand Dollars ($1,200,000.00) as return of the investment.

5.3    Then return the land Owner's equity adjusted according the final balance of the capital account of the land owner's in the joint venture.

5.4    Then the final distribution to (a) DIMAS, LLC. – 50.00%; (b) the Company – 50.00%.

6.    The return of DIMAS, LLC.'s equity will be stated as follows: (a) Lot No. 6 in the pre-determine value of $1,000,000.00; (b) the balance of the net equity in the form of cash which will be adjusted according to the Capital Account of DIMAS, LLC. reflected in the accounting of the Joint Venture. And the distribution according the above paragraph 5.0

7.    The Joint Venture will employ John Ho (Ridge View Investment Ltd., LLC.) as its sole project manager to conduct daily business affair of The Joint Venture. The compensation for the project management fee will be at 5% of total project cost indicated at project cost and profit analysis statement (see attached in Exhibit "E"). The duty and responsibility of the project manager will be stated in the contract agreement between The Joint Venture and John Ho (Ridge View Investment, Ltd., LLC.) The project management fee will be paid on the progress payment basis for the duration of the entire project (see attached project cash flow analysis as Exhibit "F").

8.    Upon execution of this Joint Venture Agreement, The Company will pay DIMAS, LLC. Five Hundred Fifty Thousand Dollars ($250,000.00) from its general funds which will deduct from DIMAS, LLC's equity in the Joint Venture as the Rakfiln family's living expenditure for the fiscal year of 2001 and 2002 and reimbursement for the direct project related cost.

9.    The Company will open a Bank Account with Bank of America located at Fremont, CA. - Beacon Branch - for the purpose of receiving and disbursing all the funds related to the Joint Venture business. Milpitas Countryside Estate Development, Inc. will be the party in charge of the disbursement of the funds for improvement and construction of the project development.

D1093

10. This Agreement shall not be modified or changed without the all parties approval and consent.

11. The Laws of the state of California shall be the governing laws in the events of dispute

12. Each of the persons signing this Agreement covenant that he or she has the authority to enter the Agreement and to bind the signing party.

IN THE WITNESS WHEREOF, the parties have executed this Joint Venture Agreement

Milpitas Countryside Estates Development, Inc.
a California Corporation

BY: _____
Tony, _____

Its: _____

DATE: _____6/__/01____

DIMAS, LLC.

BY: _Adrienne L. Rakitin_, Principal
Adrienne Rakitin, Principal

DATE: __6/25/01____

D1094