**E-Filed 8/25/2008**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE DIMAS, LLC, <br><br> Debtor, | Case Number C 07-4084 <br><br> ORDER[1] AFFIRMING JUDGMENT OF BANKRUPTCY COURT <br><br> [re: docket nos. 3, 5, 9] |

On July 27, 2007, the United States Bankruptcy Court for the Northern District of California entered judgment in favor of Appellee Milpitas Countryside Estates Development, Inc., ("MCED") against Appellant Dimas, LLC ("Dimas"). On August 8, 2007, Dimas filed an appeal of that decision in this Court. The Court heard oral argument on May 30, 2008. For the reasons set forth below, the judgment of the Bankruptcy Court will be affirmed.

**I. BACKGROUND**

The Bankruptcy Court made the following findings of fact. In 1985, Adrienne Rakitin ("Rakitin") acquired a twenty-four acre parcel of real property located in Milpitas, California . In 2000, Rakitin formed Dimas, a family-owned limited liability company, to hold title to and develop the property. In August of that year, Rakitin obtained financing arranged by Investment

---

[1] This disposition is not designated for publication and may not be cited.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Grade Loans ("IGL").

On August 16, 2000, Rakitin met with John Ho to negotiate a business agreement for the development of the property.  On September 11, 2000, Ho met with a group of investors,[2] and together they entered into an agreement to form MCED ("The September 11, 2000 Agreement"). The September 11, 2000 Agreement provided that Ho was to be Dimas's sole agent and project manager and authority to act on the behalf of the investors.  It further provided that the investors would furnish working capital of $850,000,  Dimas would transfer title to the property to MCED, and MCED would obtain a construction loan for an amount between $3,300,000 and $3,500,000 from Valley Financial.  The funds obtained from Valley Financial were to be used to pay loans due to IGL and also to construct improvements on the property.  To secure the investors' capital, Dimas would grant to the investors a second deed of trust that would be subordinated to the construction loan.  As discussed below, MCED was not formally incorporated until June 25, 2001.

In March of 2001, Dimas had insufficient investment capital to make the interest payments that were due to IGL.  On April 10, 2001, Rakitin signed a letter stating that Ho had "total authority on behalf of Dimas, LLC and the Rakitins to negotiate with any third party, who is interested as an investor of the Milpitas Countryside Estates Development project . . . .  The final decision regarding how to structure the join [sic] venture relationship with any third party or parties will be made jointly by Dimas, LLC, the Rakitins and Mr. Ho."  Appellant's Record on Appeal, Tab 75 at 5.  Rakitin later testified that this letter did not grant Ho broad general authority to act on behalf of Dimas but rather was a necessary step for the solicitation of new investors.  Ho testified that he believed that he had been given wide latitude and authority to act on behalf of Dimas.

Although Dimas continued to execute joint venture agreements with MCED, each purporting to supersede prior agreements, Rakitin was unaware that MCED had not yet been

_____

[2] The investors were identified as Michael Jeng, Jerry Wong, Jack Lu, Angie Hsu, Josephine Chang and C.Y. Lin Ho.

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

incorporated.  On April 19, 2001, Dimas and MCED entered into a purported agreement ("the April 19, 2001 Agreement") that allowed Dimas to retain title to the property.  In exchange for title, Dimas agreed to grant a $1.2 million deed of trust to MCED to secure the investors' capital.  The Agreement further provided that MCED would "keep existing mortgage from Investment Grade Loans" and pay $200,000 as an interest reserve for those loans.  *Id*. at 6.  The joint venture was to make the mortgage payments beginning on March 1, 2001.

On April 21, 2001, Dimas entered into a contract with Ridge View Investment Inc., a construction company controlled by Ho.  Under the terms of this contract, the construction manager would receive compensation of one percent of the total project cost, or $100,000, for the preconstruction phase of the project and four percent of the total project cost, or $450,000, payable in monthly installments of $20,000.

On June 20, 2001, Dimas and MCED executed a purported joint venture agreement ("the June 20 Agreement") that included language in paragraph 3 providing that "[MCED] will keep existing mortgage from Investment Grade Loans current."  *Id*.  Rakitin testified that Ho represented to her that the investors understood that they would be paying the mortgage.  Although the signature of MCED investor Michael Jeng appears on the agreements dated April 19 and June 20, 2000, Jeng testified that those signatures were not his.  The Bankruptcy Court found that Ho signed the agreements on Jeng's behalf.

On June 22, 2001, Dimas and MCED entered into yet another purported joint venture agreement ("the June 22 Agreement")  negotiated by Ho and Tony Hu ("Hu").  That agreement provided for a $1.2 million advance in working capital, secured by a deed of trust.[3]  The Bankruptcy Court found that there were "significant differences" between the June 20 and June 22 Agreements.  Specifically, the Bankruptcy Court noted that Paragraph 3 of the June 22 Agreement omitted the word "current" and provided instead that MCED "will keep existing mortgages from Investment Loan Group,"  *Id*. at 8.  Paragraph 10 of the June 20 Agreement,

---

[3] MCED also was to provide Dimas with $250,000 which would be deducted from Dimas's equity in the joint venture to pay for the Rakitin family's living expenses and for reimbursement of direct project-related costs.

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

which provided that the of the mortgage payment to IGL would be the responsibility of the joint venture, also was omitted from the June 22 Agreement.  While Rakitin's signature appears on the June 22 Agreement, she testified that she did not sign it, pointing out that her name was misspelled.

MCED was incorporated on June 25, 2001.  Hu was named as an officer, but Ho was not. Robert Liu was appointed as secretary.   Following its incorporation, MCED advanced funds to Dimas on June 27, July 11, July 23, and August 13, 2001.  Despite these disbursements, the IGL mortgage payments were not made.  The Bankruptcy Court found that Hu was not aware until September 2001 of either the high interest loan or the fact that funds had been used to make some mortgage payments. Hu did not believe that MCED was obligated to make mortgage payments on the property.  Rakitin, on the other hand, read Paragraph 3 of the June 22 Agreement as expressly creating such an obligation.  Hu testified that Dimas's failure to make mortgage payments and Ho's deception regarding the use of funds caused him to lose confidence in Dimas.

On September 18, 2001, Rakitin wrote to Ho expressing her concerns and asserting that MCED was in breach of its financial obligation to maintain the mortgage.  Ho responded by letter on September 23, 2001.  Ho stated that MCED was withdrawing from the joint venture with Dimas and treating the amounts advanced as a loan, secured by the existing deed of trust, that would become due and payable on December 31, 2001.  Ho signed the letter as president of Ridge View and as the "authorized representative" of MCED.  *Id*. at 11.  At trial, Ho testified that he was not authorized to act as a representative of MCED and that Hu was unaware of the letter dated September 23, 2001.  Rakitin testified that she considered the joint venture terminated upon receipt of that letter.

On March 13, 2002, Dimas commenced Chapter 11 proceedings in the Bankruptcy Court to stop foreclosure by IGL, scheduling a claim of MCED in the amount of $450,000.  MCED received notice of the proceedings and of the July 9, 2002 deadline for filing proofs of claim, but it did not respond.  However, MCED did participate in the Chapter 11 proceedings.

On July 31, 2002, after the deadline for filing a proof of claim had run, Dimas

4

commenced an adversary proceeding against MCED to invalidate MCED's deed of trust.  Along

with a motion to dismiss, MCED also filed opposition to Dimas's motion to refinance the

secured debt or alternatively, to subordinate MCED's deed of trust. The dispute regarding the

motion to refinance was resolved by the following stipulation:

> The parties agree that Milpitas, MCED did not pay the sum of 1.2 million to
> Dimas.  The parties also agree that Milpitas asserts that it loaned to Dimas
> approximately 450,000.  And Dimas asserts that it received directly or indirectly
> from Milpitas the approximate sum of 250,000.  The parties agree that the amount
> of this loan remains in dispute.
> Dimas agrees to allow Milpitas to submit to the escrow a demand in the amount of
> 250,000.  The demand to be applied towards the claim of MCED.
> The payment of the demand is conditioned upon Dimas obtaining a loan in the
> amount of not less than 4.3 million.

This stipulation was approved by the Bankruptcy Court on July 12, 2002.  On September 3, 2002,

MCED reconveyed the deed of trust to Dimas so that Dimas could obtain a loan.  In exchange,

Dimas agreed to pay MCED $250,000 within sixty days the refinancing.

When Dimas was unable to obtain a loan, IGL commenced foreclosure proceedings.

While these proceedings were pending, IGL and MCED negotiated a purchase option for MCED

in return for MCED's agreement not to oppose foreclosure.  On September 10, 2002, ILG refused

a tender by Dimas to cure default, and the foreclosure sale was completed.  On November 18,

2002,  Dimas brought an action for wrongful foreclosure against IGL and the foreclosure

company.  Dimas named  MCED as a defendant because of MCED's acquisition of the purchase

option.  MCED answered the complaint in that action on January 24, 2003, at which point the

disposition of the Chapter 11 proceedings became dependent on the outcome of the adversary

proceedings.

In 2005, the Bankruptcy Court granted Dimas partial summary judgment setting aside the

foreclosure sale.  Dimas and IGL then reached a settlement agreement entitling IGL to

$4,000,000, to be paid in installments.  The settlement agreement provided that if Dimas failed to

pay the first installment within thirty days of the Court's approval of the settlement agreement,

ILG had the option of purchasing title from Dimas for $1,800,000.  Dimas defaulted, and IGL

obtained title to the property.

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Following a settlement conference in 2005, Dimas began for the first time to file objections to claims in the Chapter 11 proceedings, including MCED's claim.  Although Dimas filed a plan and disclosure statement, the Bankruptcy Court declined approval until Dimas liquidated the disputed claims so that the Court could fix the amount of distribution to creditors. In December 2005, the Bankruptcy Court issued an order to show cause as to why Dimas's action against MCED should not be dismissed for failure to prosecute.  MCED then sought leave to file a proof of claim, and Dimas opposed the motion, arguing that it was untimely.  On July 7, 2006, the Bankruptcy Court held that it would be equitable to allow MCED to file a late claim.  On October 4, 2006, MCED filed a proof of claim in the sum of $534,829 that later was amended to $467,000.

The Bankruptcy Court's decision on the merits awarded judgment to MCED based on a finding that there was neither an enforceable loan agreement nor an enforceable joint venture agreement, but that MCED was nonetheless entitled to restitution for the value it had  provided to Dimas.  On appeal, Dimas argues that MCED should not have been permitted to file a late claim four years after the claims bar date.  Dimas also asserts that the Bankruptcy Court erred in awarding MCED restitution because: (1) MCED did not provide notice of a claim for restitution; (2) the Bankruptcy Court erred in finding that the June 22 Agreement was not a binding and enforceable joint venture agreement; and (3) restitution is not proper under the Restatement of Restitution.  Dimas also challenges the Bankruptcy Court's award of restitution for money paid to Ridge View.

## II.  STANDARD OF REVIEW

A district court reviews a bankruptcy court's order permitting the filing of a late claim based up on excusable neglect for an abuse of discretion.  *In re Dix*, 95 B.R. 134 (B.A.P. 9th Cir. 1988).  Findings of fact are reviewed for clear error and applications of law to the facts are reviewed *de novo*. *In Re Niles*, 106 F.3d 1456, 1459 (9th Cir. 1997).

Case No. C 07-4084
ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT
(JFLC1)

# III.  DISCUSSION

1.    Excusable Neglect

As this Court noted in its previous order denying Dimas's request for a stay, the Bankruptcy Court framed the issue of MCED's untimely claim as a question of excusable neglect.  In the Ninth Circuit, in determining whether neglect is "excusable" a court must:

> take[] account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

Dimas challenges the Bankruptcy Court's findings with respect to each *Pioneer* factor. First, Dimas argues that it was prejudiced by MCED's failure to file a timely claim because it was precluded from factoring the claim into its settlement negotiations with IGL.  The Bankruptcy Court rejected this argument explaining, "there is no indication that IGL would have increased its payment amount to acquire the property.  For much of the relevant period the posture of the case lent itself to resolving the IGL claim first."   Appellant's Record on Appeal, Tab 64 at 16.

Dimas also argues both that the Bankruptcy Court also erred in finding that there was valid reason for the delay and that a four-year delay simply cannot be excusable.  The Bankruptcy Court noted the following reasons for delay:

> MCED explains that it relied on its deed of trust and then subsequently on Dimas' agreement to pay it $250,000 after it reconveyed the deed of trust by stipulation.
> It also appears after the foreclosure by IGL that there would be no assets with which . . . to make a distribution to unsecured creditors.  So for those reasons MCED failed to file a timely proof of claim.
> These appear to the Court to be both plausible and reasonable bases not to file a claim.

*Id*. at 17.  The record shows that the Bankruptcy Court identified several reasons for delay that were not within MCED's control.

Excusable neglect is meant to be an "elastic concept and is not limited strictly to omissions caused by circumstances beyond control of the movant."  *Pioneer*,  507 U.S. at 293;

7

*see also Pincay*, 389 F.3d at 856 ("In *Pioneer* itself the Court adopted a broader and more flexible test for excusable neglect."); *Marx v. Loral Corp.*, 87 F.3d 1049, 1053-54 (9th Cir. 1996) (replacing the former "strict standard" for measuring excusable neglect with an equitable standard following *Pioneer*). The Bankruptcy Court did not clearly err in weighing the relevant factors. Accordingly, this Court concludes that the Bankruptcy Court did not abuse its discretion in allowing MCED to file a late claim.

2.      Restitution

The Bankruptcy Court granted restitution to MCED based upon a finding that there was no enforceable joint venture agreement between the parties. Specifically, having examined the circumstances surrounding the June 20,and June 22 Agreements, the Bankruptcy Court found that there was no meeting of the minds: while Rakitin believed that the terms of the joint venture were set forth in the June 20 Agreement, Hu believed that the June 22 Agreement was controlling. Because it found significant differences between the two agreements, the Bankruptcy Court concluded that the parties never had the same understanding with respect to the terms of the joint venture.[4]  The Court also rejected the argument that the June 22 Agreement, should be enforced because it was the only agreement ratified by MCED following incorporation, finding that6 in any case HO lacked authority to enter into that contract. On appeal, Dimas argues that Dimas did not have notice of a claim for restitution, that the June 22 Agreement is enforceable and that an award of restitution is inconsistent with the Restatement of Restitution.

These arguments are unpersuasive. Dimas claims that because MCED filed a proof of claim for "money loaned," Dimas did not have notice of a claim for restitution. However, as

---

[4] The Bankruptcy Court found:

There was no mutual consent between the parties with respect to the amount of capital to be invested, the equity contribution by the property owner, the valuation fo the property, the profit distribution, the obligation to make the mortgage payments, and retention of the existing mortgages. These terms are material because they have a significant financial impact on the parties.

Appellant's Record on Appeal, Tab 75 at 23.

Case No. C 07-4084
ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT
(JFLC1)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MCED points out, Dimas was aware that the claim arose from the joint venture agreements submitted along with its proof of claim. There is no dispute that Dimas had notice of the amount of money being requested and the nature of the request. Moreover, Dimas does not explain how it was prejudiced as a practical matter by MCED's failure to provide notice that it was seeking restitution as such.

Dimas next contends that MCED is entitled to restitution because the June 22 Agreement is enforceable. Based on the April 10, 2001 Letter of Authority, Dimas argues that Ho had ostensible authority to negotiate the June 22 Agreement on Dimas's behalf. Under California Civil Code § 2317, "[o]stensible authority is such a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent possess." Here, the Letter of Authority expressly limits Ho's authority by stating that "[t]he final decision regarding how to structure the join [sic] venture relationship with any third party or parties will be made jointly by DIMAS, LLC, the Rakitins and Mr. Ho." Appellant's Record on Appeal, Tab 75 at 25. More to the point, the Bankruptcy Court found expressly that Hu did not believe that Ho was negotiating on behalf of Dimas, but instead believed that the June 22 Agreement had been ratified by Rakitin (whose name Ho forged on the document). Based on these findings, which are not clearly erroneous, this Court finds no error in the Bankruptcy Court's conclusion that the June 22 Agreement is unenforceable because Ho did not have the authority to enter into it on behalf of Dimas.

Finally, Dimas claims that the Bankruptcy Court incorrectly applied the Restatement of Restitution. As noted by the Bankruptcy Court, the Restatement provides in relevant part:

> § 15 Mistaken Belief of Contract with Payee
> A person is entitled to recover money which he has paid another pursuant to the terms of a supposed contract with or offer from the other which, because of the payor's mistake of fact as to the existence of consent, of consideration or of a required formality, he erroneously believed to exist, if he does not get the expected exchange.

Restatement (First) of Restitution § 15. Citing, *Ghirardo v. Antionoli*, 14 Cal. 4th 39, (Cal. 1996), in which the court held that "a party who does not know about another's mistake, and has

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

no reason to suspect it, may not be required to give up the benefit of he also relied on it to his detriment," *Id*. at 51, Dimas argues that MCED may not recover restitution because Dimas was not aware of MCED's mistaken belief that the investment could not be used to keep the existing mortgage current.  However, the Bankruptcy Court did not base its conclusion on a finding that *Ho* was mistaken with respect to MCED's mortgage obligations.  Rather, the Bankruptcy Court based its conclusion on a finding that there was no meeting of the minds *between the parties* regarding the existence of a joint venture.[5]  Although the Bankruptcy Court did not provide detailed reasoning with respect to this point, the record clearly supports its conclusion that Ho, as a representative of Dimas, knew that: (1) he did not have authority to enter into the June 22 Agreement; (2) he had forged Rakitin's signature; and (3) the Agreement thus could not be binding.  On the other hand, MCED's representative, Hu, testified that he was under the impression that the agreement was binding and that he was unaware that Rakitin's signature had been forged.  Dimas, through its agent Ho, is charged with knowledge of MCED's mistake.  Accordingly, the Court concludes that the Bankruptcy Court did not err in awarding restitution to MCED.

3.      Payments to Ridge View

        The Bankruptcy Court reasoned that MCED also  was entitled to restitution from Dimas for funds it paid to Ridge View because Ho had both actual and ostensible authority to act as Dimas's agent with respect to those payments.  The Bankruptcy Court's conclusion that Ho had actual authority is based upon following language contained in both the June 20 and June 22 Agreements:

> The Joint Venture will employ John Ho (Ridge View Investment Ltd. LLC) as its
> sole project manager to conduct daily business affair [sic] of the Joint Venture.
> The compensation for the project management fee will be at 5% of total project
> costs indicated at project cost and profit analysis settlement . . . .  The duty and
> responsibility of the project manager will be stated in the contract agreement
> between The Joint Venture and Ho (Ridge View Investment, Ltd. LLC).  The
> project management fee will be paid on the progress payment basis for the

_____

[5] The Bankruptcy Court based its conclusion on the proposition that "[w]hen contract formation fails based on lack of mutual consent, the proper remedy is restitution of the value received."  Appellant's Record on Appeal, Tab 75 at 30.

10

1    duration of the entire project.

2    Appellant's Record on Appeal, Tab 75 at 33.  The Bankruptcy Court noted that the April 10

3    Letter of Authority confirmed that Ho was the sole project manager and concluded that "[t]he

4    evidence indicates that Ho has actual authority to receive the advances from MCED as an agent

5    for Dimas."  *Id*.  The Bankruptcy Court also noted that Rakitin acquiesced to MCED making its

6    advances to Ho, thus vesting Ho with at least ostensible authority.

7         Dimas argues that the Agreements could not have vested Ho with any authority if they

8    were not enforceable.  While this assertion might support a conclusion that Ho did not have

9    *actual* authority, it does not provide a basis for concluding that Ho lacked ostensible authority for

10   the purposes at issue.  Accordingly, the Bankruptcy Court did not err in permitting MCED

11   recover payments made to Ridge View, including funds retained by Ho.

12        Finally, Dimas argues that MCED is not entitled to receive restitution for the funds that

13   MCED provided to Lui in January and February of 2002 because these payments were made

14   pursuant to an agreement dated January 9, 2002, and there was no mistake of fact with respect to

15   consent governing that agreement.  Lui's testimony supports the Bankruptcy Court's finding that

16   these payments in fact were not made pursuant to the January 9, 2002 agreement, but instead

17   were intended to be a loan from MCED to Dimas.  This finding was not clearly erroneous.

18

19                              **IV.  ORDER**

20        Good cause therefor appearing, IT IS HEREBY ORDERED the judgment of the

21   Bankruptcy Court is AFFIRMED.

22

23   DATED: August 25, 2008.

24

25                              _____
                                 JEREMY FOGEL
26                               United States District Judge

27

28

                              11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 07-4084
ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT
(JFLC1)

1

2

This Order has been served upon the following persons:

3

4

Christine H. Long                        christine.long@berliner.com

5

6

Javed I. Ellahie                         javed@ellahie.net

7

8

Laura Anne Palazzolo                     laura.palazzo@berliner.com

9

10

Michael E. Sone                          mikeestone@yahoo.com

11

12

Laurence E. Smith                        larry@lesmithlaw.com

13

14   Marilyn Morgan
     U.S. Bankruptcy Court
15   280 South First St.
     Rm 3035
     San Jose, CA 95113

16

17   USBC Manager-San Jose
     U.S. Bankruptcy Court
18   280 South First St.
     Rm 3035
     San Jose, CA 95113

19

20   U.S. Trustee/SJ
     U.S. Federal Bldg.
21   280 S. First Street
     San Jose, CA 95113-3004

22

23

24

25

26

27

28

13

Case No. C 07-4084
ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT
(JFLC1)